UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re KRAFT HEINZ SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) | Docket No. 2:19-cv-00549-MRH |
| | ) | CONSOLIDATED VERIFIED |
| This Document Relates To: | ) ) | STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF |
| ALL ACTIONS. | ) ) | FIDUCIARY DUTY, UNJUST ENRICHMENT, AND CONTRIBUTION |
| | ) ) | FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |

DEMAND FOR JURY TRIAL

Plaintiffs Stephen Silverman, Charlotte Hays, Ian Green and the Vladimir Gusinsky Revocable Trust ("Plaintiffs"), by their undersigned attorneys, submit this Consolidated Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Contribution for Violations of Federal Securities Laws. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to Plaintiffs which are based on personal knowledge. This complaint is also based on the investigation of Plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiffs on behalf of Nominal Defendant The Kraft Heinz Company ("Kraft Heinz" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment and contribution for violations of federal securities laws. Defendants are Alexandre Behring ("Behring"), John T. Cahill ("Cahill"), Gregory Abel ("Abel"), Tracy Britt Cool ("Cool"), Feroz Dewan ("Dewan"), Jeanne P. Jackson ("Jackson"), Jorge Paulo Lemann ("Lemann"), John C. Pope ("Pope"), Marcel Herrmann Telles ("Telles"), Alexandre Van Damme ("Van Damme"), George Zoghbi ("Zoghbi"), Mackey J. McDonald ("McDonald"), Bernardo Hees ("Hees"), Paulo Basilio ("Basilio"), David Knopf ("Knopf"), Christopher R. Skinger ("Skinger") and Vince Garlati ("Garlati") (together, "Defendants"). Defendants' misconduct resulted in billions of dollars in damages to Kraft Heinz's reputation, goodwill and standing in the business community. These actions have also exposed Kraft Heinz to billions of dollars in potential liability for violations of state and federal law.

2.      Formed in July 2015 when Kraft Foods Group, Inc. ("Kraft") merged with and into H.J. Heinz Holding Corp. ("Heinz"), Kraft Heinz is one of the largest food and beverage companies

in the world. The Company's brands include Heinz, Kraft, Oscar Mayer, Philadelphia, Planters, Velveeta, Lunchables, Maxwell House, Capri Sun and Ore-Ida. After the merger, Kraft Heinz was led by Defendants and, in particular, by a group of executives that were, or had been, partners or formers employees of 3G Capital, Inc. ("3G Capital"). Defendants Behring, Lemann and Telles are co-founders of 3G Capital.

3.      Defendant Hees, a partner at 3G Capital since July 2010, served as Chief Executive Officer ("CEO") of Heinz since June 2013 and became CEO of Kraft Heinz upon the closing of the merger. Likewise, Defendant Basilio, a partner of 3G Capital since July 2012, served as Chief Financial Officer ("CFO") of Heinz in June 2013 and became CFO of Kraft Heinz upon the closing of the merger. On October 1, 2017, Defendant Knopf assumed Defendant Basilio's responsibilities and became CFO of Kraft Heinz. Defendant Knopf has been a partner of 3G Capital since July 2012 and held various roles at 3G Capital from 2013 to 2015.

4.      As Kraft Heinz's corporate fiduciaries, Defendants owed the Company fiduciary duties to direct the corporation's business and affairs lawfully and to protect and preserve Kraft Heinz's valuable corporate assets. This notwithstanding, Defendants caused Kraft Heinz to engage in an unlawful scheme designed to artificially inflate the trading price of Kraft Heinz and, in turn, the Company's shareholders' equity.

5.      More specifically, from 2016 through June 2019, Defendants caused Kraft Heinz to make positive, albeit materially false and misleading, statements about its publicly reported net income, the value of its goodwill and intangible assets, and the integrity of the Company's internal control over financial reporting and disclosure. For example, Defendants misrepresented that the Company enjoyed significant net income while under their leadership, including reporting net income of $1,159 million in the second quarter of 2017, net income of $8,003 million in the fourth quarter of 2017, and net income of $993 million in the first quarter of 2018. Defendants further

represented that the Company had adequate internal controls over financial reporting and disclosure, as well as the valuation of goodwill and intangible assets, that complied with the laws, rules and regulations applicable to Kraft Heinz's business.

6.       Defendants' positive statements created a false façade around Kraft Heinz's business – one designed to hide its deteriorating business and financial conditions.  After the merger, Defendants, consistent with 3G Capital's philosophy, adopted a series of cost-reduction initiatives when integrating the operations of Kraft and Heinz.  Initially, these cost-cutting initiatives appeared to help lower costs and drive increases in highly leveraged Kraft Heinz's profitability even though the Company's sales were declining.  By early May 2017, however, Defendants knew or recklessly ignored that their belt-tightening measures had run their course, depleted the Company of valuable resources, marginalized its internal controls, and left Kraft Heinz's iconic brands badly damaged.

7.       For example, Defendants knew the value of Kraft Heinz's Oscar Mayer cold cut trademarks were impaired when that business suffered sales declines and market share losses due, in part, to Defendants' reluctance to invest the resources needed for product distribution and new equipment.  Further, Defendants knew the value of Kraft Heinz's Kraft cheese trademarks were impaired when that business suffered sales declines and market share losses to aggressively priced private-label offerings and cheaper brands sold by e-commerce retailers.  Further still, Defendants knew, or recklessly ignored, that the goodwill associated with Kraft Heinz's Canadian retail business was impaired when year-over year sales for that business had been falling and its operations were suffering from product discontinuations, higher input costs and higher promotional expenses.

8.       As 2017 and 2018 unfolded, Kraft Heinz common stock continued to trade at artificially inflated prices.  While Kraft Heinz's shares traded at artificially inflated prices, in August 2018, 3G Capital sold 20.6 million shares of Kraft Heinz shares for trading proceeds of more than $1.2 billion.

4825-6887-1325.v2

9.      Defendants' scheme began to unravel in late February 2019. Then, on February 21, 2019, Defendants suddenly announced that, during the 2018 fourth quarter, Kraft Heinz had taken massive goodwill and intangible asset impairments of $7.1 billion and $8.3 billion, respectively. In a Current Report on SEC Form 8-K Defendants stated, in relevant part, as follows:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts. As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the *Kraft* and *Oscar Mayer* trademarks. These charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

10.     Defendants further revealed that the SEC was investigating the Company's accounting practices and policies and that Kraft Heinz had been improperly accounting for the costs of products sold, stating, in relevant part, as follows:

> The Company received a subpoena in October 2018 from the U.S. Securities and Exchange Commission (the "SEC") associated with an investigation into the Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors.

> Following this initial SEC document request, the Company together with external counsel launched an investigation into the procurement area. In the fourth quarter of 2018, as a result of findings from the investigation, the Company recorded a $25 million increase to costs of products sold as an out of period correction as the Company determined the amounts were immaterial to the fourth quarter of 2018 and its previously reported 2018 and 2017 interim and year to date periods.

11.     Worse yet, on May 6, 2019, Defendants revealed that Kraft Heinz will restate its financial statements for 2016 and 2017 by $181 million, after a review into its procurement and accounting procedures discovered serious misconduct. More particularly, in a Current Report on SEC Form 8-K the Company stated, in relevant part, as follows:

> [T]he Company reached a determination to restate the Company's consolidated financial statements and related disclosures for the years ended December 30, 2017

and December 31, 2016 included in its Annual Reports on Form 10-K, and to restate each of its quarterly and year-to-date periods in fiscal year 2017 and the quarterly and year-to-date periods for the nine months ended September 29, 2018. . . .

. . . [T]he Company did not file its Annual Report on Form 10-K for the fiscal year ended December 29, 2018 by the prescribed due date. The Company's further delay in completing such filing is due to the length of time taken to conduct the investigation, which is substantially complete, and taking the necessary time to thoroughly and properly reflect the restatements discussed herein in such report. The Company is working diligently to file its Annual Report on Form 10-K for the fiscal year ended December 29, 2018 as soon as practicable.

Additionally, due to the delays in filing its Annual Report on Form 10-K, the Company will not be able to timely file its Quarterly Report on Form 10-Q for the period ended March 30, 2019.

12.     In response to these adverse developments, the trading price of Kraft Heinz common stock collapsed from over $48.00 per share to $32.00 per share, wiping out more than $16 billion of the Company's shareholders' equity.

13.     Although Kraft Heinz has been severely injured, Defendants have not fared nearly as badly. On the contrary, Defendants collectively pocketed $61.9 million in cash, bonuses, fees and other incentive-based compensation payments that were not justified by Kraft Heinz's actual financial performance while under their stewardship. Similarly, 3G Capital profited handsomely by selling 20.6 million shares of its Kraft Heinz stock for proceeds of $1.2 billion, before Defendants disclosed the adverse material nonpublic information described above. These payments wasted valuable corporate assets and unjustly enriched Defendants.

14.     Further, as a direct result of this unlawful course of conduct, Kraft Heinz is now the subject of numerous federal securities class action lawsuits on behalf of investors who purchased Kraft Heinz's shares. The complaints allege the Company and certain of its current and former directors and officers violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") based upon many of the same or similar facts and allegations detailed herein.

15.     On April 22, 2019, the Company announced that Defendant Hees would be stepping down from his position as CEO effective June 30, 2019.

16.     Nevertheless, the Kraft Heinz Board of Directors (the "Board") has taken no legal action against the persons responsible for this misconduct.  Nor will they, because each member of the Board at the time this action was commenced could not independently evaluate a pre-suit demand.

## JURISDICTION AND VENUE

17.     Jurisdiction is conferred by 28 U.S.C. §1331.  The claims asserted herein arise under §21D of the Exchange Act.  This Court has exclusive subject matter jurisdiction over the federal securities laws claims under §27 of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

18.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Kraft Heinz maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Kraft Heinz, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

20.     Plaintiff Stephen Silverman is a stockholder of Kraft Heinz and has continuously held Kraft Heinz stock since November 2016.

21.     Plaintiff Charlotte Hays is a stockholder of Kraft Heinz and has continuously held Kraft Heinz stock since January 2011.

22.     Plaintiff Ian Green is a stockholder of Kraft Heinz and has continuously held Kraft Heinz stock since August 2012.

23.     Plaintiff Vladimir Gusinsky Revocable Trust is a stockholder of Kraft Heinz and has continuously held Kraft Heinz stock since July 2015.

**Nominal Defendant**

24.     Nominal Defendant Kraft Heinz is a Delaware corporation with its principal executive offices located at One PPG Place, Pittsburgh, Pennsylvania 15222.  Kraft Heinz is one of the largest food and beverage companies in the world.  The Company's common stock is listed and trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "KHC."

**Defendants**

25.     Defendant Alexandre Behring has been Kraft Heinz's Chairman and a director since July 2015.  Defendant Behring is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Behring knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Kraft Heinz paid Defendant Behring at least $1.6 million in directors' fees consisting of

- 7 -

cash and stock awards. Behring is a co-founder and has been the CEO/Managing Partner, and board member of 3G Capital since before 2014.

26. Defendant John T. Cahill is a Kraft Heinz director and has been since July 2015. Defendant Cahill knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Cahill at least $1,309,360 in directors' fees consisting of cash, incentive stock and other compensation.

27. Defendant Gregory E. Abel has been a Kraft Heinz director since July 2015. Defendant Abel knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Abel at least $941,641 in directors' fees consisting of cash, incentive stock and other compensation.

28. Defendant Tracy Britt Cool has been a Kraft Heinz director since July 2015. Defendant Cool knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Cool at least $965,652 in directors' fees consisting of cash and incentive stock.

29. Defendant Feroz Dewan has been a Kraft Heinz director since October 2016. Defendant Dewan is also a member of the Audit Committee of the Board. Defendant Dewan knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill

- 8 -

and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Dewan at least $553,969 in directors' fees consisting of cash and incentive stock.

30.     Defendant Jeanne P. Jackson has been a Kraft Heinz director since July 2015. Defendant Jackson is also a member of the Audit Committee of the Board. Defendant Jackson knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Jackson at least $759,469 in directors' fees consisting of cash and incentive stock.

31.     Defendant Jorge Paulo Lemann has been a Kraft Heinz director since July 2015. Defendant Lemann knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Lemann at least $941,641 in directors' fees consisting of cash and incentive stock. Lemann is a co-founder and has been a board member of 3G Capital since before 2015.

32.     Defendant John C. Pope has been a Kraft Heinz director since July 2015. Defendant Pope is also a member of the Audit Committee of the Board. Defendant Pope knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Pope at least $829,360 in directors' fees consisting of cash and incentive stock.

33.     Defendant Marcel Herrmann Telles has been a Kraft Heinz director since July 2015. Defendant Telles knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Telles at least $941,587 in directors' fees consisting of cash and incentive stock. Telles is a co-founder and has been a board member of 3G Capital since before 2015.

34.     Defendant Alexandre Van Damme has been a Kraft Heinz director since April 2018. Defendant Van Damme knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.

35.     Defendant George Zoghbi has been a Kraft Heinz director since April 2018. Defendant Zoghbi was the Company's Chief Operating Officer ("COO") until October 1, 2017. Defendant Zoghbi is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act. Defendant Zoghbi knowingly or recklessly made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. Kraft Heinz paid Defendant Zoghbi at least $29.2 million in salary, bonus and other incentive-based compensation.

36.     Defendant Mackey J. McDonald served as a director of the Company from July 2, 2015 until April 23, 2018. In addition, Defendant McDonald previously served as a member of the Audit Committee. Kraft Heinz paid Defendant McDonald at least $558,870 in directors' fees consisting of cash and incentive stock.

- 10 -

37.     Defendant Paulo Basilio has been Kraft Heinz's Zone President of U.S. Business since October 1, 2017.  Defendant Basilio was also the Company's Chief Financial Officer ("CFO") from July 2015 until October 1, 2017.  Defendant Basilio is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act. Defendant Basilio knowingly, recklessly, or with gross negligence made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.  Kraft Heinz paid Defendant Basilio at least $8.3 million in salary and other incentive-based compensation from 2015 through 2017 and an additional $18.8 million in 2018.

38.     Defendant David H. Knopf has been Kraft Heinz's CFO and Executive Vice President ("EVP") since October 1, 2017.  Defendant Knopf was the Company's Vice President of Finance, Head of Global Budget & Business Planning, Zero-Based Budgeting, and Financial & Strategic Planning of Kraft Heinz from July 2015 until August 2016, and Vice President, Category-Head of Planters Business from August 2016 until September 2017.  Defendant Knopf is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Knopf knowingly, recklessly, or with gross negligence made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.  Kraft Heinz paid Defendant Knopf at least $10.9 million in salary and other incentive-based compensation.  Additionally, before joining Kraft Heinz, Defendant Knopf held various roles at 3G Capital from 2013 to 2015 and has been a partner at 3G since 2015.

39.     Defendant Bernardo Hees was Kraft Heinz's CEO from 2015 until June 2019. Defendant Hees is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Hees knowingly, recklessly, or with gross negligence made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.  Kraft Heinz paid Defendant Hees at least $14.8 million in salary and other incentive-based compensation from 2015 through 2017 and an additional $27.6 million in 2018.  Defendant Hees has been a partner at 3G Capital since before 2015.

40.     Defendant Vince Garlati has been Kraft Heinz's Global Controller and Principal Accounting Officer since June 18, 2018.  Defendant Garlati is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act. Defendant Garlati knowingly, recklessly, or with gross negligence made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.

41.     Defendant Christopher R. Skinger was Kraft Heinz's Vice President, Global Controller and Principal Accounting Officer until his resignation from the Company on June 18, 2018.  Defendant Skinger is named as a defendant in a related securities class action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Skinger knowingly, recklessly, or with gross negligence made or allowed Kraft Heinz to make improper statements in the Company's press releases and public filings concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.

42.     Non-party 3G Capital is a private equity firm specializing in buyout investments in brands and businesses in the retail and consumer sectors.  3G Capital, and its affiliates, including 3G Global Food Holdings L.P. and 3G Capital Ltd., was one of the largest beneficial owners of Kraft Heinz common stock.  Defendants Hees, Basilio, Knopf, Behring, Lemann and Telles at all relevant times were partners and/or controlling persons of 3G Capital.

43.     Collectively, the Defendants identified in ¶¶25-42 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

44.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Kraft Heinz and its stockholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Kraft Heinz in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Kraft Heinz and not in furtherance of their personal interest or benefit.

45.     To discharge their duties, the officers and directors of Kraft Heinz were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Kraft Heinz were required to, among other things:

(a)     accurately guide the Company's stockholders and the public when speaking about the Company's results of operations and financial condition;

(b)     ensure that Kraft Heinz operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the federal securities laws;

- 13 -

(c)    conduct the affairs of the Company in an efficient, businesslike manner in compliance with all applicable laws, rules and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)    remain informed as to how Kraft Heinz conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

46.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Kraft Heinz, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

47.    The Individual Defendants breached their duty of loyalty and good faith by causing the Company to disseminate improper statements concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX, improper practices that wasted the Company's assets, and caused Kraft Heinz to incur substantial damage.

48.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Kraft Heinz, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Kraft Heinz has expended, and will continue to expend, significant sums of money.

- 14 -

49.     In addition to these duties, the Kraft Heinz Board has adopted and adheres to a framework designed to assist individual directors in the exercise of their fiduciary duties and responsibilities, in the best interest of the Company and its shareholders.

**Additional Duties of the Audit Committee Defendants**

50.     Under the Company's Audit Committee Charter in effect since August 3, 2017, Defendants Dewan, Jackson and Pope (the "Audit Committee Defendants"), each of whom served on the Audit Committee during all or a portion of the wrongdoing alleged herein, owed specific duties to Kraft Heinz to assist the Board in overseeing the Company's "accounting and financial reporting processes, and the audits of its financial statements." Moreover, the Audit Committee's Charter provides the Audit Committee is responsible for assisting the Board's oversight of:

1.     The integrity of Kraft Heinz's financial statements and Kraft Heinz's accounting and financial reporting processes and systems of internal control over financial reporting and safeguarding Company assets;

2.     Kraft Heinz's compliance with legal and regulatory requirements;

3.     Kraft Heinz's independent auditors' retention, termination, qualifications, independence, and performance;

4.     The performance of Kraft Heinz's internal auditors and internal audit function;

5.     Kraft Heinz's financial matters and financial strategy; and

6.     Kraft Heinz's guidelines and policies with respect to risk assessment and risk management.

51.     In addition, the Audit Committee Charter provides:

**Authority and Responsibilities**.

A.     Financial Statements and Related Disclosures.

1.     Accounting Policies. The Committee will review and discuss with management, the internal auditors and the independent auditors, in separate meetings if the Committee deems appropriate:

a)     Any analyses or other written communications prepared by management and/or the independent auditors setting forth

significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

b)    Kraft Heinz's critical accounting policies and practices;

c)    The effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on Kraft Heinz; and

d)    Major issues regarding accounting principles and financial statement presentations, including any significant changes in Kraft Heinz's selection or application of accounting principles, and major issues as to the adequacy of Kraft Heinz's internal controls over financial reporting and safeguarding Company assets, and any special steps adopted in light of material control deficiencies.

2.    <u>Form 10-K</u>. Annually, the Committee will recommend to the Board whether Kraft Heinz's consolidated financial statements should be included in Kraft Heinz's annual report on Form 10-K.

3.    <u>Annual Report</u>. The Committee will prepare and approve the Committee's annual report to stockholders for inclusion in Kraft Heinz's annual proxy statement.

4.    <u>PEO and PFO Certifications</u>. The Committee will review disclosures made by Kraft Heinz's principal executive officer(s) and principal financial officer(s) regarding compliance with their certification obligations under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including Kraft Heinz's disclosure controls and procedures and systems of internal control over financial reporting, and evaluations thereof.

5.    <u>Earnings Guidance</u>. The Committee will review and discuss earnings press releases and will generally discuss the type and presentation of (a) information to be included in earnings press releases (in particular any use of "pro forma" or "adjusted" non-GAAP information) and (b) financial information and earnings guidance provided to analysts and rating agencies.

6.    <u>Internal Controls and Financial Reporting Review</u>. The Committee will review and discuss with management, the independent auditors, and the internal auditors the quality and adequacy of Kraft Heinz's financial reporting processes, systems of internal control over financial reporting and safeguarding of Company assets and disclosure controls and procedures, including whether there are (a) any significant deficiencies in the design or operation of such processes, controls and procedures, (b) any material weaknesses in

such processes, controls and procedures, (c) any corrective action taken or proposed to be taken with regard to significant deficiencies and weaknesses, (d) any fraud involving management or other employees with a significant role in such processes, controls and procedures, and (e) any significant fraud involving management or any Kraft Heinz employee.

B.    <u>Compliance with Legal and Regulatory Requirements</u>

1.    <u>Compliance Program</u>.  At least annually, the Committee will meet with Kraft Heinz's General Counsel, Chief Compliance Officer or similar officer to review (a) the application and administration of all director and employee codes of conduct and ethics adopted by Kraft Heinz's (collectively, the "Codes") and the procedures for identifying, pursuing and investigating any alleged violation of the Codes, and (b) the implementation and effectiveness of Kraft Heinz's programs and strategies designed to foster compliance with the Codes.    As necessary, the Committee will review and make determinations on exceptions to the Codes and discuss actual and alleged violations of the Codes with the General Counsel, Chief Compliance Officer or similar officer.    The General Counsel and Chief Compliance Officer or similar officer will have the authority to communicate directly to the Committee about actual and alleged violations of the Codes, including any matters involving criminal or potential criminal conduct.

2.    <u>Complaints</u>.  The Committee will establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding the federal securities laws, including accounting, internal accounting controls or audit matters, and (b) the confidential, anonymous submission by Kraft Heinz's employees of concerns regarding such matters, and review any significant complaints regarding such matters received pursuant to such procedures.

3.    <u>Risk Assessment</u>.  The Committee will review and discuss Kraft Heinz's guidelines and policies with respect to risk assessment and risk management, including Kraft Heinz's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

4.    <u>NEO Expense Accounts</u>.  At least annually, the Committee will verify that Kraft Heinz's internal auditors, independent auditors or other officials have thoroughly checked the accuracy and propriety of the named executive officers' expense accounts and perquisites, including their use of corporate assets.

- 17 -

C.    Independent Auditors.

    1.    Appointment and Oversight.   The Committee will be directly responsible for the appointment (and recommendation that the Board submit the appointment for stockholder ratification), compensation, retention, and oversight, of the work of the independent auditors (including resolution of any disagreements between management and the independent auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for Kraft Heinz.  The independent auditors will report directly to the Committee.  The Committee will have the sole authority to retain and terminate Kraft Heinz's independent auditors (subject, if applicable, to stockholder ratification).

    2.    Pre-Approval of Services.  The Committee will pre-approve all future audit and non-audit services provided by Kraft Heinz's independent auditors.  In addition, the Committee will have the authority to determine the terms of the services the independent auditors provide to Kraft Heinz.

    3.    Audit Fees.  The Committee will have the authority to approve all audit engagement fees to be paid to the independent auditors.

    4.    Audit Procedures; Audit Plan.   The Committee will review and discuss with the independent auditors their audit procedures, including the audit plan and its scope with respect to Kraft Heinz's consolidated financial statements.

D.    Financial Reporting, Disclosure and Reports.

    1.    Review of Financial Statements.  The Committee will review and discuss with the independent auditors and with management the results of the annual audit of Kraft Heinz's consolidated financial statements and interim financial statements, in each case prior to the filing or distribution thereof, including:

        a)    Kraft Heinz's disclosures within the footnotes to the Financial Statements and under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and

        b)    Any appropriate matters regarding accounting principles, practices and judgments and the independent auditors' opinion as to the quality thereof and any items the independent auditors are required to communicate to the Committee in accordance with standards established and

- 18 -

amended from time to time by the Public Company Accounting Oversight Board.

2.  Attestation and Report.  The Committee will review the independent auditors' attestation and report on management's assessment of internal control over financial reporting.

3.  Audit Problems and Responses.  The Committee will review and discuss with the independent auditors any audit problems or difficulties and management's response thereto, including (a) any restrictions on the scope of the independent auditors' activities or access to required information, (b) any significant disagreements with management, (c) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise), (d) any communications between the audit team and the independent auditors' national office with regard to significant auditing or accounting issues presented by the engagement, and (e) any "management" or "internal control" letter issued, or proposed to be issued, by Kraft Heinz's independent auditors.

4.  Hiring Policy.  The Committee will establish clear policies for Kraft Heinz's hiring of current or former employees of the independent auditors.

5.  Annual Evaluation.  At least annually, the Committee will evaluate the independent auditors' qualifications, performance and independence, and present the Committee's conclusions and recommendations with respect to the independent auditors to the Board.  As part of such evaluation, the Committee will:

    a)  Obtain and review a report from Kraft Heinz's independent auditors describing (i) the independent auditors' internal quality-control procedures, and (ii) any material issues raised by (A) the most recent internal quality-control review or peer review of the auditing firm, or (B) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

    b)  To require that the independent auditors' prepare and deliver annually a statement of independence (it being understood that the independent auditor is responsible for the accuracy and completeness of such statement), to discuss with the independent auditor any relationships or services disclosed that may impact the objectivity and independence of the Company's independent auditors and to take appropriate

action in response to such statement to satisfy itself of the independent auditors' independence;

c) Review and evaluate the independent auditors' lead audit partner's experience, qualifications and performance;

d) In addition to assuring the regular rotation of the lead partner(s) as required by law, consider whether the independent auditing firm should be rotated, so as to assure continuing auditor independence; and

e) Obtain management's and the internal auditor's opinion of the independent auditors' performance.

**Directors Ethics Code**

52. The Kraft Heinz Board has also adopted a written Code of Business Conduct and Ethics for Non-Employee Directors and Code of Conduct for Employees (the "Directors Ethics Code") that is designed to deter wrongdoing and promote:

- honest and ethical conduct;

- due care, diligence and loyalty;

- confidentiality of our proprietary information;

- compliance with applicable laws, rules and regulations, including insider trading compliance; and

- accountability for adherence to the Directors Ethics Code and prompt internal reporting of violations.

53. Specifically, the Directors Ethics Code, which the directors are to annually certify, provides:

**<u>Code of Business Conduct and Ethics for Non-Employee Directors</u>**

**<u>CODE OF CONDUCT FOR DIRECTORS</u>**

The Kraft Heinz Company (the "**Company**") is committed to the highest ethical standards in the operation of its global business. The Board of Directors (the "**Board**") acknowledges its responsibility for promoting an ethical culture through the actions of Board members and the effective oversight of the Company's compliance programs, policies and procedures.

In furtherance of its responsibilities, the Board is committed to the following:

- 20 -

**Codes of Conduct, Laws and Policies**

Observing the basic principles set forth in the Company's Code of Business Conduct ("**Code of Conduct**"), including acting ethically at all times, adhering to the applicable codes, standards, policies and procedures adopted by the Company and complying with all laws, regulations and rules that apply to the Company's business affairs. The Board has approved the Code of Conduct and hereby affirms its commitment to monitor the Company's compliance programs, standards, policies, codes, procedures and activities in furtherance of the Code of Conduct.

**Ethical Culture**

Promoting an ethical culture that respects and values all employees and encourages compliance with all laws and policies of the Company and creating accountability for violations of the laws and policies. The Board understands its responsibility for setting the "tone at the top" and will observe the highest ethical standards by acting with honesty and integrity.

**Performance of Duties**

Acting in the best interests of the Company and its shareholders, including acting responsibly with due care and diligence in the performance of its duties.

**Conflicts of Interest**

Maintaining its loyalty to the Company, avoiding any situations that create or appear to create a conflict of interest and providing notice to the Chair of any actual or apparent conflict of interest.

**Corporate Opportunity**

Refraining from using the Company's property, information or position for personal gain.

**Proprietary Information**

Maintaining the confidentiality of the Company's proprietary information, except when the Company authorizes disclosure or as required by laws, regulations, or legal proceedings.

**Reporting Guidelines**

Consulting with the Company's General Counsel or Chair of the Board regarding any questions about this Code of Business Conduct and Ethics for Non-Employee Directors (the "**Code**"). Directors must promptly contact the Chair or the General Counsel if the director believes there has been a violation of this Code, or if he or she is aware of illegal or unethical behavior by any employee, officer, or director, or by anyone purporting to be acting on the Company's behalf.

- 21 -

**Annual Certification**

Ensuring that each director formally reaffirms his or her commitment to the Code of Conduct and to this Code on an annual basis.

I hereby affirm my commitment to the Company's Code of Business Conduct and the Code of Business Conduct and Ethics for Non-Employee Directors:

_____

Director's Signature          Date

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Kraft Heinz, regarding the Individual Defendants' management of Kraft Heinz's operations and the Company's business and results of operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Kraft Heinz and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

56.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

57.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants'

- 22 -

violations of law, breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

58.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

59.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

60.     Formed when Kraft merged with and into Heinz in 2015 (the "Merger"), Kraft Heinz is one of the largest food and beverage companies in the world.  Before the Merger, Kraft was a public company listed on the NASDAQ stock exchange that produced, marketed and distributed a variety of valuable, widely recognized brands, including A.1., Capri Sun, Jell-O, Kool-Aid, Kraft, Oscar Mayer, Philadelphia and Velveeta.  Heinz was a nonpublic food company that manufactured and marketed packaged foods, including ketchup, condiments and sauces, frozen foods, beans, and other food products.

61.     Heinz at that time was controlled by Berkshire Hathaway Inc. ("Berkshire Hathaway") and 3G Special Situations Fund III, L.P. ("3G Special Situations Fund"), an affiliate of 3G Capital, each of whom beneficially owned approximately 50% of Heinz common stock.  3G Capital is a Brazilian-American private equity firm known for its use of cost-cutting strategies,

- 23 -

including "zero-based budgeting." Zero-based budgeting creates budgets using expenses only if they are deemed necessary in a given period, regardless of what the budget may have been in previous periods.

62. Before the Merger, 3G Special Situations Fund transferred its Heinz shares to 3G Global Food Holdings, L.P. ("3G Global Food Holdings"), another affiliate of 3G Capital. Since the Merger, Berkshire Hathaway and 3G Global Food Holdings were the largest beneficial owners of Kraft Heinz common stock, each owning approximately 25% of the Company's outstanding shares.

63. 3G Capital's executives and partners led Kraft Heinz after the Merger. Defendant Hees, a partner at 3G Capital since 2010, became CEO of Kraft Heinz upon the closing of the Merger. Defendant Basilio, a partner of 3G Capital since 2012, became EVP and CFO of Kraft Heinz upon the Merger's closing after previously serving as CFO of Heinz. Later, Defendant Basilio became the Company's U.S. Zone President in 2017. In October of 2017, Defendant Knopf assumed Defendant Basilio's responsibilities and became EVP and CFO of Kraft Heinz. Previously, Defendant Knopf was a partner of 3G Capital.

64. After the Merger, Defendants adopted 3G Capital's aggressive cost-cutting strategies while integrating the operations of Kraft and Heinz. Although these strategies initially helped lower costs, the Company's sales declined as a result of saving expenditures on research and marketing, among other costs necessary to maintain customers and the reputability of the Company's brands. Kraft Heinz recently spent only 2%-3% of annual sales revenue on advertising and marketing its brands, whereas the industry average falls between 5% and 10%.

65. By May 2017, the Individual Defendants knew or should have known that these cost-saving measures had taken a toll on the Company's resources, marginalized Kraft Heinz's internal controls, and damaged the Company's brands and trademarks. In addition to faltering sales growth, the Company experienced decreases in market shares as consumers switched to organic brands and

small or private label alternatives with competitive prices, leaving Kraft Heinz with decreased pricing power. Meanwhile, the Company was experiencing supply chain issues and cost inflation. These factors, taken together, cut the product margins and profitability of its brands, resulting in an impairment in their value.

66.     During 2016, 2017 and 2018, the Individual Defendants either knew of or should have known that the value of the Oscar Mayer trademark was impaired, as indicated by declining sales and decreases in market shares. Additionally, the Individual Defendants either knew or should have known that the value of Kraft cheese trademarks was impaired when that business suffered sales declines and market share losses to competitively priced private-label offerings and cheaper brands sold by e-commerce retailers. Further, Defendants either knew or recklessly ignored that the goodwill associated with the Kraft Heinz Canadian retail business was impaired when year-over-year sales declined and its operations suffered from product discontinuations and higher input costs, as well as higher promotional expenses.

67.     The Individual Defendants knew or should have known that these foreseeable declines in the goodwill value of the Company's assets would take a significant toll on Kraft Heinz. In 2017, Kraft Heinz reported $44.8 billion in goodwill on its balance sheet. In 2018, goodwill and intangible assets together represented 87% of Kraft Heinz's assets. Yet, Defendants ignored that goodwill and intangible asset values were being impaired as consumers were switching over to private labels, changing the competitive landscape for the Company in a permanent way that posed an immediate and future threat to the Company's sales, margins and cash flows.

68.     Despite these foreseeable and known value impairments, the Individual Defendants claimed the Company's business and financial health were in better shape than they actually were.

## FALSE AND MISLEADING

69.     Between at least February 2016 and June 7, 2019, the Individual Defendants made, or caused Kraft Heinz to make, improper statements concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.  These statements were false or materially misleading at the time they were made, as the Individual Defendants either knew or failed to disclose: (i) the Company's internal controls were inadequate, specifically as they related to the procurement area; and (ii) that Kraft Heinz would be forced to write off a significant amount of goodwill and certain intangible assets.

70.     On February 23, 2017, the Individual Defendants caused the Company to file with the SEC its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K reported net income attributable to stockholders of $3,452 million for the fiscal year.  The 2016 Form 10-K was signed by Defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, McDonald, Hees, Basilio and Skinger, each of whom attested to the accuracy of the information presented in the 2016 Form 10-K.

71.     The 2016 Form 10-K also reported that the Company did not have a meaningful change in its goodwill for the United States and Canada, with carrying amounts of $33,696 million and $4,913 million, respectively.  In addition, the 2016 Form 10-K stated:

> In connection with the 2015 Merger, we recorded $30.5 billion of goodwill in purchase accounting, representing the fair value as of the 2015 Merger Date.  As of July 3, 2016, the assignment of goodwill to reporting units was final.  During the first half of 2016, we made measurement period adjustments to the 2015 Merger purchase price allocation, resulting in an increase of $1.4 billion to goodwill in the United States segment.  See Note 2, *Merger and Acquisition*, for additional information on these measurement period adjustments.

> *                *                *

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2016 annual impairment testing in the second quarter of 2016.  There was no impairment of goodwill as a result of our testing; however we noted that one reporting unit within the Europe segment had

an estimated fair value in excess of its carrying value of less than 10%. The goodwill carrying value of this reporting unit was $48 million as of April 4, 2016 (our goodwill impairment testing date).

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.1 billion as of December 31, 2016. As a majority of our goodwill was recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there is not a significant excess of fair values over carrying values as of December 31, 2016. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. ***No events occurred during the period ended December 31, 2016 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of December 31, 2016***.

*       *       *

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2016 annual impairment testing in the second quarter of 2016. There was no impairment of indefinite-lived intangibles as a result of our testing; however, we noted that seven brands each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $6.1 billion at April 4, 2016 (our indefinite-lived intangible asset impairment testing date). Of the $6.1 billion aggregate carrying value, $5.6 billion was attributable to *Velveeta*, *Lunchables*, *Maxwell House*, and *Cracker Barrel*.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.3 billion as of December 31, 2016. As a majority of our indefinite-lived intangible assets were recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there is not a significant excess of fair values over carrying values as of December 31, 2016. We have a risk of future impairment to the extent individual brand performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. ***No events occurred during the period ended December 31, 2016 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired***.

4825-6887-1325.v2

In 2015, we recognized non-cash impairment losses of $58 million in SG&A, primarily related to declines within frozen soup in the United States, frozen meals and snacks primarily in the United Kingdom, and pasta sauce in the United States and Canada.

In 2014, we recognized non-cash impairment losses of $221 million in SG&A, primarily related to our Heinz North America frozen meals and snacks business due to continued category softness and weaker than anticipated sales.

72.     The 2016 Form 10-K contained Defendants Hees' and Basilio's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The 2016 Form 10-K claimed that the Company had adequate internal controls and complied with SEC regulations.  In particular, the 2016 Form 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2016, the end of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the quarter ended December 31, 2016.  We determined that there were no changes in our internal control over financial reporting during the quarter ended December 31, 2016, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those written policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles;

- provide reasonable assurance that receipts and expenditures are being made only in accordance with management and director authorization; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. Management based this assessment on criteria described in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

Based on this assessment, management determined that as of December 31, 2016, we maintained effective internal control over financial reporting.

PricewaterhouseCoopers LLP, an independent registered public accounting firm, who audited the consolidated financial statements included in this Annual Report on Form 10-K, has also audited the effectiveness of our internal control over financial reporting as of December 31, 2016, as stated in their report which appears herein under Item 8.

73. On May 4, 2017, Kraft Heinz filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended April 1, 2017 (the "Q1 2017 Form 10-Q"). The Q1 2017 Form 10-Q represented net income attributable to common stockholders of $893 million during the quarter. In addition, the Q1 2017 Form 10-Q contained Defendants Hees' and Basilio's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud.

- 29 -

The Q1 2017 Form 10-Q claimed that the Company's internal controls were adequate and complied with SEC regulations. In particular, the Q1 2017 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended April 1, 2017. We determined that there were no changes in our internal control over financial reporting during the three months ended April 1, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

74.     The Q1 2017 Form 10-Q also explained that "[n]o events occurred during the period ended April 1, 2017 that indicated that it was more likely than not that our goodwill was impaired." Specifically, the Q1 2017 Form 10-Q stated:

We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2016 annual impairment testing in the second quarter of 2016. There was no impairment of goodwill as a result of our testing; however, we noted that one reporting unit within the Europe segment had an estimated fair value in excess of its carrying value of less than 10%. The goodwill carrying value of this reporting unit was $48 million as of April 4, 2016 (our 2016 annual impairment testing date).

Our goodwill balance consists of 18 reporting units and had an aggregate carrying value of $44.3 billion as of April 1, 2017. As a majority of our goodwill was recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there was not a significant excess of fair values over carrying values as of April 4, 2016 (our 2016 annual impairment testing date). We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our

- 30 -

current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. ***No events occurred during the period ended April 1, 2017 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of April 1, 2017***.

\*      \*      \*

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2016 annual impairment testing in the second quarter of 2016. There was no impairment of indefinite-lived intangibles as a result of our testing; however, we noted that seven brands each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $6.1 billion at April 4, 2016 (our 2016 annual impairment testing date). Of the $6.1 billion aggregate carrying value, $5.6 billion was attributable to *Velveeta*, *Lunchables*, *Maxwell House*, and *Cracker Barrel*.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of April 1, 2017. As a majority of our indefinite-lived intangible assets were recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there was not a significant excess of fair values over carrying values as of April 4, 2016 (our 2016 annual impairment testing date). We have a risk of future impairment to the extent individual brand performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. ***No events occurred during the period ended April 1, 2017 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired***.

75.     On August 4, 2017, Kraft Heinz filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended July 1, 2017 (the "Q2 2017 Form 10-Q"). The Q2 2017 Form 10-Q reported net income attributable to common stockholders of $1,159 million during the quarter. In addition, the Q2 2017 Form 10-Q contained Defendants Hees' and Basilio's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The Q2 2017 Form

- 31 -

10-Q claimed that the Company's internal controls were adequate and complied with SEC regulations. In particular, the Q2 2017 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended July 1, 2017. We determined that there were no changes in our internal control over financial reporting during the three months ended July 1, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

76.     The Q2 2017 Form 10-Q also explained that the Company did not have any impairments to goodwill:

We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. ***As a result of our 2017 annual impairment test, there was no impairment of goodwill.*** Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our goodwill balance consists of 18 reporting units and had an aggregate carrying value of $44.6 billion as of July 1, 2017. As a majority of our goodwill was recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment

in the future. *There were no accumulated impairment losses to goodwill as of July 1, 2017*.

*    *    *

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $48 million in SG&A for the three and six months ended July 1, 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our Europe segment as the related trademark is owned by our Italian subsidiary. *Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017*.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.5 billion as of July 1, 2017. As a majority of our indefinite-lived intangible assets were recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, *there was not a significant excess of fair values over carrying values as of April 2, 2017*. We have a risk of future impairment to the extent individual brand performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future.

77. On September 8, 2017, Kraft Heinz filed with the SEC a Current Report on Form 8-K announcing certain management changes effective October 1, 2017: (i) Defendant Basilio's appointment as U.S. Zone President; (ii) Defendant Knopf appointment as EVP and CFO; and (iii) Defendant Zoghbi's transition from COO of the Company's U.S. business to a Strategic Advisor for the Kraft Heinz Board.

78. On November 6, 2017, the Individual Defendants announced in a Current Report on Form 8-K filed with the SEC, that the financial statements included in the Company's Q1 2017 Form 10-Q and Q2 2017 Form 10-Q "should not be relied upon due to the misstatement in adopting new Accounting Standards Update 2016-15 ('ASU 2016-15'). . . . ASU 2016-15 requires companies to record cash receipts from beneficial interests within trade receivable securitization programs as

cash provided from investing activities in the statement of cash flows." The Form 8-K also revealed that the Company would file amended Forms 10-Q for these quarters to "correctly classify certain items in our condensed consolidated statements of cash flows." Kraft Heinz explained further that these changes "[did] not reflect a fundamental change in our underlying business" and "[did] not impact any other components of our consolidated financial statements, including, without limitation, cash and cash equivalents, net income, net sales or any other financial data."

79.     The November 6, 2017 Form 8-K also disclosed a material weakness in the Company's internal controls relating to the adoption and disclosure of new accounting standards. The Form 8-K further stated that Kraft Heinz's internal controls and procedures were not effective, stating, in pertinent part:

> In reevaluating the effectiveness of the design and operation of our disclosure controls and procedures as of April 1, 2017 and July 1, 2017, and as part of our assessment as to whether or not there were any changes during the third quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, we have concluded that the ASU 2016-15 adoption misstatement, as described above, was primarily the result of a failure of an existing control surrounding the adoption and disclosure of new accounting standards. ***We have concluded that this control failure constitutes a material weakness in internal control over financial reporting and that our disclosure controls and procedures were not effective***. The remediation of this material weakness will primarily include steps to improve the validation and documentation of new accounting standards' impacts and communication with the appropriate individuals, including the importance of adherence to the internal control structure that is in place regarding the adoption of new accounting standards and guidance. We plan to have these remediation steps in place during our 2017 fiscal year, but will allow for testing to determine operating effectiveness before concluding on remediation.

80.     The following day, on November 7, 2017, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). The Q3 2017 Form 10-Q reported net income attributable to stockholders of $944 million during the quarter. The Q3 2017 Form 10-Q contained the signed SOX certifications of Defendants Hees and Knopf, who admitted that the Company's internal controls were ineffective due to

- 34 -

misapplication of ASC 2016-15. However, the Q3 2017 Form 10-Q failed to mention any issues with the procurement of ASC 2016-15 and further claimed that the Company had adequate internal controls and complied with SEC regulations. The Q3 2017 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report to determine if our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Based on this evaluation, we concluded that our disclosure controls and procedures were not effective as of September 30, 2017 due to the material weakness in internal control over financial reporting related to the misapplication of ASU 2016-15, as described below.

**Material Weakness in Internal Control Over Financial Reporting**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We did not maintain effective controls over the adoption of new accounting standards. Specifically, we did not maintain effective controls to evaluate and document the impact of new accounting standards, including communication with the appropriate individuals in coming to our conclusions on the application of new standards.

This control deficiency resulted in the misstatement of our operating and investing cash flows and related financial disclosures, and in the restatement of our consolidated financial statements for the quarters ended April 1, 2017 and July 1, 2017, including the comparable prior periods. Additionally, this control deficiency could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

**Remediation of Material Weakness**

The remediation of this material weakness will primarily include steps to improve the evaluation and documentation of new accounting standards' impacts and

communication with the appropriate individuals. We plan to have these remediation steps in place during our 2017 fiscal year but will allow for testing to determine operating effectiveness before concluding on remediation.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended September 30, 2017. We determined that there were no changes in our internal control over financial reporting during the three months ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

81. The Q3 2017 Form 10-Q also explained that the Company did not have any

impairments to goodwill:

We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, there was no impairment of goodwill. Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our goodwill balance consists of 18 reporting units and had an aggregate carrying value of $44.9 billion as of September 30, 2017. As a majority of our goodwill was recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, ***there was not a significant excess of fair values over carrying values as of April 2, 2017***. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. No events occurred during the three months ended September 30, 2017 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of September 30, 2017.

*       *       *

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $48 million in selling, general and administrative expenses for the nine months ended September 30, 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our Europe segment as the related trademark is owned by our Italian

- 36 -

subsidiary.  Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.6 billion as of September 30, 2017.  As a majority of our indefinite-lived intangible assets were recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, ***there was not a significant excess of fair values over carrying values as of April 2, 2017***.  We have a risk of future impairment to the extent individual brand performance does not meet our projections.  Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future.  ***No events occurred during the three months ended September 30, 2017 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired***.

82.     On February 16, 2018, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 30, 2017 (the "2017 Form 10-K").  The 2017 Form 10-K reported net income attributable to stockholders of $8,003 million and $10,999 million during the fourth quarter and fiscal year, respectively.  The 2017 Form 10-K was signed by Defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, McDonald, Hees, Knopf and Skinger, each of whom attested to the accuracy of the information presented in the 2017 Form 10-K.

83.     The 2017 Form 10-K reported slight increases in the Company's goodwill for the United States and Canada with carrying amounts of $33,700 million and $5,246 million, respectively.  In addition, the 2017 Form 10-K stated:

Our goodwill balance consists of 18 reporting units and had an aggregate carrying value of $44.8 billion as of December 30, 2017.  As a majority of our goodwill was recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there was not a significant excess of fair values over carrying values as of April 2, 2017.  We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections.  Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a

- 37 -

potential impairment in the future.  ***No events occurred during the period ended December 30, 2017 that indicated it was more likely than not that our goodwill was impaired.  There were no accumulated impairment losses to goodwill as of December 30, 2017***.

\*      \*      \*

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2017 annual impairment test as of April 2, 2017.  As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $49 million in SG&A in 2017.  This loss was due to continued declines in nutritional beverages in India.  The loss was recorded in our Europe segment as the related trademark is owned by our Italian subsidiary.  Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.7 billion as of December 30, 2017.  As a majority of our indefinite-lived intangible assets were recently recorded in connection with the 2013 Merger and the 2015 Merger, representing fair values as of those merger dates, there was not a significant excess of fair values over carrying values as of April 2, 2017.  We have a risk of future impairment to the extent individual brand performance does not meet our projections.  Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future.  ***No events occurred during the period ended December 30, 2017 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired***.

***There was no impairment of indefinite-lived intangible assets as a result of our 2016 testing***.  In 2015, we recognized non-cash impairment losses of $58 million in SG&A, primarily related to declines within frozen soup in the United States, frozen meals and snacks primarily in the United Kingdom, and pasta sauce in the United States and Canada.

84.      In addition, the 2017 Form 10-K contained Defendants Hees' and Knopf's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud.  The 2017 Form 10-K claimed that the Company had adequate internal controls and complied with SEC regulations.  In particular, the 2017 Form 10-K stated:

- 38 -

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures, as of December 30, 2017, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Remediation of Previously Disclosed Material Weakness**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. As previously disclosed concurrently with the filing of our Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, we concluded that we had a material weakness in internal control over financial reporting related to the misapplication of Accounting Standards Update 2016-15. Specifically, we did not maintain effective controls over the adoption of new accounting standards, including communication with the appropriate individuals in coming to our conclusions on the application of new standards. Our management determined that the control deficiency constituted a material weakness.

During the fourth quarter of 2017, management implemented steps to improve the evaluation and documentation of new accounting standards' impacts and communication with the appropriate individuals.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended December 30, 2017. During the three months ended December 30, 2017, management implemented steps to improve the evaluation and documentation of new accounting standards' impacts and communication with the appropriate individuals. These changes have been designed to ensure enhanced subject matter expert input in relation to new accounting standard pronouncements.

We determined that, except for the remediation activities described above, there were no changes in our internal control over financial reporting during the three months ended December 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

4825-6887-1325.v2

**Management's Report on Internal Control Over Financial Reporting**

       Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those written policies and procedures that:

       •      pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets;

       •      provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles;

       •      provide reasonable assurance that receipts and expenditures are being made only in accordance with management and director authorization; and

       •      provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

       Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

       Management assessed the effectiveness of our internal control over financial reporting as of December 30, 2017. Management based this assessment on criteria described in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

       Based on this assessment, management determined that as of December 30, 2017, we maintained effective internal control over financial reporting.

       PricewaterhouseCoopers LLP, an independent registered public accounting firm, who audited the consolidated financial statements included in this Annual Report on Form 10-K, has also audited the effectiveness of our internal control over financial reporting as of December 30, 2017, as stated in their report which appears herein under Item 8.

85.      On May 3, 2018, Kraft Heinz filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q"). In the Q1 2018 Form 10-Q, the Individual Defendants reported net income attributable to stockholders of $993 million during the

- 40 -

quarter.  In addition, the Q1 2018 Form 10-Q contained Defendants Hees' and Knopf's signed

certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any

material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all

fraud.  The Q1 2018 Form 10-Q claimed that the Company's internal controls were adequate and

complied with SEC regulations.  In particular, the Q1 2018 Form 10-Q stated:

### Evaluation of Disclosure Controls and Procedures

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures, as of March 31, 2018, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities and Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

> Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended March 31, 2018.  We determined that there were no changes in our internal control over financial reporting during the three months ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

86.     In the Q1 2018 Form 10-Q, the Individual Defendants claimed that Kraft Heinz's

goodwill and intangible assets had carrying values of $44,843 million and $53,757 million,

respectively.  In particular, the Q1 2018 Form 10-Q stated:

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2017 annual impairment test as of April 2, 2017.  ***As a result of our 2017 annual impairment test, there was no impairment of goodwill***.  Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.

> Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.8 billion as of March 31, 2018.  As a majority of our goodwill was recently recorded in connection with business combinations that occurred in

2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. ***No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of March 31, 2018***.

\*  \*  \*

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $49 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary. Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.8 billion as of March 31, 2018. As a majority of our indefinite-lived intangible assets were recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent individual brand performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. ***No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired***.

87. On June 6, 2018, the Company filed with the SEC a Current Report on Form 8-K announcing that Defendant Skinger, its Global Controller and Principal Accounting Officer, had left the Company. The Form 8-K announced that effective June 18, 2018, Defendant Garlati would replace Defendant Skinger as Principal Accounting Officer and Global Controller.

- 42 -

88.     On August 3, 2018, Kraft Heinz filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q"). In the Q2 2018 Form 10-Q, the Individual Defendants reported net income attributable to stockholders of $756 million during the quarter. In addition, the Q2 2018 Form 10-Q contained Defendants Hees' and Knopf's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The Q2 2018 Form 10-Q claimed that the Company's internal controls were adequate and complied with SEC regulations. In particular, the Q2 2018 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of June 30, 2018, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended June 30, 2018. We determined that there were no changes in our internal control over financial reporting during the three months ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

89.     In the Q2 2018 Form 10-Q, the Individual Defendants claimed that Kraft Heinz's goodwill and intangible assets had carrying values of $44,270 million and $53,379 million, respectively. In particular, the Q2 2018 Form 10-Q stated:

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of June 30, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We

- 43 -

performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region. The goodwill carrying value of this reporting unit was $509 million prior to its impairment. Additionally, we noted that four of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, and $326 million for Southeast Asia.

We generally utilize the discounted cash flow method under the income approach to estimate the fair value of our reporting units. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each reporting unit (including net sales, cost of products sold, SG&A, working capital, and capital expenditures), income tax rates, and a discount rate that appropriately reflects the risk inherent in each future cash flow stream. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual reporting units requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, income tax rates, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. Additionally, as a majority of our goodwill was recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.

Accumulated impairment losses to goodwill were $164 million at June 30, 2018. There were no accumulated impairment losses to goodwill at December 30, 2017.

\* \* \*

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of June 30, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the *Quero* brand in Brazil. Additionally, as of April 1,

- 44 -

2018, two brands (*ABC* and *Smart Ones*) each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $665 million as of April 1, 2018.

As a result of our 2017 annual impairment testing, we recognized a non-cash impairment loss of $48 million in SG&A in the second quarter of 2017 . This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary.

We generally utilize the excess earnings method under the income approach to estimate the fair value of certain of our largest brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each brand (including net sales, cost of products sold, and SG&A), contributory asset charges, income tax considerations, a discount rate that reflects the level of risk associated with the future earnings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

We generally utilize the relief from royalty method under the income approach to estimate the fair value of our remaining brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net sales for each brand, royalty rates (as a percentage of revenue that would hypothetically be charged by a licensor of the brand to an unrelated licensee), income tax considerations, a discount rate that reflects the level of risk associated with the future cost savings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual indefinite-lived intangible assets requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, royalty rates, contributory asset charges, income tax considerations, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. Additionally, as a majority of our indefinite-lived intangible assets were recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.

90.     In October of 2018, unbeknownst to the Company's stockholders, Kraft Heinz received a subpoena from the SEC regarding its investigation into the Company's accounting policies and procedures, as well as its internal controls over financial reporting.

91.     On November 2, 2018, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 29, 2018 (the "Q3 2018 Form 10-Q").  In the Q3 2018 Form 10-Q, the Individual Defendants reported net income attributable to stockholders of $630 million during the quarter.  In addition, the Q3 2018 Form 10-Q contained Defendants Hees' and Knopf's signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud.  The Q3 2018 Form 10-Q claimed that the Company's internal controls were adequate and complied with SEC regulations.  In particular, the Q3 2018 Form 10-Q stated:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 29, 2018, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended September 29, 2018.  We determined that there were no changes in our internal control over financial reporting during the three months ended September 29, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

- 46 -

92.     In the Q3 2018 Form 10-Q, the Individual Defendants claimed that Kraft Heinz's goodwill and intangible assets had carrying values of $44,308 million and $53,038 million, respectively.  In particular, the Q3 2018 Form 10-Q stated:

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of September 29, 2018.  We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs.  We performed our 2018 annual impairment test as of April 1, 2018.  As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit.  This impairment loss was primarily due to margin declines in the region.  The goodwill carrying value of this reporting unit was $509 million prior to its impairment.  Additionally, five of our 20 reporting units each had excess fair value over its carrying value of less than 10%.  As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, $326 million for Southeast Asia, and $232 million for Other Latin America.

We generally utilize the discounted cash flow method under the income approach to estimate the fair value of our reporting units.  Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each reporting unit (including net sales, cost of products sold, SG&A, working capital, and capital expenditures), income tax rates, and a discount rate that appropriately reflects the risk inherent in each future cash flow stream.  We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors.  Estimating the fair value of individual reporting units requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions.  If our current assumptions and estimates, including future annual net cash flows, income tax rates, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future.  Additionally, as a majority of our goodwill was recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.  No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our goodwill was impaired.

Accumulated impairment losses to goodwill were $164 million at September 29, 2018.  There were no accumulated impairment losses to goodwill at December 30, 2017.

*     *     *

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.0 billion as of September 29, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the *Quero* brand in Brazil. Additionally, as of April 1, 2018, two brands (*ABC* and *Smart Ones*) each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $665 million as of April 1, 2018.

In the third quarter of 2018, we recognized a non-cash impairment loss of $215 million in SG&A related to the *Smart One*s brand. This impairment loss was primarily due to reduced future investment expectations and continued sales declines in the third quarter of 2018. We transferred the remaining carrying value of *Smart Ones* to definite-lived intangible assets. No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our other indefinite-lived intangible assets were impaired.

As a result of our 2017 annual impairment testing, we recognized a non-cash impairment loss of $48 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by an Italian subsidiary.

We generally utilize the excess earnings method under the income approach to estimate the fair value of certain of our largest brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each brand (including net sales, cost of products sold, and SG&A), contributory asset charges, income tax considerations, a discount rate that reflects the level of risk associated with the future earnings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

We generally utilize the relief from royalty method under the income approach to estimate the fair value of our remaining brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net sales for each brand, royalty rates (as a percentage of revenue that would hypothetically be charged by a licensor of the brand to an unrelated licensee), income tax considerations, a discount rate that reflects the level of risk associated with the future cost savings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market

- 48 -

conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual indefinite-lived intangible assets requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, royalty rates, contributory asset charges, income tax considerations, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. Additionally, as a majority of our indefinite-lived intangible assets were recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.

93.     On November 6, 2018, Kraft Heinz announced that it agreed to sell its Canadian natural cheese business to Parmalat S.p.A for approximately $1.23 billion.

## REASONS THE STATEMENTS WERE IMPROPER

94.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the reported values of certain product lines were materially overstated by the Company;

(b)     that Kraft Heinz's intangible assets, including goodwill, were materially impaired, at least for its natural cheese, Oscar Mayer cold cuts, U.S. Refrigerated and Canadian retail businesses;

(c)     that the Company was improperly using accounting policies and procedures associated with its procurement function;

(d)     that Kraft Heinz was not properly accounting for the costs of products sold;

(e)     that the Company had material weaknesses in its internal controls over financial reporting, including, but not limited to, those relating to the accounting and disclosure of new accounting standards, the cost of products sold, its procurement function, and the impairment of goodwill and intangible assets;

(f)     that Kraft Heinz's operating results were materially misstated; and

(g)     as a result of the foregoing, the Individual Defendants' representations concerning Kraft Heinz's operating results, goodwill and intangible asset values, internal controls and certifications pursuant to SOX were improper.

**THE TRUTH EMERGES**

95.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on February 21, 2019, as Kraft Heinz filed with the SEC a Current Report on Form 8-K reporting its fourth quarter and full year 2018 results.  In the Form 8-K, the Company announced a $15.4 billion impairment in the Company's goodwill and intangible asset values, and belatedly revealed  the SEC investigation.  The Form 8-K disclosed goodwill and intangible asset impairments of $7.1 billion and $8.3 billion, respectively, during the fourth quarter of 2018.  In the Form 8-K, Kraft Heinz admitted:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts.  As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the *Kraft* and *Oscar Mayer* trademarks.  These charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

96.     In the February 21, 2019 press release, the Individual Defendants further revealed that the SEC was investigating Kraft Heinz's accounting practices related to its procurement function.  In addition, the Individual Defendants admitted that following their own internal investigation, they

- 50 -

discovered improper accounting of the Company's costs of products sold. As a result, the Company recorded a $25 million increase to costs of products sold. The Form 8-K stated:

> **The Company received a subpoena in October 2018 from the U.S. Securities and Exchange Commission (the "SEC") associated with an investigation into the Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors.**
>
> Following this initial SEC document request, the Company together with external counsel launched an investigation into the procurement area. **In the fourth quarter of 2018, as a result of findings from the investigation, the Company recorded a $25 million increase to costs of products sold** as an out of period correction as the Company determined the amounts were immaterial to the fourth quarter of 2018 and its previously reported 2018 and 2017 interim and year to date periods. Additionally, the Company is in the process of implementing certain improvements to its internal controls to mitigate the likelihood of this occurring in the future and has taken other remedial measures. The Company continues to cooperate fully with the U.S. Securities and Exchange Commission.
>
> At this time, the Company does not expect the matters subject to the investigation to be material to its current period or any prior period financial statements.

97. Also, on February 21, 2019, the Company held a conference call with analysts and investors to discuss Kraft Heinz's earnings. During the call, Defendant Hees admitted that the Company was "overly optimistic on delivering savings that did not materialize" and further stated, "[f]or that, we take full responsibility."

98. In the wake of the impairment charge and SEC subpoena disclosures, the price of Kraft Heinz stock plunged more than 31%, or $15.06 per share on February 26, 2019, to close at $33.12 per share compared to the closing of $48.18 per share on February 21, 2019, erasing over $18.3 billion in market capitalization.

99. On February 22, 2019, the *Wall Street Journal* published an article commenting on the Company's impairment charges titled "Key Brands Pay Price of Kraft Heinz Cost-Cutting." The article notes that Defendant Hees' comments "are at odds with his promise to investors four years

- 51 -

ago," explaining, "Mr. Hees, who is also a partner at 3G [Capital], had said he could boost the company's sales without sacrificing its profit margin." Although Defendant Hees attributed the Company's deteriorating results including the impairment charges on challenges facing the industry as whole during the February 21, 2019 conference call, the article explains similar businesses have not been as severely affected by shifting consumer trends. The disappointing impairment charges "'validate fears that Kraft Heinz may have been more focused on costs than on building brand equity,'" said an analyst quoted by the *Wall Street Journal* in the article. In particular, the article provides:

> Kraft Heinz Co., in slashing the value of some of its biggest brands this week, basically admitted that its Kraft cheese and Oscar Mayer deli meat aren't worth as much as they were when the brands merged with H.J. Heinz Co. less than four years ago.

> \*    \*    \*

> As a result, Kraft Heinz wrote down its assets by a total of $15.4 billion, which is bigger than the $9.6 billion in the combined write-offs of the entire U.S. consumer staples industry from 2013 through 2017, according to studies by Duff & Phelps.

> The news rattled investors, who wiped out more than $14 billion of the company's market value Friday. Michael Lavery, an analyst at Piper Jaffray, said he has lost confidence that Kraft Heinz can successfully manage big brands to compete in the changing consumer environment.

> "These impairments validate fears that Kraft Heinz may have been more focused on costs than on building brand equity," he said. "Even if management has now seen the light," he said, its brands are likely too damaged to drive growth in a sustainable way.

> Specifically, Kraft Heinz wrote down $7.1 billion worth of goodwill, suggesting some of the value the company thought the Heinz merger had generated effectively didn't exist.

100.    On February 28, 2019, Kraft Heinz filed with the SEC a Notification of Late Filing on Form 12b-25 disclosing that the filing of its Annual Report for 2018 would be delayed pending the

conclusion of an "internal investigation into the procurement area as a result of the previously disclosed subpoena received in October 2018 from the [SEC]."

101.     On April 22, 2019, the Company announced that Defendant Hees would leave the Company effective June 30, 2019.  At the same time, Kraft Heinz announced that Miguel Patricio will replace Defendant Hees as the Company's CEO effective July 1, 2019.

102.     On May 6, 2019, the Individual Defendants further shocked the Company's stockholders as Kraft Heinz filed a Current Report on Form 8-K with the SEC, announcing that the Company will restate its financial statements for 2016, 2017, and the first nine months of 2018 to reflect a $181 million increase in costs of products.  Following the Company's internal investigation into its procurement area sparked by the initial SEC subpoena, the Form 8-K disclosed, Kraft Heinz found that several employees in the procurement area engaged in misconduct.  The Form 8-K explained the misconduct included recognizing the benefits of costs and rebates in the wrong time period, resulting in undervalued costs of goods in the Company's financial statements.  In particular, the Form 8-K stated:

> **Item 4.02.  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On May 2, 2019, the Company, in consultation with the Audit Committee of its Board of Directors (the "Audit Committee"), reached a determination that ***the Company's consolidated financial statements and related disclosures for the years ended December 30, 2017, and December 31, 2016, included in its Annual Reports on Form 10-K, and for each of the quarterly and year-to-date periods in 2017 and the quarterly and year-to-date periods for the nine months ended September 29, 2018, should no longer be relied upon because of certain misstatements contained in those financial statements***.  The Company does not believe that such misstatements constitute a quantitatively material misstatement to any individual period presented in the Company's prior annual or interim financial statements, but due to the qualitative nature of the matters identified in the investigation, including the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved, the Company has determined that it is appropriate to correct the misstatements in the Company's previously issued financial statements through restating such financial statements. The Company also discussed this assessment with the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC").

- 53 -

As previously disclosed in the Company's press release as furnished with its Current Report on Form 8-K filed on February 21, 2019 (the "Earnings Release"), the Company received a subpoena in October 2018 from the SEC related to the Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its suppliers. Following receipt of this subpoena, the Company, together with external counsel and forensic accountants, and under the oversight of the Audit Committee, initiated an investigation into the procurement area, which is now substantially complete. As a result of the findings from the Company's investigation, which identified that several employees in the procurement area engaged in misconduct, the Company has recorded adjustments to correct prior period misstatements that increase the total cost of products sold in prior financial periods, which the Company does not believe constitute a quantitatively material misstatement to any individual period. ***These misstatements principally relate to the incorrect timing of when certain cost and rebate elements associated with complex supplier contracts and arrangements were initially recognized, and once corrected for, the Company expects to recognize corresponding decreases to costs of products sold in future financial periods***. The findings from the investigation did not identify any misconduct by any member of the senior management team. Additionally, the Company has implemented and continues to implement certain remedial actions, including employee personnel actions and certain improvements to its internal controls, to mitigate the likelihood of this occurring in the future. The Company also continues to cooperate fully with the SEC.

In connection with the internal investigation described above, the Company also conducted a comprehensive review of significant supplier contracts to identify other potential misstatements in the timing of the recognition of supplier rebates, incentive payments, and pricing arrangements. ***The review identified additional misstatements, which may or may not have resulted from the misconduct noted above, primarily related to certain supplier contracts and arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period***. These misstatements will be corrected for in the same manner as those noted above. The Company corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was contingent upon future events and to correctly recognize the consideration as a reduction of cost of products sold over the terms of the arrangements with the suppliers. The misstatements arising from the contract review relate to the timing of recognizing certain cost and rebate elements, and the Company thus expects to recognize corresponding decreases to costs of products sold in future financial periods.

The Company's investigation and review described above identified required adjustments of approximately $208 million, of which approximately $27 million was recorded in the previously furnished fourth quarter 2018 cost of products sold. ***As a result, the cumulative net misstatements to the previously furnished or reported annual and interim financial statements were approximately $181 million***, which,

- 54 -

when reflected over the relevant periods, resulted in misstatements that are not quantitatively material to any prior year or quarter, but would have been significant to the fourth quarter of 2018 if corrected in that period. The impact of these corrections to previously reported financial statements is an increase to cost of products sold of approximately $25 million in 2015, $26 million in 2016 and $100 million in 2017. The impact to the previously furnished financial statements in 2018 is an increase in cost of products sold of approximately $30 million. These misstatements were also not quantitatively material to any quarter, with the largest correction being a $38 million increase to cost of products sold in the third quarter of 2017.

In addition, the Company evaluated other elements of these complex supplier contracts and arrangements, including the classification of leases embedded in supplier arrangements as capital or operating. As a result of the review, the Company identified certain arrangements that were improperly classified as embedded capital leases. The correction of this error did not impact previously reported 2017 net income and resulted in a decrease to previously furnished 2018 net loss of approximately $2 million. The correction reduced previously reported 2017 Adjusted EBITDA by approximately $2 million and previously furnished 2018 Adjusted EBITDA by approximately $33 million. The Company will also correct for these misstatements in connection with the restatement.

103. The May 6, 2019 Form 8-K further disclosed that the Company was adding another $13 million to its previously disclosed impairment loss of $15.4 billion. The Form 8-K explained the increase was necessary due to miscalculations in projected cash flows, stating:

*Intangible Asset and Goodwill Impairments*

Subsequent to the issuance of the Company's Current Report on Form 8-K on February 28, 2019 disclosing material impairments, ***the Company identified errors in the calculations performed in connection with the interim goodwill and intangible asset impairment testing in the fourth quarter of 2018***. The Company identified certain errors in projected net cash flows and allocation calculations, which resulted in a net increase of approximately $13 million to non-cash impairment losses in SG&A, as further described below.

***The Company identified errors in the allocation of forecasted cash flows to certain brands used as a basis for the interim goodwill and intangible asset impairment testing as of December 29, 2018***. Correcting this allocation error resulted in an increase to the impairment loss initially calculated for intangible assets of approximately $278 million, partially offset by a reduction to the impairment loss initially calculated for the goodwill reporting units of approximately $173 million. In addition, the corrections to the carrying value of the balance sheet at December 29, 2018 recorded as part of the correction of supplier rebate misstatements described above resulted in a further reduction to the goodwill impairment loss of approximately $92 million. The net impact of these misstatements was an increase

- 55 -

of approximately $13 million from the previously disclosed $15.4 billion impairment loss in the fourth quarter of 2018.

Additionally, in the third quarter of 2018, the Company had previously determined that a definite-lived intangible asset had been impaired in the fourth quarter of 2016 and recorded an out-of-period correction of this misstatement of approximately $17 million to recognize the non-cash impairment loss. In connection with the restatement of prior periods, the Company will correct this previously identified misstatement to recognize this impairment loss in the appropriate period. In total, the Company expects to recognize adjustments to reduce non-cash impairment losses in SG&A by $4 million in 2018 and increase non-cash impairment losses in SG&A by $17 million in 2016 compared to previously furnished and reported amounts, respectively, to correct for each of the impairment misstatements noted above.

*Other Adjustments*

In addition, the restated financial statements will include other adjustments in historical periods, including those that were previously corrected for as immaterial out-of-period adjustments. These other adjustments are unrelated to the items described above.

104. As a result of the misconduct and accounting errors, the May 6, 2019 Form 8-K also disclosed that the Company "anticipates identifying and reporting two or more material weaknesses in its internal controls over financial reporting" in the 2018 Annual Report yet to be filed. In addition, the Form 8-K revealed that on March 1, 2019, the Company received another subpoena from the SEC regarding Kraft Heinz's assessment of goodwill and intangible asset impairments and related matters, noting further that the subpoena requested documents related to procurement. The Form 8-K stated:

*Management's Report on Internal Control Over Financial Reporting*

The Company anticipates identifying and reporting two or more material weaknesses in its internal controls over financial reporting in connection with these misstatements in its Annual Report on Form 10-K for the fiscal year ended December 29, 2018.

*Securities and Exchange Commission Subpoenas*

Following the Company's Earnings Release issued on February 21, 2019, which disclosed the results of its interim goodwill and intangible asset impairment testing as of December 29, 2018, *the Company received an additional subpoena from the SEC on March 1, 2019 associated with its assessment of goodwill and*

- 56 -

*intangible asset impairments and related matters, and this subpoena also included document requests related to the procurement area*.  The Company cannot predict the eventual scope, duration, or outcome of any potential SEC investigation or whether it could have a material impact on the financial condition, results of operations, or cash flow of the Company.  The Company has been responsive to the ongoing document requests, and as noted above, will continue to cooperate fully with the SEC.

105.    On May 7, 2019, CNBC published an article titled "Misconduct at Kraft Heinz puts spotlight on employee pressure to meet bonus targets."  Based on the input of several former employees, executives and suppliers, the article details how the Company's bonus structure was "heavily tied to making annual targets."  The article explains that the pressure to meet management's targets "fell on the procurement and operations teams, which contributed to a large percentage of the company's cost savings – particularly as other savings stalled, said people familiar with the company's internal operations."  Thus, the article further confirms that the Individual Defendants were well aware that Kraft Heinz's cost-saving measures had taken a toll on the Company's resources, marginalized Kraft Heinz's internal controls, and damaged the Company's brands and trademarks.  The article provides:

> Each year, Kraft Heinz as a company must meet a target for earnings before interest, taxes, depreciation and amortization for the majority of its executives to get their bonuses, which for some could more than double their salary.  In 2017, nearly no one got a bonus, say former executives.  That year, Kraft Heinz only grew its organic EBITDA by 3%, according to the company's proxy, less than the minimum of 6.1%

> In 2018, most executives did get at least a portion of their bonus.

> As the company's sales declined – nearly a percentage point from 2016 to 2017, according to FactSet – pressure to increase EBITDA through cutting costs ramped up.  Organic sales, which strip out the impact of currency, acquisitions and divestitures, did edge slightly up the next year.

> A large portion of that pressure fell on the procurement and operations teams, which contributed to a large percentage of the company's cost savings – particularly as other savings stalled, said people familiar with the company's internal operations.

- 57 -

Kraft Heinz does not break out its procurement costs, but from August 2013 to August 2015 it cut its sales, general and administrative expenses by $532 million, or roughly 21%.

Kraft Heinz was created when Warren Buffett's Berkshire Hathaway and private equity firm 3G Capital in 2015 merged Kraft Foods with H.J. Heinz. The investment team previously worked together to take Heinz private two years prior.

3G has been lauded for its ability to quickly integrate deals and slash costs. In two years, it extracted roughly $1.7 billion in savings from Kraft Heinz. To help achieve those goals, it laid off thousands of employees, including those with years of experience in the consumer goods industry. None of the business unit heads in place when Kraft and Heinz merged are in the same role, and many have left.

Filling the gap were young, hungry employees that Kraft Heinz promised "Wall Street" money, should they meet their goals to help make its targets. Amid the turnover, it promoted quickly.

In 2017, it elevated 29-year-old David Knopf to be its chief financial officer. While the Princeton graduate is widely described as intelligent by his peers, he does not have the same decades of experience that typically distinguish a CFO at such a high-profile company. Knopf joined Kraft Heinz in 2015 as vice president of finance, coming from 3G Capital where he is a partner and helped with the Kraft Heinz merger.

After slightly more than a year, Knopf was named vice president of beverages and snacks, and category lead of its Planters snack nuts business.

**Aggressive targets**

Kraft Heinz gave employees "management-based objectives" that helped determine their bonuses for the year. Those goals are derived from the objectives laid out by the company's board for its CEO.

"We are competing for talent with well-established, fast-moving consumer goods organizations with long histories of success. So we target a higher incentive pay than our peers and are consistently above the market," wrote CFO Knopf in a 2018 integration update.

Not all targets are quantitative. Those that are can pertain to growth, costs and market share, among other things. The MBOs provide transparency, clear goals and prevent waste. Other companies associated with 3G, like Ab InBev and Restaurant Brands International have similar compensation models and have not run into the same issues that Kraft Heinz has.

But as Kraft Heinz's performance has deteriorated, it has become harder to meet its goals. Outgoing CEO Bernardo Hees in 2017 only achieved 60% of his MBOs, according to the company's proxy. Knopf achieved 48%.

In the company's procurement group, which was crucial to the company's EBITDA goals, pressures to meet MBOs were particularly intense.

Suppliers say Kraft Heinz employees are aggressive in demanding lower contract costs, sometimes at the sacrifice of longer-term alternatives used by peers like Unilever or Proctor & Gamble. One example is pushing for extra savings in the next quarter, if a supplier in [sic] unable to do so in shorter term.

"They're just using it as a blunt instrument, saying 'give me 10%.' You can't do that, especially in a mature, consumer goods company," said Rob Handfield, a professor of supply chain management at North Carolina State University. Handfield advised courier company DHL in 2017 when it was negotiating its contracts with Kraft Heinz.

According to Monday's filing, a handful of Kraft Heinz employees were marking down savings from its supplier contracts that should have been carried over a longer time period, along with other similar transgressions. It could not be immediately determined whether they did so accidentally or intentionally, but doing so can inaccurately imply they achieved certain targets that they did not reach.

Following the results of the investigation, Kraft Heinz said in the filing that it "has implemented and continues to implement certain remedial actions, including employee personnel actions and certain improvements to its internal controls, to mitigate the likelihood of this occurring in the future."

106.    Ultimately, Defendants caused the Company to file with the SEC its belated 2018 Annual Report on Form 10-K ("2018 Form 10-K") on June 7, 2019. The 2018 Form 10-K provided more detail regarding the lack of internal financial controls that led to the massive write-down of the Company's goodwill. Specifically, the 2018 Form 10-K explained:

**Explanatory Note**

**General**

On May 2, 2019, management, in consultation with the Audit Committee of our Board of Directors, concluded that our audited consolidated financial statements and related disclosures for the fiscal years ended December 30, 2017 and December 31, 2016 included in our Annual Reports on Form 10-K, and each of our unaudited condensed consolidated financial statements for the quarterly and year-to-date periods in fiscal year 2017 and each of our unaudited condensed consolidated financial statements for the quarterly and year-to-date periods for the nine months ended September 29, 2018 included in our Quarterly Reports on Form 10-Q (unaudited condensed consolidated financial statements for the quarterly periods ended September 29, 2018, June 30, 2018, March 31, 2018, and September 30, 2017) and Form 10-Q/A (unaudited condensed consolidated financial statements for the quarterly periods ended July 1, 2017 and April 1, 2017) should no longer be relied

- 59 -

upon due to misstatements that are described in greater detail below, and that we would restate such financial statements to make the necessary accounting corrections. We discussed this conclusion with our independent registered public accounting firm, PricewaterhouseCoopers LLP.

**Restatement**

This Annual Report on Form 10-K for the year ended December 29, 2018 includes audited consolidated financial statements at December 29, 2018 and December 30, 2017 and for the years ended December 29, 2018, December 30, 2017, and December 31, 2016, as well as relevant unaudited interim financial information for the quarterly periods ended December 29, 2018, September 29, 2018, June 30, 2018, March 31, 2018, December 30, 2017, September 30, 2017, July 1, 2017, and April 1, 2017. We have restated certain information within this Annual Report on Form 10-K, including our consolidated financial statements at December 30, 2017 and for the years ended December 30, 2017 and December 31, 2016, selected financial data at and for the year ended January 3, 2016, and the relevant unaudited interim financial information for the quarterly periods ended September 29, 2018, June 30, 2018, March 31, 2018, December 30, 2017, September 30, 2017, July 1, 2017, and April 1, 2017 (collectively known as the "Financial Statements").

*Restatement Background*

As described in our Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on May 6, 2019, management noted certain misstatements contained in the Financial Statements relating principally to the accounting treatment for supplier contracts and related arrangements. As previously disclosed, we received a subpoena from the SEC in October 2018related [sic] to our procurement area, specifically the accounting policies, procedures, and internal controls related to our procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to agreements with our suppliers. Following the receipt of this subpoena, we, together with external counsel and forensic accountants, and subsequently, under the oversight of the Audit Committee of our Board of Directors (the "Audit Committee"), conducted an internal investigation into the procurement area and related matters. As a result of the findings from this internal investigation, which is now complete and which identified that multiple employees in the procurement area engaged in misconduct, we corrected prior period misstatements that generally increased the total cost of products sold in prior financial periods. These misstatements principally related to the incorrect timing of when certain cost and rebate elements associated with supplier contracts and related arrangements were initially recognized. The findings from the internal investigation did not identify any misconduct by any member of the senior management team. We continue to cooperate with the SEC concerning its investigation of these matters.

In connection with the internal investigation, we also conducted a comprehensive review of supplier contracts and related arrangements to identify other potential misstatements in the timing of the recognition of supplier rebates,

incentive payments, and pricing arrangements. The review identified further misstatements, which we also investigated and have been unable to conclude if they resulted from the misconduct described above. These misstatements were primarily related to certain supplier contracts and related arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period. We corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was contingent upon future events and to correctly recognize the consideration as a reduction of cost of products sold over the terms of the arrangements with the suppliers.

Our internal investigation and review identified adjustments that resulted in an understatement of cost of products sold totaling $208 million, including $175 million relating to the periods up through September 29, 2018 that are being restated in this Annual Report on Form 10-K. The misstatements of cost of products sold related to our internal investigation and review included $22 million for fiscal year 2018, $94 million for fiscal year 2017, $35 million for fiscal year 2016, and $24 million for fiscal year 2015. We do not believe that the misstatements are quantitatively material to any period presented in our prior financial statements. However, due to the qualitative nature of the matters identified in our internal investigation, including the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved, we determined that it would be appropriate to correct the misstatements in our previously issued consolidated financial statements by restating such financial statements. The restatement also included corrections for additional identified out-of-period and uncorrected misstatements in the impacted periods. Accordingly, we have restated our consolidated financial statements and the impacted amounts within the accompanying footnotes thereto.

In addition, the statements of income for fiscal years 2017 and 2016, as previously reported, did not originally reflect the adoption of accounting standards update ("ASU") 2017-07 related to the presentation of net periodic benefit cost (pension and postretirement cost). This ASU was adopted in the first quarter of 2018 and was applied retrospectively for statement of income presentation of service cost components and other net periodic benefit cost components. The restated statements of income for fiscal years 2017 and 2016 reflect the retrospective application of ASU 2017-07 and are labeled "As Recast."

### *Restatement of Previously Issued Consolidated Financial Statements*

This Annual Report on Form 10-K restates amounts included in the 2017 Annual Report described above, including the audited consolidated financial statements at December 30, 2017 and for the fiscal years ended December 30, 2017 and December 31, 2016. In addition to the misstatements related to the supplier contracts and related arrangements, including the misstatements related to lease classification, we corrected additional identified out-of-period and uncorrected misstatements that were not material, individually or in the aggregate, to our

consolidated financial statements. These misstatements were related to customer incentive program expense misclassifications, balance sheet misclassifications, income taxes, impairments, and other misstatements.

See Note 2, *Restatement of Previously Issued Consolidated Financial Statements*, in Item 8, *Financial Statements and Supplementary Data*, for additional information.

The relevant unaudited interim financial information for the quarterly periods ended September 29, 2018, June 30, 2018, March 31, 2018, December 30, 2017, September 30, 2017, July 1, 2017, and April 1, 2017, has also been restated. The 2018 quarterly restatements will be effective with the filing of our future 2019 unaudited interim condensed consolidated financial statement filings in Quarterly Reports on Form 10-Q.

*        *        *

**Control Considerations**

In connection with the restatement, management has assessed the effectiveness of our internal control over financial reporting. Based on this assessment, management identified material weaknesses in our internal control over financial reporting resulting in the conclusion by our Chief Executive Officer and Chief Financial Officer that our disclosure controls and procedures were not effective as of December 29, 2018. Management has taken and is taking additional steps to remediate the material weaknesses in our internal control over financial reporting. See Item 9A, *Controls and Procedures*, for additional information related to these material weaknesses in internal control over financial reporting and the related remedial measures.

<h3 style="text-align:center">Additional Information Specific to Goodwill<br>and Indefinite-Lived Intangible Asset Impairment</h3>

We announced on February 21, 2019 that as part of our normal quarterly reporting procedures and planning processes for the fourth quarter of 2018, the fair values of certain goodwill and intangible assets were below their carrying amounts. As a result, we announced non-cash impairment losses of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the Kraft and Oscar Mayer brands. As disclosed in our Current Report on Form 8-K filed with the SEC on May 6, 2019, we subsequently identified errors in the calculations performed in connection with the interim goodwill and indefinite-lived intangible asset impairment testing in the fourth quarter of 2018. Specifically, we identified certain errors in projected net cash flows and allocations to certain brands. Correcting this allocation error resulted in an increase to the impairment losses initially calculated for brands of approximately $278 million, partially offset by a reduction to the impairment losses initially calculated for reporting units of approximately $171 million.

In addition, the corrections to the carrying values on our balance sheet at December 29, 2018 recorded as part of the correction of the procurement-related

- 62 -

misstatements described above resulted in an adjustment to the carrying amounts of certain reporting units, and therefore resulted in a reduction to goodwill impairment losses of approximately $92 million. The net impact of these misstatements was an increase of approximately $15 million from the $15.4 billion total impairment losses in the fourth quarter of 2018 previously announced in our earnings release and investor call on February 21, 2019.

As discussed in Item 9A, *Controls and Procedures*, of this Annual Report on Form 10-K, we did not design and maintain effective controls to reassess the level of precision used to review the allocation of cash flow projections to certain brands used as a basis for performing our fourth quarter 2018 interim impairment assessments in response to the significant reduction in, and in certain instances elimination of, the excess fair value over carrying amount for certain brands that resulted from the changing business environment. This material weakness resulted in the errors in the calculations performed in connection with the interim goodwill and indefinite-lived intangible asset impairment testing in the fourth quarter of 2018, as described above, because approximately five to ten percent of cash flows were not subjected to our control procedures. This material weakness arose during our interim impairment testing in the fourth quarter of 2018 due to the significant reduction in excess fair value over carrying amount for certain brands as noted above, which required us to increase the percentage of cash flows subject to our control procedures to nearly one hundred percent. This did not result in a misstatement of any previously reported consolidated financial statements but was determined to be a material weakness because it could have resulted in a material misstatement that would not have been prevented or detected.

107. In addition, the 2018 Form 10-K explained that the Company's

Chief Executive Officer and Chief Financial Officer have concluded that as of December 29, 2018, due to the existence of the material weaknesses in our internal control over financial reporting described below, our disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

108. The 2018 Form 10-K went on to explain specifically why the Company's internal

controls over financial reporting were deficient:

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those written policies and procedures that:

•    pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets;

•    provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles;

•    provide reasonable assurance that receipts and expenditures are being made only in accordance with management and director authorization; and

•    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 29, 2018 based on the framework described in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this evaluation, our management concluded that we did not maintain effective internal control over financial reporting as of December 29, 2018 due to the material weaknesses described below.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

We identified a material weakness in the risk assessment component of internal control as we did not appropriately design controls in response to the risk of misstatement due to changes in our business environment. This material weakness in risk assessment gave rise to the specific control deficiencies described below, which we also determined to be material weaknesses:

•    *Supplier Contracts and Related Arrangements*: We did not design and maintain effective controls over the accounting for supplier contracts and related arrangements. Specifically, certain employees in our procurement organization engaged in misconduct and circumvented controls that included withholding information or directing others to withhold information related to supplier contracts

that affected the accounting for certain supplier rebates, incentives, and pricing arrangements, in an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain due to changes in our business environment. Additionally, in certain instances, we did not have a sufficient understanding or maintain sufficient documentation of the transaction to determine the appropriate accounting for certain cost and rebate elements and embedded leases. This material weakness resulted in misstatements that were corrected in the restatement included in this Annual Report on Form 10-K.

• *Goodwill and Indefinite-lived Intangible Asset Impairment Testing*: We did not design and maintain effective controls to reassess the level of precision used to review the impairment assessments related to goodwill and indefinite-lived intangible assets as changes in our business environment occurred. Specifically, we did not design and maintain effective controls to reassess the level of precision used in the review of the allocation of cash flow projections to certain brands used as a basis for performing our fourth quarter 2018 interim impairment assessments in response to the significant reduction in, and in certain instances elimination of, the excess fair value over carrying amount of certain brands that resulted from changes in our business environment. This material weakness did not result in a misstatement of any previously issued consolidated financial statements.

Additionally, the material weaknesses described above could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement of the annual or interim consolidated financial statements that would not be prevented or detected.

PricewaterhouseCoopers LLP, an independent registered public accounting firm that audited the consolidated financial statements included in this Annual Report on Form 10-K, has also audited the effectiveness of our internal control over financial reporting as of December 29, 2018, as stated in their report which appears herein under Item 8, *Financial Statements and Supplementary Data*.

**Remediation of Material Weaknesses**

We are evaluating the material weaknesses and developing a plan of remediation to strengthen our internal controls related to our risk assessment component of internal control over financial reporting, supplier contracts and related arrangements, and the level of precision applied to the goodwill and indefinite-lived intangible asset impairment testing process. The remediation efforts summarized below, which are in the process of being implemented, are intended to address the identified material weaknesses and enhance our overall internal control environment.

• Personnel Actions – A comprehensive disciplinary plan is in the process of being implemented for all employees found to have engaged in misconduct, including termination, written warnings, and appropriate training depending on the severity of the misconduct.

• Performance Targets – We have identified and will be implementing several performance-based target enhancements as follows: (i) implementing

- 65 -

checkpoints to evaluate significant changes in the environment that could adversely impact the attainability of management goals and targets; (ii) reassessing and adjusting the overall balance of performance measures provided to employees to help drive challenging but attainable targets; and (iii) enhancing our training and overall communication specific to the Management by Objective ("MBO") process, including a focus on the process to request relief from previously established MBOs, to help ensure all eligible employees are aware of and understand the overall MBO waiver and relief process; (iv) reinforcing the importance of adherence to established internal controls and company policies and procedures through other formal communications, town hall meetings, and other employee trainings; and (v) reassessing certain employees' key performance indicators.

• Organizational Enhancements – We have identified and are in the process of implementing organizational enhancements as follows: (i) augmenting our procurement finance teams with additional professionals with the appropriate levels of accounting and controls knowledge, experience, and training in the area of supplier contracts and related arrangements; and (ii) realigning reporting lines whereby procurement finance now report directly to the finance organization.

• Procurement Practices – We have evaluated our procurement practices and are in the process of implementing improvements to those practices, including: (i) developing more comprehensive contract approval policies and processes; (ii) enhancing required communication protocols among all functions involved in the procurement process (e.g., procurement, legal, accounting, and finance) to ensure all relevant parties are involved in the contract review process; (iii) standardizing contract documentation and analyses; and (iv) developing a more comprehensive accounting review process and monitoring controls over supplier contracts and related arrangements to ensure transactions are recorded in accordance with generally accepted accounting principles.

• Training Practices – We are in the process of developing a comprehensive global procurement training program that will cover supplier contracts and related arrangements, including potential accounting implications. As part of this effort, we have held mandatory training for our global procurement function, which focused on our policies and procedures related to procurement, including the proper accounting for the contract terms that contributed to the material weakness.

• Procurement Management Software – We have started to evaluate potential solutions to implement or upgrade the existing procurement management software to enhance the identification, tracking, and monitoring of supplier contracts and related arrangements.

• Level of Precision Applied to Impairment Testing – We are in the process of implementing a plan to enhance the level of precision at which our internal controls over financial reporting relating to goodwill and indefinite-lived intangible asset impairment assessments are performed. Specifically, we will be implementing and executing additional procedures to (i) enhance our analysis of

- 66 -

forecasted cash flows used in the impairment assessment and (ii) test the accuracy of forecasted cash flow allocations to specific brands.

We believe the measures described above will remediate the material weaknesses we have identified and strengthen our internal control over financial reporting. We are committed to continuing to improve our internal control processes and have begun to implement some of the steps described above. We will also continue to review, optimize, and enhance our financial reporting controls and procedures. As we continue to evaluate and work to improve our internal control over financial reporting, we may take additional measures to address control deficiencies or we may modify certain of the remediation measures described above. These material weaknesses will not be considered remediated until the applicable remediated controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

## INSIDER SALES BY THE INSIDER SELLING DEFENDANTS

109.    Rather than providing the market with correct information, Defendants Hees, Knopf, Basilio, Behring, Lemann and Telles (collectively, "Insider Selling Defendants") used their knowledge about Kraft Heinz's true business health to sell their Kraft Heinz holdings while the Company's stock price was artificially inflated.

110.    While in possession of material, nonpublic information about Kraft Heinz's improper business practices and the impending decline in the Company's stock, Defendants Hees, Knopf, Basilio, Behring, Lemann and Telles sold 20.6 million shares of the stock they held through 3G Capital, in August 2018, for unlawful proceeds of $1.2 billion. The Insider Selling Defendants control 3G Capital and represent three of the five founding partners of 3G Capital and three of the eleven additional partners at 3G Capital. The material, nonpublic information about Kraft Heinz was the direct result of the changes implemented at Kraft Heinz by the Insider Selling Defendants consistent with 3G Capital's business philosophies, including a series of cost-reduction initiatives when integrating the operations of Kraft and Heinz.

111.    The inside information was proprietary, nonpublic information regarding the Company's past, current and future business prospects known to the Insider Selling Defendants. The information which formed the basis for their sale of Company stock was the type of information

which the Insider Selling Defendants, in accordance with Directors Ethics Code of the Company, were specifically barred from using – the Company's property, information or position for personal gain. The inside information was a proprietary asset belonging to Kraft Heinz which was usurped for the Insider Selling Defendants' benefit.

112.    The Insider Selling Defendants' use of this information was a breach of internal corporate policies and their fiduciary duty of loyalty. These Defendants' trades were motivated in whole or in part by their possession of material, nonpublic information.

113.    The timing and scope of the sale is suspicious. 3G Capital and the Insider Selling Defendants had not previously sold any Kraft Heinz stock since 2016, and timed the sale to maximize profit from Kraft Heinz's then artificially inflated stock price. At the time of their stock sale, the Insider Selling Defendants knew that the public disclosure of this information would adversely affect the market price of Kraft Heinz stock. Thus, the Insider Selling Defendants took the opportunity to sell their shares before the public fully appreciated serious problems at Kraft Heinz. Once the truth about Kraft Heinz's accounting problems and decrease in brand value and goodwill became known to the investing public, the price of the Company's stock plummeted.

114.    Worse yet, Defendants knew or should have known that Kraft Heinz was engaged in a stock buyback and was purchasing shares on the open market simultaneously with the Insider Selling Defendants' insider sales.

115.    The sale was also suspicious because the number of shares sold was seven times more than their only other previous sale.

**DAMAGES TO KRAFT HEINZ**

116.    As a result of the Individual Defendants' improprieties, Kraft Heinz disseminated improper, public statements concerning the Company's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX. These improper

- 68 -

statements have devastated Kraft Heinz's credibility as reflected by the Company's $78.8 billion, or 67%, market capitalization loss from its February 2017 high to present.

117. Kraft Heinz's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, a company's current and potential investors consider the company's trustworthiness, stability and ability to evaluate known risks. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and regulations, and are uncertain about their own financial condition. Accordingly, the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, Kraft Heinz stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

118. Further, as a direct and proximate result of the Individual Defendants' actions, Kraft Heinz has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred from the SEC investigations, including any fines;

(b)   costs incurred from the Company's internal investigation into its accounting practices and policies;

(c)   costs incurred from revisiting and restating previous financial reports;

(d)   costs incurred from restoring the value of its impaired brands and trademarks;

(e)   costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(f)   costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Kraft Heinz.

- 69 -

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

119.     Plaintiffs bring this action derivatively on behalf of Kraft Heinz to redress injuries suffered, and to be suffered, by Kraft Heinz as a result of the Individual Defendants' breaches of fiduciary duty, unjust enrichment and contribution for violations of the federal securities laws.  Kraft Heinz is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.     Plaintiffs will adequately and fairly represent the interests of Kraft Heinz in enforcing and prosecuting these derivative claims.

121.     At the time this action was commenced, the Board consisted of the following 11 members: Defendants Abel, Behring, Cahill, Telles, Cool, Dewan, Jackson, Lemann, Pope, Van Damme and Zoghbi.  On June 12, 2019, Castro-Neves replaced Telles on the Board.  A pre-suit demand upon the Board is excused in this case because a majority of the Board is disabled from fairly, independently and objectively considering any pre-suit demand that Plaintiffs may make.

**Demand Is Excused Because the Majority of the Kraft Heinz Board
Lack Independence Rendering Them Incapable of Impartially
Considering a Pre-Suit Demand**

122.     Board members Abel, Behring, Castro-Neves, Cool, Lemann, Telles and Van Damme lack the independence necessary to impartially consider a pre-suit demand due to their long-time and lucrative business associations with 3G Capital and its affiliates, Berkshire Hathaway and Warren Buffett, and each other.

123.     As of June 5, 2019, 3G Capital owns 22.1% and Berkshire Hathaway owns 26.7% of the Company's common stock.  According to the Company's SEC filings, 3G Capital and Berkshire Hathaway may be deemed a "group" for purposes of §13(d) of the Exchange Act and therefore may be deemed to hold 595,539,525 shares of common stock as of June 5, 2019, or 48.8% of the Company.

124.     Board members Lemann and Behring, along with Defendant Telles, are co-founders of 3G Capital which is alleged herein to have improperly sold Company stock at inflated values while in possession of, and based upon, adverse material nonpublic information.  Additionally, 3G Capital partners Hees, Basilio and Knopf have been accused of making false and misleading public statements in the securities class action which charges these individuals with violations of the Exchange Act.  Accordingly, Board members Lehman, Behring and Telles are each interested and lack independence from each other and from the other Defendants associated with 3G Capital (including Hees, Basilio, Knopf and Castro-Neves) so as to undermine their ability to fairly, independently and objectively consider a pre-suit demand.  Lehman, Behring and Telles are also disabled from fairly, independently and objectively considering a pre-suit demand due to their own personal financial interests in 3G Capital which are worth tens of billions of dollars.

125.     Board member Van Damme previously served as a director of Burger King Worldwide, Inc. and its predecessor while it was privately owned by 3G Capital between 2011 and 2014 and currently serves on the board of directors of Restaurant Brands International ("RBI"), through which 3G Capital owns Burger King and Tim Hortons.  Van Damme has served on RBI's board with Behring since December 2014, with Castro-Neves since June 2018, and with 3G Capital founding principal partner, Carlos Alberto da Veiga Sicupira, since December 2014.  Van Damme has also been a director of Anheuser-Busch InBev since 1992, which 3G Capital has controlled through board designees and its significant ownership stake.  Over the years, numerous 3G Capital partners and representatives have served alongside Van Damme on the Anheuser-Busch InBev board including Behring (2014-2019), Telles (2004-present), Sicupira (2004-2019), Sicupira's daughter, Ceclia Sicupira (2019-present), Lemann (2004-2014), and Lemann's son, Paulo Alberto Lemann (2014-present).  Castro-Neves was also an executive officer of Anheuser-Busch InBev during the same time period.  When he replaced Warren Buffet on Kraft Heinz's board in 2018, it was publicly

- 71 -

reported that Van Damme was close to 3G Capital's founders. Accordingly, Van Damme is disabled from fairly, independently, and objectively considering a pre-suit demand due to his long-standing and ongoing business relationships with 3G Capital, its founders and its partners.

126. Board member Castro-Neves has been a partner with 3G Capital since July 2018 along with Defendants Hees (July 2010), Knopf (July 2015) and Basilio (July 2012). Castro-Neves also served as CEO of Anheuser-Busch and North America Zone President of Anheuser-Busch InBev from January 2015 to December 2017, having previously held positions of increasing responsibility within AB InBev and Ambev since 1996. Accordingly, Castro-Neves is disabled from fairly, independently and objectively considering a pre-suit demand due to his own personal financial interests as a partner of 3G Capital, and his long-standing and ongoing business relationships with 3G Capital, its founders and its partners.

127. Board members Abel and Cool are employees of Berkshire Hathaway. Berkshire Hathaway has significant and mutually beneficially ongoing business relationships with 3G Capital such that the companies, and their partners and employees, would not risk current or potential future deals by acting in any manner potentially adverse to one another. The companies' business dealings include the following:

(a) In 2013, Berkshire Hathaway and 3G Capital acquired H.J. Heinz for $23 billion with Berkshire putting up three times as much cash and with 3G Capital being primarily responsible for Heinz's operations;

(b) When 3G Capital-controlled Burger King acquired Canadian coffee and doughnut chain Tim Horton's in 2014 for $11 billion, Berkshire Hathaway committed $3 billion of preferred equity to finance the deal;

(c) In 2015, Berkshire Hathaway and 3G Capital orchestrated the $46 billion Merger between Kraft and Heinz;

- 72 -

(d)     In 2017, Berkshire Hathaway and 3G Capital used Kraft Heinz to make an unsuccessful $143 billion takeover offer for British-Dutch conglomerate Unilever; and

(e)     Recently, on February 25, 2019, Warren Buffett once again affirmed that he is open to Berkshire Hathaway doing more deals with 3G Capital in the future.

128.    Additionally, it is well known that Berkshire Hathaway's Warren Buffett and 3G Capital founder Jorge Paulo Lemann, who are among the richest individuals in the world, have been close friends since serving together on Gillette's board of directors decades ago.  Buffett himself publicly described Lemann as "a good friend of mine and marvelous human being."  Lemann recently attended Berkshire Hathaway's annual meeting in Omaha, Nebraska in May 2019, and Buffett has stated his intent to attend Lemann's 80th birthday party in August.

129.    Board member Cool is beholden to Warren Buffett and Berkshire Hathaway (and therefore to 3G Capital and its partners) such that she is incapable of exercising independent objective judgment in deciding whether to bring this action.  Cool has been described in the press as Buffett's protégé.  After first meeting Buffett in 2006, Cool was hired as his financial assistant in 2009 after graduating from Harvard Business School.  Five years later, at age 30, Cool was named CEO of Pampered Chef, a Berkshire Hathaway subsidiary, a job she continues to hold.  Cool is also involved in other Berkshire companies serving as Chairman of Benjamin Moore, Larson-Juhl and Oriental Trading Company.   Cool served with Buffett on the Company's Board until his departure in 2018 and they both signed the Company's 2016 and 2017 Forms 10-K which were admittedly false and misleading and contained financial statements which have now been restated.  For these reasons, Cool is not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

130.    Board member Abel is also beholden to Warren Buffett and Berkshire Hathaway (and therefore to 3G Capital and its partners) such that he is incapable of exercising independent objective

- 73 -

judgment in deciding whether to bring this action. Abel is believed by many to be Buffett's heir apparent. Abel has been CEO of Berkshire Hathaway Energy since 2008. After Abel was named to Berkshire Hathaway's board of directors in 2018 as Vice Chairman – Non-Insurance Operations, Buffett said Abel has "rare talents" and that "Berkshire blood flows through [his] veins." For these reasons, Abel is not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

131. Board member Zoghbi is employed full time by the Company as a Special Advisor and has received, and will continue to receive, substantial monetary compensation as a result of that employment. Zoghbi was paid more than $12.1 million in salary, bonus, and other incentive-based compensation for 2016 and more than $17 million for 2017. Although Zoghbi's 2018 total compensation has not been reported, the combination of his $850,000 base salary and his significant incentive awards likely again pushed his total compensation well into the seven figures. Defendant Zoghbi will act to preserve and not threaten his position and the perquisites thereof and, therefore, is incapable of exercising independent objective judgment in deciding whether to bring this action.

132. Board member Cahill serves as a consultant to the Company whereby he provides advisory and consulting services related to current and historical finances, relationships with licensors, customers and vendors, employee matters, product development, marketing and distribution, government affairs and strategic opportunities. Cahill has received, and will continue to receive, substantial monetary compensation as a result of that employment. Cahill is paid $500,000 annually for these services, in addition to the $255,009, $255,008, and $235,050 he received in 2016, 2017, and 2018, respectively, for his services as a director. Defendant Cahill will act to preserve and not threaten his position and the perquisites thereof and, therefore, is incapable of exercising independent objective judgment in deciding whether to bring this action.

4825-6887-1325.v2

133.    Further, the Board admits in the Company's 2018 Form 10-K that Defendants Cahill and Zoghbi are not independent.   Therefore, Defendants Cahill and Zoghbi are not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

**Demand Is Excused Because a Board Majority Face a**
**Substantial Likelihood of Liability for Their Misconduct**

134.    Pursuant to their specific duties as Board members, the members of the Kraft Heinz Board are charged with the management of the Company and to conduct its business affairs.  Board members Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme and Zoghbi breached their fiduciary duty of loyalty (and candor and good faith) owed to Kraft Heinz by making materially false statements and/or omissions in the Company's shareholder reports about the Company's publicly reported net income, the value of its goodwill and intangible assets, and the integrity of the Company's internal controls over financial reporting and disclosure.  Additionally, Board members Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Telles and Pope each signed the Company's 2016 and 2017 Forms 10-K which were admittedly false and misleading and contained financial statements which have now been restated.  Thus, these members of the Kraft Heinz Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each member participated personally in the wrongdoing and therefore face a substantial likelihood of liability for their breach of fiduciary duties.

135.    Board members Dewan, Jackson and Pope served as members of the Audit Committee.  As such, the Audit Committee Defendants were responsible for reviewing the adequacy of Kraft Heinz's financial reporting and disclosure controls, reviewing the integrity of Kraft Heinz's annual and quarterly financial results and financial statements, and reviewing Kraft Heinz's annual and quarterly SEC Forms 10-Q and 10-K.  Nonetheless, Defendants Dewan, Jackson and Pope

- 75 -

breached their fiduciary duties, along with the entire Kraft Heinz Board, by causing Kraft Heinz to make false and misleading statements to shareholders in the Company's SEC filings, as well as by failing to ensure that adequate financial reporting and disclosure controls were in place at the Company. As a result, Audit Committee Defendants Dewan, Jackson and Pope are not disinterested and face a substantial likelihood of liability that renders a pre-suit demand upon them futile.

136.    Demand is futile as to Behring, Lemann and Telles because they face a substantial likelihood of personal liability. Through 3G Capital, the Insider Selling Defendants sold $1.2 billion worth of Kraft Heinz stock under highly suspicious circumstances. The Insider Selling Defendants, as directors and/or the top level officers of Kraft Heinz, possessed material, nonpublic Company information and used that information to enrich themselves. The Insider Selling Defendants sold stock based on this knowledge of material, nonpublic company information regarding the Company's operating performance, goodwill, the adequacy of Kraft Heinz's internal controls over its financial reporting, and the impending decrease in the value of their holdings of Kraft Heinz stock. Accordingly, Insider Selling Defendants Behring, Lemann and Telles face a substantial likelihood of liability for breach of their fiduciary duties of loyalty. Any demand upon Defendants Behring, Lemann and Telles is therefore futile.

137.    Any suit by the Board to remedy these wrongs would expose the Defendants in the securities class actions – Hees, Basilio, Knopf, Zoghbi, Skinger, Garlati, Behring, 3G Capital and Kraft Heinz – to liability for violations of the federal securities laws, and would likely result in civil actions being filed against one or more of the other Individual Defendants. The securities class actions allege violations of §§10(b), 20(a) and 20A of the Exchange Act. If the Board elects for the Company to press forward with its right of action against the Individual Defendants in this action, then Kraft Heinz's efforts would compromise its defense of the securities class action. Accordingly, demand on the Board is excused.

138.    Plaintiffs have not made any demand on the other stockholders of Kraft Heinz to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Kraft Heinz is a publicly held company with over 1.2 billion shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force Plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

139.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants owed and owe Kraft Heinz fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Kraft Heinz the highest obligation of good faith, fair dealing, loyalty and due care.  These duties included an obligation of which the Individual Defendants were fully aware, to manage Kraft Heinz's business and affairs in accordance with all laws applicable to the Company's operations, including the federal securities laws, rules and regulations.

141.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith and loyalty.  More specifically, the Individual Defendants violated their duties of good faith by creating a culture of lawlessness within Kraft Heinz, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

- 77 -

142.     The Individual Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly failing to implement and maintain an adequate system of internal controls. Specifically, the Individual Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate federal securities laws, and allowing the Company to suffer needless losses by failing to implement and maintain an adequate system of internal controls to ensure the Company's public statements were truthful and disclosed any fraud or any material weakness in internal controls over financial reporting.

143.     In addition, the Individual Defendants breached their fiduciary duties of loyalty by making or allowing the Company to make improper statements in the Company's publicly disseminated documents and SEC filings concerning Kraft Heinz's: (i) net income; (ii) goodwill and intangible asset values; and (iii) internal controls and certifications pursuant to SOX.

144.     The Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company's internal controls were inadequate, specifically as they relate to the procurement area; and (ii) that Kraft Heinz would be forced to write off a significant amount of goodwill and certain intangible assets.  Accordingly, the Defendants breached their duty of care and loyalty to the Company.

145.     The Defendants, as directors of the Company, owed Kraft Heinz the highest duty of loyalty.  These Defendants breached their duty of loyalty by recklessly permitting the improper activity and improper statements detailed herein.  The Defendants knew or were reckless in not knowing: (i) that the Company's internal controls were inadequate, specifically as they relate to the procurement area; and (ii) that Kraft Heinz would be forced to write off a significant amount of goodwill and certain intangible assets.  Accordingly, these Defendants breached their duty of loyalty to the Company.

146. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

147. The Insider Selling Defendants breached their duty of loyalty by selling Kraft Heinz stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's business and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Kraft Heinz common stock.

148. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kraft Heinz has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

149. Plaintiffs, on behalf of Kraft Heinz, have no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

150. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

151. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Kraft Heinz. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Kraft Heinz.

- 79 -

152.     Plaintiffs, as stockholders and representatives of Kraft Heinz, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

153.     Plaintiffs, on behalf of Kraft Heinz, have no adequate remedy at law.

## COUNT III

**Against Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Skinger and Garlati
for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act**

154.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

155.     Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Skinger and Garlati are named as Defendants in related securities class actions.  The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

156.     Kraft Heinz is named as a defendant in related securities class actions that allege and assert claims arising under §10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Kraft Heinz is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

157.     As officers, directors and otherwise, Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Skinger and Garlati had the power or ability to, and did, control or influence, either directly

or indirectly, Kraft Heinz's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5.

158. Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Skinger and Garlati are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

159. Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Skinger and Garlati have damaged the Company and are liable to the Company for contribution.

160. No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Kraft Heinz, demand judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment and contribution for violations of federal securities laws;

B. Directing Kraft Heinz to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kraft Heinz and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. A proposal to strengthen the Company's controls over financial reporting;

2. A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4825-6887-1325.v2

3.      A provision to permit the stockholders of Kraft Heinz to nominate at least three candidates for election to the Board; and

4.      A proposal to strengthen Kraft Heinz's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, and equity sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Kraft Heinz have an effective remedy;

D.      Awarding to Kraft Heinz restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 31, 2019                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BENNY C. GOODMAN III
                                        ERIK W. LUEDEKE

                                        _____
                                                s/ Erik W. Luedeke
                                               ERIK W. LUEDEKE

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        bennyg@rgrdlaw.com
                                        eluedeke@rgrdlaw.com

4825-6887-1325.v2

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
mblasy@rgrdlaw.com

*Proposed Lead Derivative Counsel*

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR. (PA 17419)
GERALD L. RUTLEDGE (PA 62027)
300 Mt. Lebanon Blvd., Suite 206-B
Pittsburgh, PA 15234
Telephone: 412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER (PA 81757)
BRETT D. STECKER (PA 86242)
JAMES M. FICARO (PA 308198)
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: 610/225-2677
610/408-8062 (fax)
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

4825-6887-1325.v2

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
FELIPE J. ARROYO (163803)
5040 Shoreham Place
San Diego, CA 92122
Telephone: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com

*Attorneys for Plaintiffs*

## VERIFICATION

I, Erik W. Luedeke, hereby declare the following:

1.     I am one of the attorneys for plaintiffs and proposed Lead Derivative Counsel. This verification is based upon my personal knowledge and I could competently testify to the statements contained herein if called upon as a witness.

2.     I have knowledge of the facts alleged in the Consolidated Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Contribution for Violations of the Federal Securities Laws, and I believe them to be true to the best of my information and belief.

3.     I make this verification because plaintiffs Stephen Silverman, Charlotte Hays, Ian Green and Vladimir Gusinsky Revocable Trust are absent from the County of San Diego where I maintain my office.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of July, 2019, at San Diego, California.

_____
ERIK W. LUEDEKE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 31, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Erik W. Luedeke
ERIK W. LUEDEKE

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: eluedeke@rgrdlaw.com

# Mailing Information for a Case 2:19-cv-00549-MRH IN RE KRAFT HEINZ SHAREHOLDER DERIVATIVE LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roy W. Arnold**
  rarnold@blankrome.com,roy-arnold-9833@ecf.pacerpro.com,jworker@blankrome.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William A. Clareman**
  wclareman@paulweiss.com

- **Andrew J. Ehrlich**
  aehrlich@paulweiss.com,mao_fednational@paulweiss.com

- **Shawna J. English**
  senglish@blankrome.com,bkruger@blankrome.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Michael I. Fistel , Jr**
  MichaelF@johnsonfistel.com,paralegal@johnsonfistel.com

- **Benny C. Goodman , III**
  bennyg@rgrdlaw.com,e_file_sd@rgrdlaw.com,ehyatt@rgrdlaw.com

- **Daniel J. Kramer**
  dkramer@paulweiss.com,mao_fednational@paulweiss.com

- **Erik W. Luedeke**
  eluedeke@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Craig W. Smith**
  csmith@robbinsarroyo.com,notice@robbinsarroyo.com

- **Steven R. Wedeking , II**
  swedeking@robbinsarroyo.com,jcabuhat@robbinsarroyo.com

- **Alfred G. Yates , Jr**
  yateslaw@aol.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`