**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re KRAFT HEINZ SHAREHOLDER DERIVATIVE LITIGATION | Case No. 20-cv-2259 |
| | Judge Robert M. Dow, Jr. |
| | **REDACTED VERSION** |

**CONSOLIDATED VERIFIED SECOND AMENDED
<u>STOCKHOLDER DERIVATIVE COMPLAINT</u>**

742505 2

TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF ACTION ...................................................................1

II.   JURISDICTION AND VENUE ................................................................................4

III.  THE PARTIES ........................................................................................................5

IV.  DUTIES OF THE INDIVIDUAL DEFENDANTS .....................................................12

     A.    Fiduciary Duties................................................................................12

     B.    Code of Ethics...................................................................................13

     C.    Duties of Audit Committee ................................................................14

V.   SUBSTANTIVE ALLEGATIONS ............................................................................17

     A.    Background ........................................................................................17

     B.    After the Merger, the Individual Defendants Cause Kraft Heinz to Implement Disastrous Cost-Cutting Practices...................................19

     C.    The Individual Defendants Cause Kraft Heinz to Issue Materially Misleading Statements About the Impact of the Company's Cost-Cutting Measures .......................................................................21

     D.    The Individual Defendants Should Have Recorded Impairments Due to the Deterioration in Kraft Heinz's Brands Caused by the Cost-Cutting Measures .......................................................................32

     E.    ███████████████████████████████████ .................................................57

     F.    ████████████████████████████ ................................64

     G.    The Individual Defendants Cause the Company to Issue a Misleading Proxy ...............................................................................65

     H.    The Truth Emerges in a Series of Partial Disclosures .........................68

     I.    Defendants Hees, Knopf, Basilio, Behring, Lemann and Telles Sold Over $1.2 Billion in Kraft Heinz Stock While In Possession of Material Non-Public Information ....................................................................81

     J.    Kraft Heinz Settles Charges With SEC for $62 Million .....................82

     K.    Denial of Motion to Dismiss the Securities Class Action....................89

VI.     DAMAGES TO KRAFT HEINZ ......................................................................90

VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS......................................91

Demand Is Excused Because There Is Reason to Doubt the Independence
of the Majority of the Members of the Kraft Heinz Board ................................92

Demand Is Excused Because a Majority of the Board Members Face
a Substantial Likelihood of Liability for Their Misconduct ...............................99

VIII.   CLAIMS ................................................................................................103

COUNT I
Against All Defendants for Breach of Fiduciary Duty....................................103

COUNT II
Against 3G Capital, Behring, Lemann, Telles, Hees, Knopf, and Basilio –
*Brophy* Claim ...............................................................................................104

COUNT III
Against All Defendants for Unjust Enrichment ...........................................105

COUNT IV
Against Defendants Behring, Hees, Basilio, Knopf, Zoghbi, and Oliveira
for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act ..........105

COUNT V
Violations of Section 14 of the Securities Exchange Act of 1934 Against Behring,
Cahill, Abel, Dewan Jackson, Lemann, and Pope ......................................107

IX.    PRAYER FOR RELIEF .............................................................................108

JURY DEMAND .....................................................................................109

Lead Plaintiffs Stephen Silverman and Dale Waters, and additional plaintiffs Charlotte Hays, Ian Green, the Vladimir Gusinsky Revocable Trust, Richard Merritts, and Steven Hill (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, The Kraft Heinz Company ("Kraft Heinz" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (a *Brophy* claim), unjust enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and contribution for violations of Section 10(b) of the Exchange Act. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included the review and analysis of: (a) documents and information obtained pursuant to 8 Del. C. § 220 ("Section 220") (the "220 Demand"); (b) public filings made by Kraft Heinz and other related parties and non-parties with the United States ("U.S." Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by certain of the Defendants (defined herein) and other related non-parties; and (d) other publicly available information concerning Kraft Heinz and Defendants.

## I. NATURE AND SUMMARY OF ACTION

1. Kraft Heinz is one of the largest food and beverage companies, selling a variety of products under a host of brands including *Heinz, Kraft, Oscar Mayer, Philadelphia, Planters, Velveeta,* and *Lunchables.* The Company formed when Kraft Foods Group, Inc. ("Kraft") merged with and into The H.J. Heinz Company ("Heinz") in July 2015. Before the merger, Heinz had been controlled by Berkshire Hathaway Inc. ("Berkshire Hathaway") and an affiliate of defendant 3G Capital, Inc. ("3G Capital")

2.      After the merger, 3G Capital installed its founders to key management roles and implemented its notorious zero-based budgeting strategy, a means of cost-cutting by creating budgets allowing for only necessary expenses.  The strategy had purportedly been successfully employed by 3G Capital at other consumer goods companies to achieve growth by targeting duplication and waste without sacrificing operational capability, innovation, or brand support.

3.      However, at Kraft Heinz, zero-based budgeting set unrealistic expectations that had two effects: (i) the drastic cost-cutting practice deteriorated the Company's brands and value because quality declined as employees struggled to meet cost targets; and (ii) the procurement division misstated the terms of supplier contracts and front-loaded rebates, rather than recording them over the full multi-year term of the contracts, in an effort to meet the onerous demands from Kraft Heinz's management.

4.      Between 2016 and 2018, the Company reported positive financial results, suggesting that Kraft Heinz was another success story under 3G Capital's direction.

5.      However, on February 21, 2019, Kraft Heinz revealed a $15.4 billion impairment to its goodwill and intangible assets, including renowned trademarks such as *Kraft* and *Oscar Mayer*, apparently due to "revised margin expectations" "driven by [the Company's] second half performance."

6.      The same day, the Company disclosed that it had received a subpoena from the SEC regarding accounting policies related to the procurement function.  As a result of an internal investigation, Kraft Heinz recorded a $25 million increase to costs of products sold.

7.      On this news, the Company's share price fell $15.98, or over 33%, over four consecutive trading sessions to close at $32.20 per share on February 27, 2019, on unusually heavy trading volume.

8.      Media articles echoed investors' concerns that the true cause of the impaired assets was drastic cost-cutting measures.  For example, a *Wall Street Journal* article noted that the $15.4 billion impairment, "which is bigger than the $9.6 billion in the combined write-offs of the entire U.S. consumer staples industry from 2013 through 2017," may "validate fears that Kraft Heinz may have been more focused on costs than building brand equity."

9.      On May 6, 2019, the Company revealed that it would restate financial statements for 2016, 2017, and the first nine months of 2018 to reflect a $181 million increase in costs of products sold.  The restatement followed an internal investigation in connection with the SEC subpoena into the procurement area and "principally relate[d] to the incorrect timing of when certain cost and rebate elements" were recognized.

10.     In addition, the Company reported an additional $13 million impairment to goodwill and intangible assets due to "errors in the allocation of forecasted cash flows to certain brands."  Kraft Heinz also revealed a second subpoena from the SEC related to its assessment of goodwill and intangible asset impairments.

11.     These revelations precipitated the filing of a securities class action in the United States District Court for the Northern District of Illinois, captioned *Union Asset Management Holding AG v. Kraft Heinz Company, et al.*, Case No. 1:19-cv-01339 (the "Securities Class Action").

12.     Suspecting wrongdoing, on April 3, 2019, plaintiff Waters served a books and records demand on the Company pursuant to Section 220.  After negotiations, the Company produced documents and information subject to a confidentiality agreement in response to the demand.  One of the grounds for Plaintiffs' allegations is their review of books and records

produced by The Kraft Heinz Company, all of which are expressly incorporated by reference in this Complaint.

13.     On September 3, 2021, the SEC charged the Company, former Chief Operating Officer Eduardo Pelleissone, and former Chief Procurement Officer Klaus Hofmann with violations of "negligence-based anti-fraud, reporting, books and records, and internal accounting controls provisions of the federal securities laws." Kraft Heinz consented to cease and desist from future violations and pay a civil penalty of $62 million.

14.     Plaintiffs did not make a litigation demand on the Board prior to filing this action. The Board is currently composed of ten members, nine of whom are named as defendants in this action.  As alleged herein, at least four directors allowed misleading statements to be disseminated: the three directors on the Company's Audit Committee failed to ensure the effectiveness of Kraft Heinz's internal controls and integrity of its financial statements, and one non-independent director attended the Audit Committee meetings but failed to ensure candid disclosure of the Company's financial condition.  Moreover, four directors have significant interlocks as founders of 3G Capital, a controlling shareholder of the Company, and as directors of various other companies owned by 3G Capital.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) and 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.     THE PARTIES

**Plaintiffs**

17.     Lead Plaintiff Stephen Silverman purchased Kraft Heinz stock in November 2016 and has continuously owned Kraft Heinz stock since that time.

18.     Lead Plaintiff Dale Waters purchased Kraft Heinz stock in 2009 and has continuously owned Kraft Heinz stock since that time.

19.     Plaintiff Charlotte Hays purchased Kraft Heinz stock in January 2011 and has continuously owned Kraft Heinz stock since that time.

20.     Plaintiff Ian Green purchased Kraft Heinz stock in August 2012 and has continuously owned Kraft Heinz stock since that time.

21.     Plaintiff Vladimir Gusinsky Revocable Trust purchased Kraft Heinz stock in July 2015 and has continuously owned Kraft Heinz stock since that time.

22.     Plaintiff Richard Merritts purchased Kraft Heinz stock in April 2014 and has continuously owned Kraft Heinz stock since that time.

23.     Plaintiff Steven Hill purchased Kraft Heinz stock in October 2008 and has continuously owned Kraft Heinz stock since that time.

**Nominal Defendant**

24.     Nominal Defendant Kraft Heinz is a corporation incorporated under the laws of Delaware with its principal executive offices located at One PPG Place, Pittsburgh, Pennsylvania 15222.  The Company's stock trades on the NASDAQ exchange under the symbol "KHC."

**Defendants**

25.     Defendant Alexandre Behring ("Behring") has served as Chairman of the Company's Board since June 2013.  He is a co-founder and Managing Partner of 3G Capital.  At all relevant times, Behring was a member of the Compensation Committee and the Operations and Strategy Committee.  He is named as a defendant in the Securities Class Action.  Defendant Behring received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|
| 2015 | $133,533 | $301,881 | $435,414 |
| 2016 | $270,000 | $125,009 | $395,009 |
| 2017 | $270,000 | $125,008 | $395,008 |
| 2018 | $270,000 | $125,050 | $395,050 |
| 2019 | $263,984 | $125,003 | $388,987 |
| 2020 | $260,000 | $125,007 | $385,007 |

26.     Defendant Bernardo Hees ("Hees") served as the Company's Chief Executive Officer ("CEO") from July 2015 to June 30, 2019.  He served as the CEO of Heinz from 2013 to 2015. Hees was a partner of 3G Capital from July 2010 to June 2019 and is named as a defendant in the Securities Class Action. Hees received the following compensation from the Company:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive | All other | Total |
|---|---|---|---|---|---|---|
| 2015 | $1,000,000 | - | $2,878,583 | $1,450,000 | $39,455 | $5,368,038 |
| 2016 | $1,000,000 | $1,449,990 | - | $2,730,574 | $92,027 | $5,272,591 |
| 2017 | $1,000,000 | $2,730,557 | - | - | $463,622 | $4,194,179 |
| 2018 | $1,000,000 | $25,483,713 | - | $1,060,000 | $149,136 | $27,692,849 |
| 2019 | $536,538 | - | - | $1,084,000 | $1,212,904 | $2,833,442 |

27.     Defendant Paulo Basilio ("Basilio") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") since September 1, 2019.  Prior to that, he served as Kraft Heinz's Zone President of U.S. Business from October 2017 to September 2019, and as CFO of Kraft Heinz from July 2015 until October 2017. Basilio has been a partner of 3G

Capital since July 2012 and is named as a defendant in the Securities Class Action. Basilio received the following compensation from the Company:

| Fiscal Year | Salary & Bonus | Stock Awards | Option Awards | Non-Equity Incentive | All other | Total |
|---|---|---|---|---|---|---|
| 2015 | $550,000 | - | $1,869,511 | $500,000 | $414,270 | $3,433,781 |
| 2016 | $600,000 | $599,924 | - | $1,500,000 | $48,656 | $2,748,580 |
| 2017 | $623,077 | $1,499,909 | - | - | $79,840 | $2,202,826 |
| 2018 | $750,000 | $16,989,123 | - | $1,023,000 | $83,699 | $18,845,822 |
| 2019 | $750,000 | $13,556,182 | - | $780,000 | $283,212 | $15,369,394 |
| 2020 | $1,500,000 | $2,107,510 | - | $2,165,625 | $622,817 | $6,395,952 |

28.     Defendant David H. Knopf ("Knopf") served as the Company's CFO and EVP from October 1, 2017 to September 1, 2019.  Prior to that, Knopf was the Vice President of Finance, Head of Global Budget & Business Planning, Zero-Based Budgeting, and Financial & Strategic Planning of Kraft Heinz from July 2015 to August 2016, and Vice President, Category-Head of Planters Business from August 2016 to September 2017. Before joining the Company, Knopf held various roles at 3G Capital from 2013 and 2015 and has been a partner of 3G Capital since 2015. He is named as a defendant in the Securities Class Action. Knopf received the following compensation from the Company:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive | All other | Total |
|---|---|---|---|---|---|---|
| 2017 | $288,461 | $2,833,532 | $327,515 | - | $27,714 | $3,477,222 |
| 2018 | $500,000 | $5,946,213 | $497,835 | $500,000 | $28,177 | $7,472,225 |
| 2019 | $500,000 | $2,728,142 | - | $293,098 | $1,077,423 | $4,598,663 |

29.     Defendant George Zoghbi ("Zoghbi") has served as a director of the Company since April 19, 2018 and as a Special Advisor since October 2017.  He served as Chief Operating Officer of U.S. Business from July 2015 to October 2017.  He is named as a defendant in the Securities Class Action. Zoghbi received the following compensation from the Company:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive | All other | Total |
|---|---|---|---|---|---|---|---|
| 2016 | $850,000 | $7 mm | $1,210,564 | - | $3 mm | $57,777 | $12,135,578 |
| 2017 | $850,000 | $4 mm | $9,589,411 | $2,456,323 | - | $148,366 | $17,071,261 |

30.    Defendant Vince Garlati ("Garlati") has served as the Company's Global Controller and Principal Accounting Officer ("PAO") since June 18, 2018.

31.    Defendant Christopher R. Skinger ("Skinger") served as the Company's Vice President, Global Controller and PAO from July 2015 to June 18, 2018.

32.    Defendant Rafael Oliveira ("Oliveira") has served as the International Zone President of Kraft Heinz since July 2019. Prior to that, Oliveira served as the President of Kraft Heinz Europe from October 2016 to July 2019. He is named as a defendant in the Securities Class Action.

33.    Defendant John T. Cahill ("Cahill") has served as Vice Chairman of the Company's Board since July 2015.  Defendant Cahill is a member of the Operations and Strategy Committee. Defendant Cahill received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | All other Compensation | Total |
|---|---|---|---|---|
| 2015 | $64,293 | - | - | $64,293 |
| 2016 | $130,000 | $125,009 | - | $255,009 |
| 2017 | $130,000 | $125,008 | - | $255,008 |
| 2018 | $110,000 | $125,050 | $500,000 | $735,050 |
| 2019 | $121,429 | $125,003 | $250,000 | $496,432 |
| 2020 | $130,000 | $125,007 | - | $255,007 |

34.    Defendant Gregory Abel ("Abel") has served as a director of the Company since June 2013.  At all relevant times, defendant Abel was a member of the Operations and Strategy Committee.  Defendant Abel received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|

| 2015 | $54,402 | $182,118 | $236,520 |
| 2016 | $125,009 | $125,009 | $235,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,054 | $125,050 | $235,104 |
| 2019 | $110,024 | $125,003 | $235,027 |
| 2020 | $110,015 | $125,007 | $235,022 |

35. Defendant Feroz Dewan ("Dewan") served as a director of the Company from October 21, 2016 to May 2020. At all relevant times, Dewan was a member of the Audit Committee. Defendant Dewan received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $21,522 | $125,009 | $83,857 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,054 | $125,050 | $235,104 |
| 2019 | $110,024 | $125,003 | $235,027 |
| 2020 | $38,690 | - | $38,690 |

36. Defendant Jeanne P. Jackson ("Jackson") served as a director of the Company from July 2015 to May 2020. At all relevant times, Jackson was a member of the Audit Committee and the Operations and Strategy Committee. Defendant Jackson received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
| --- | --- | --- | --- |
| 2015 | $54,402 | - | $54,402 |
| 2016 | $110,000 | $125,009 | $235,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,000 | $125,050 | $235,050 |
| 2019 | $110,024 | $125,003 | $235,027 |
| 2020 | $38,690 | - | $38,690 |

37. Defendant Jorge Paulo Lemann ("Lemann") has served as a director of the Company since June 2013. At all relevant times, Lemann was a member of the Compensation Committee. Lemann is a co-founder of 3G Capital and served as a director since 2004. Defendant Lemann received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
| --- | --- | --- | --- |
| 2015 | $54,402 | $182,118 | $236,520 |

| | | | |
|---|---|---|---|
| 2016 | $110,000 | $125,009 | $235,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,054 | $125,050 | $235,104 |
| 2019 | $110,024 | $125,003 | $235,027 |
| 2020 | $110,015 | $125,007 | $235,022 |

38.     Defendant John C. Pope ("Pope") has served as a director of the Company since July 2015.  At all relevant times, Pope was a member of the Audit and Compensation Committees. Defendant Pope received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|
| 2015 | $64,293 | - | $64,293 |
| 2016 | $130,000 | $125,009 | $255,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $130,000 | $125,050 | $255,050 |
| 2019 | $130,000 | $125,003 | $255,003 |
| 2020 | $130,000 | $125,007 | $255,007 |

39.     Defendant Alexandre Van Damme ("Van Damme") has served as a director of the Company since April 19, 2018.  Defendant Van Damme received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|
| 2018 | $82,500 | $125,050 | $207,550 |
| 2019 | $110,024 | $125,003 | $235,027 |
| 2020 | $110,015 | $125,007 | $235,022 |

40.     Defendant Tracy Britt Cool ("Cool") served as a director of the Company from June 2013 to January 23, 2020.  Defendant Cool received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|
| 2015 | $54,402 | $206,129 | $260,531 |
| 2016 | $110,000 | $125,009 | $235,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,054 | $125,050 | $235,104 |
| 2019 | $192,503 | $125,003 | $317,506 |
| 2020 | $6,951 | - | $6,951 |

41.     Defendant Marcel Herrmann Telles ("Telles") served as a director of the Company from June 2013 to June 2019.  He is a co-founder and has been a director of 3G Capital since before 2015.  Defendant Abel received the following compensation from the Company:

| Fiscal Year | Fees | Stock Awards | Total |
|---|---|---|---|
| 2015 | $54,402 | $182,118 | $236,520 |
| 2016 | $110,000 | $125,009 | $235,009 |
| 2017 | $110,000 | $125,008 | $235,008 |
| 2018 | $110,000 | $125,050 | $235,050 |
| 2019 | $49,560 | - | $49,560 |

42.     Defendant Mackey J. McDonald ("McDonald") served as a director of the Company from July 2015 to April 19, 2018.  During his tenure, McDonald served as a member of the Audit Committee.  He was paid at least $558,870 in directors' fees consisting of cash and incentive stock.

43.     Defendants Behring, Hees, Basilio, Knopf, Zoghbi, Garlati, Skinger, Oliveira, Cahill, Abel, Dewan, Jackson, Lemann, Pope, Van Damme, Cool, Telles, and McDonald are sometimes referred to herein as the "Individual Defendants." Defendants Behring, Zoghbi, Abel, Dewan, Jackson, Lemann, Pope, Van Damme, Cool, Telles, and McDonald are sometimes referred to herein as the "Director Defendants."

44.     Defendant 3G Capital, along with its affiliates, is one of the largest beneficial owners of Kraft Heinz common stock.  3G Capital is a private equity firm that specializes in buyout investments in brands and businesses in the retail and consumer sectors.  Defendants Hees, Basilio, Knopf, Behring, Lemann, and Telles at all relevant times were partners and/or controlling persons of 3G Capital.

**Relevant Non-Parties**

45.     Timothy Kenesey ("Kenesey") has served as a director of the Company since January 23, 2020.  Kenesey is President and Chief Executive Officer of Berkshire Hathaway's

MedPro Group, the nation's largest healthcare liability insurance company, where he has served since 2001. Kenesey has also served as the Chairman of Fechheimer Brothers, a Berkshire Hathaway public safety uniform and apparel company, since 2007, and the chairman of other smaller Berkshire Hathaway insurance subsidiaries. Kenesey is a member of the Compensation Committee.

46.     Joao M. Castro-Neves ("Castro-Neves") has served as a director of the Company since June 2019. He has been a partner of 3G Capital since July 2018. Castro-Neves is a partner with 3G Capital. Castro-Neves previously served as Chief Executive Officer of Anheuser-Busch, AB InBev's North American unit, and Zone President, North America of AB InBev, from January 2015 until December 2017.

47.     Miguel Patricio has served as the CEO since July 1, 2019.

48.     Rashida La Lande ("La Lande") has served as Senior Vice President of the Company since January 16, 2018.

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

A.     Fiduciary Duties

49.     By reason of their positions as officers, directors, and/or fiduciaries of Kraft Heinz and because of their ability to control the business and corporate affairs of Kraft Heinz, at all relevant times, the Individual Defendants owed Kraft Heinz and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Kraft Heinz in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Kraft Heinz and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Kraft Heinz and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Kraft Heinz, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Kraft Heinz, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

51.     To discharge their duties, the officers and directors of Kraft Heinz were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Kraft Heinz were required to, among other things:

> (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

> (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

> (c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

> (d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Code of Ethics**

52.     The Kraft Heinz Board has also adopted a written Code of Business Conduct and Ethics for Non-Employee Directors and Code of Conduct for Employees (the "Code of Ethics") that is designed to deter wrongdoing and promote: "honest and ethical conduct; due care, diligence

and loyalty; confidentiality of our proprietary information; compliance with applicable laws, rules and regulations, including insider trading compliance; and accountability for adherence to the Directors Ethics Code and prompt internal reporting of violations."

53.     Among other things, the Code of Ethics provides that the Board is committed to "[p]romoting an ethical culture . . . and creating accountability for violations of the laws and policies." It further states that "[t]he Board understands its responsibility for setting the 'tone at the top' and will observe the highest ethical standards by acting with honesty and integrity."

### C.     Duties of Audit Committee

54.     The members of the Company's Audit Committee must also adhere to the duties set forth by the Audit Committee Charter. The charter provides the Audit Committee is responsible for assisting the Board's oversight of, among other things, "[t]he integrity of Kraft Heinz's financial statements and Kraft Heinz's accounting and financial reporting processes and systems of internal control over financial reporting and safeguarding Company assets." The committee is also responsible for "[t]he performance of Kraft Heinz's internal auditors and internal audit function," as well as "Kraft Heinz's financial matters and financial strategy" and "Kraft Heinz's guidelines and policies with respect to risk assessment and risk management."

55.     With respect to the Company's financial statements and related disclosures, the Audit Committee Charter provides:

1.  <u>Accounting Policies.</u> The Committee will review and discuss with management, the internal auditors and the independent auditors, in separate meetings if the Committee deems appropriate:

    a)  Any analyses or other written communications prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

    b)  Kraft Heinz's critical accounting policies and practices;

      c)  The effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on Kraft Heinz; and

      d)  Major issues regarding accounting principles and financial statement presentations, including any significant changes in Kraft Heinz's selection or application of accounting principles, and major issues as to the adequacy of Kraft Heinz's internal controls over financial reporting and safeguarding Company assets, and any special steps adopted in light of material control deficiencies

2.  <u>Form 10-K.</u> Annually, the Committee will recommend to the Board whether Kraft Heinz's consolidated financial statements should be included in Kraft Heinz's annual report on Form 10-K.

3.  <u>Annual Report</u>. The Committee will prepare and approve the Committee's annual report to stockholders for inclusion in Kraft Heinz's annual proxy statement.

4.  <u>PEO and PFO Certifications.</u> The Committee will review disclosures made by Kraft Heinz's principal executive officer(s) and principal financial officer(s) regarding compliance with their certification obligations under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including Kraft Heinz's disclosure controls and procedures and systems of internal control over financial reporting, and evaluations thereof.

5.  <u>Earnings Guidance.</u> The Committee will review and discuss earnings press releases and will generally discuss the type and presentation of (a) information to be included in earnings press releases (in particular any use of "pro forma" or "adjusted" non-GAAP information) and (b) financial information and earnings guidance provided to analysts and rating agencies.

6.  <u>Internal Controls and Financial Reporting Review.</u> The Committee will review and discuss with management, the independent auditors, and the internal auditors the quality and adequacy of Kraft Heinz's financial reporting processes, systems of internal control over financial reporting and safeguarding of Company assets and disclosure controls and procedures, including whether there are (a) any significant deficiencies in the design or operation of such processes, controls and procedures, (b) any material weaknesses in such processes, controls and procedures, (c) any corrective action taken or proposed to be taken with regard to significant deficiencies and weaknesses, (d) any fraud involving management or other employees with a significant role in such processes, controls and procedures, and (e) any significant fraud involving management or any Kraft Heinz employee.

      56.    As to legal and regulatory compliance, the Audit Committee charter provides that

its members must review "the application and administration of all director and employee codes

of conduct and ethics" and "make determinations on exceptions to the Codes and discuss actual and alleged violations of the Codes." Moreover, the committee must "discuss Kraft Heinz's guidelines and policies with respect to risk assessment and risk management, including Kraft Heinz's major financial risk exposures and the steps that have been taken to monitor and control such exposures."

57. The Audit Committee charter also dictated specific duties with respect to financial reporting, disclosure, and associated reports:

1. Review of Financial Statements. The Committee will review and discuss with the independent auditors and with management the results of the annual audit of Kraft Heinz's consolidated financial statements and interim financial statements, in each case prior to the filing or distribution thereof, including:

    a) Kraft Heinz's disclosures within the footnotes to the Financial Statements and under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and

    b) Any appropriate matters regarding accounting principles, practices and judgments and the independent auditors' opinion as to the quality thereof and any items the independent auditors are required to communicate to the Committee in accordance with standards established and amended from time to time by the Public Company Accounting Oversight Board.

2. Attestation and Report. The Committee will review the independent auditors' attestation and report on management's assessment of internal control over financial reporting.

3. Audit Problems and Responses. The Committee will review and discuss with the independent auditors any audit problems or difficulties and management's response thereto, including (a) any restrictions on the scope of the independent auditors' activities or access to required information, (b) any significant disagreements with management, (c) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise), (d) any communications between the audit team and the independent auditors' national office with regard to significant auditing or accounting issues presented by the engagement, and (e) any "management" or "internal control" letter issued, or proposed to be issued, by Kraft Heinz's independent auditors.

4. <u>Hiring Policy</u>. The Committee will establish clear policies for Kraft Heinz's hiring of current or former employees of the independent auditors.

5. <u>Annual Evaluation</u>. At least annually, the Committee will evaluate the independent auditors' qualifications, performance and independence, and present the Committee's conclusions and recommendations with respect to the independent auditors to the Board. As part of such evaluation, the Committee will:

    a) Obtain and review a report from Kraft Heinz's independent auditors describing (i) the independent auditors' internal quality-control procedures, and (ii) any material issues raised by (A) the most recent internal quality-control review or peer review of the auditing firm, or (B) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

    b) To require that the independent auditors' prepare and deliver annually a statement of independence (it being understood that the independent auditor is responsible for the accuracy and completeness of such statement), to discuss with the independent auditor any relationships or services disclosed that may impact the objectivity and independence of the Company's independent auditors and to take appropriate action in response to such statement to satisfy itself of the independent auditors' independence;

    c) Review and evaluate the independent auditors' lead audit partner's experience, qualifications and performance;

    d) In addition to assuring the regular rotation of the lead partner(s) as required by law, consider whether the independent auditing firm should be rotated, so as to assure continuing auditor independence; and

    e) Obtain management's and the internal auditor's opinion of the independent auditors' performance.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

58. Formed when Kraft merged with and into Heinz in July 2015 (the "Merger"), Kraft Heinz is one of the largest food and beverage companies in the world. Before the Merger, Kraft was a public company with a variety of valuable, widely recognized brands, including *A.1., Capri Sun, Jell-O, Kool-Aid, Kraft, Oscar Mayer, Philadelphia* and *Velveeta*, and Heinz was a private

company that manufactured and marketed packaged foods, including ketchup, condiments and sauces, frozen foods, beans, and other food products.

59.     Before the merger, Heinz had been controlled by Berkshire Hathaway and 3G Special Situations Fund III, L.P., an affiliate of 3G Capital, each of whom beneficially owned approximately 50% of Heinz common stock.  3G Capital is a Brazilian-American private equity firm known for its use of cost-cutting strategies, including "zero-based budgeting."  Zero-based budgeting creates budgets using expenses only if they are deemed necessary in a given period, regardless of what the budget may have been in previous periods; each year, the budget begins at $0 and all business expenses must be justified for each new period.  Zero-based budgeting has been successfully used by many consumer goods companies, including Unilever PLC, Campbell Soup Co., and Kellogg Co., to achieve growth by targeting duplication and waste without sacrificing operational capability, innovation, or brand support.  3G Capital popularized zero-based budgeting in connection with its many acquisitions, including: (i) in 2008 when 3G Capital led InBev's takeover of Anheuser-Busch to form AB InBev; (ii) in 2010 when 3G Capital acquired Burger King Worldwide Inc. and combined it with Tim Hortons Inc. in 2014 to form Restaurant Brands International.

60.     The Merger was completed in July 2015.  After the Merger, Berkshire Hathaway and 3G Capital together owned approximately 51% of the outstanding shares of Kraft Heinz common stock.   In connection with the Merger, Kraft's intangible assets were valued at approximately $48 billion; Kraft's trademarks accounted for $43.1 billion of this value.

61.     Following the Merger, the controlling shareholders installed their executives and partners to key roles: (i) defendant Hees, a partner at 3G Capital since 2010, became CEO; (ii) defendant Basilio, a partner of 3G Capital since 2012 and CFO of Heinz, became EVP and CFO;

(iii) defendant Knopf, a partner of 3G Capital, became EVP and CFO in 2017 when defendant Basilio became the Company's U.S. Zone President; (iv) Bruno Keller, formerly at AB InBev, became President of Kraft Heinz Canada; (v) Pedro Devron, a 3G Capital partner, became Managing Director of Kraft Heinz Brazin; (vi) Marcos Rodrigues, who worked under Hees as CEO of America Latina Logistica S/A (which was controlled by 3G Capital), became the Company's Head of the Global Center of Excellence; and (vii) Melissa Werneck, who also worked under Hees at America Latina Logistica S/A, became the Company's Global Chief People Officer. Moreover, 3G Capital appointed Behring, Lemann, and Telles to the Board, while Berkshire appointed Abel, Buffett, and Cool to the Board.

62.     Upon the closing of the Merger, Kraft Heinz recorded $29 billion in goodwill for the Kraft brands and $45.1 billion for indefinite-lived intangible assets.

**B.      After the Merger, the Individual Defendants Cause Kraft Heinz to Implement Disastrous Cost-Cutting Practices**

63.     After the Merger, the Individual Defendants caused the Company to adopt 3G Capital's cost-cutting targets. These unrealistic cost savings goals had two effects: (i) the drastic cost-cutting practice deteriorated the Company's brands and value because quality declined as employees struggled to meet cost targets; and (ii) the procurement division misstated the terms of supplier contracts and front-loaded rebates, rather than recording them over the full multi-year term of the contracts, in an effort to meet the onerous demands from Kraft Heinz's management.

64.     Citing former employees, the Securities Class Action alleges that the Individual Defendants cut costs by, among other things:

- implementing indiscriminate layoffs that eviscerated the Company's R&D and supply chain;

- eliminating critical maintenance and product quality functions;

- making across-the-board cuts to vendor and supplier services;

- closing key plants and distribution centers without adequate replacements;

- making drastic cuts to media and marketing, which Defendants attempted to disguise by reclassifying the Company's expenditures; and

- eliminating important promotional tools, including providing trade dollars to customers, that were key to securing valuable retail space.

Securities Class Action, ECF No. 274 ("Securities CAC"), ¶ 78. Rather than targeting the "efficiencies" and "synergies" of the Merger, the Individual Defendants set gross dollar cost-cutting requirements that were not tied to any purported redundancies or duplication. *Id.* at ¶ 84. Often, there was no guidance as to how to achieve these cost-cutting targets. *Id.*

65. These cost-cutting measures were implemented with a focus on the bottom line, rather than guided by the efficiencies of the Merger. For example, in 2016, Kraft Heinz's management required 10% savings from the procurement department, even though costs were expected to increase due to commodity inflation. *Id.* at ¶ 85. A former employee recalled that management would "look at what the EBITDA needs to be [and] back into the numbers." *Id.* at ¶ 86.

66. These measures deteriorated the value of Company's brands and trademarks due to declining profitability. Kraft Heinz experienced decreases in market share as consumers switched to organic brands and small or private label alternatives with competitive prices, and the Company was experiencing supply chain issues and cost inflation. For example, Kraft Heinz refused to provide trade dollars for Planters to Walmart, a customer which accounted for about 20-30% of the brand's revenue, leading Walmart to pull distribution for the nuts in 2016. *Id.* at ¶ 150. Moreover, Walmart accounted for 9% of all sales of Oscar Mayer, another of the Company's brands, but for similar reasons the customer cut more than 20% of Oscar Mayer products and severely reduced its promotion, causing an approximate reduction by 5-10% of Oscar Mayer's Walmart revenue. *Id.* at ¶ 151.

67.     As early as May 2017, the Individual Defendants knew or should have known that the cost cutting measures adversely impacted the Company's operations, profitability, and internal controls.

### C.     The Individual Defendants Cause Kraft Heinz to Issue Materially Misleading Statements About the Impact of the Company's Cost-Cutting Measures

68.     On November 5, 2015, Kraft Heinz held a conference call for the third quarter 2015 financial results, during which defendant Hees stated that the Company was generating its "best-in-class margins" by making its supply chain "more efficient." He stated that Kraft Heinz had "already made significant progress" in "maintain[ing] best-in-class margins" through "zero-based budgeting and making [its] manufacturing distribution footprint more efficient." Defendant Basilio likewise stated that "consolidation of [the] manufacturing across Kraft Heinz North America . . . will eliminate excess capacity and reduce operational redundancies, making [the Company] more competitive and improving [its] ability to drive profitable growth for many years to come." Basilio also touted the $1.5 billion in "synergy savings" that would result from these cost-cutting measures and purported elimination of redundancies.[1]

69.     The above statements were materially misleading because they failed to disclose that the purported savings would result from wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance, rather than from reducing operational redundancies.

70.     On the November 5, 2015 earnings call, defendant Hees also stated that Kraft Heinz was "committed to growing [its] great  brands by accelerating big bet innovations, investing more in working media, and building aggressive sales teams." Defendant Zoghbi agreed, stating that the

---

[1] Unless otherwise stated, all emphases in bold and italics hereinafter is added.

Company was "putting [its] resources in and . . . making [its] investments" in "better implementation of promotional activities based on better return on investments."

71.     The above statements were materially misleading because they failed to disclose that, rather than investments in promotional activities and innovations, the Company implemented wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance.

72.     On February 25, 2016, Kraft Heinz held a conference call in connection with its fourth quarter and full year 2015 financial results. During the call, defendant Hees touted the Company's "solid EBITDA and margin gains based on savings from manufacturing footprint efficiencies and improved product mix." Defendant Basilio elaborated that U.S. "margins picked up momentum from a combination of increased integration savings and better overhead cost performance." Defendant Hees also touted the improvements to Kraft Heinz's supply chain, stating that the Company had "significantly improved [its] case fill rate in United States, and Europe to over 97% -- our best performance in both the legacy Heinz and legacy Kraft business in quite a while."

73.     During the same call, defendant Hees claimed that the Company was "pushing this agenda of innovation, of go-to-market capabilities, and higher marketing dollars in a much faster pace than we did at" Heinz, suggesting that Kraft Heinz would not experience the "downdraft on revenues" seen when cost savings program was implemented at Heinz. Defendant Zoghbi added that the working media "part of marketing will be growing by about $50 million this year versus prior year in the United States."

74.     The above statements on February 25, 2016 were materially misleading because they failed to disclose: (i) that, rather than recognizing synergies from the integration, Kraft Heinz

had implemented wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance; (ii) that these cost-cutting measures dramatically reduced productivity, service quality, and distribution, which resulted in case fill rates that were consistently in the mid-70% range; (iii) that, as a result, Kraft Heinz's relationship with retailers was significantly impaired and the Company lost business, which would require the Company to reinvest purported synergy savings to rebuild the business.

75.     On May 4, 2016, Kraft Heinz held a conference call in connection with its first quarter 2016 financial results, during which defendant Basilio confirmed that zero-based budgeting savings were "the main driver of those savings [i.e. synergies in the savings]." He also stated that Kraft Heinz was "seeing this [sic] savings appearing in our results earlier."

76.     Also on the May 4, 2016 call, an analyst clarified whether the cost savings "potentially . . . will tick off your customers, you will lose some display space and you will suffer." Defendant Hees reiterated that the cost reductions were generating "efficiencies," stating:

> The reason we are confident about the model in moving forward – if you think about it, because we believe that efficiencies we are generating put us in a competitive advantage to really support and push an agenda of profitable growth, by investing in the things we believe can really affect the marketplace. And like we say are really three pillars is innovation, both big bets strategy, more marketing expenditures and building the go-to-market capability . . . . [W]e truly believe we are preserving and investing where our consumers can see in the marketplace, and the efficiencies can help us to have a competitive advantage to push the agenda of profitable growth.

77.     During the May 4, 2016 call, the Individual Defendants touted the benefits of cost-cutting on supply chain performance. Defendant Basilio stated that Kraft Heinz was "ramping up [its] IT and supply chain footprint activities significantly, and we are highly aware that *in many ways we have benefited so far by a lack of business disruption.*" Specifically, defendant Hees pointed out that the Company's "case fill rate in the United States was 98%. Europe was above target at more than 99%, and Canada achieved for the first time 97%." These measures also

resulted in "good performance with [the Company's] customers which is shown by increased service levels in the quarter," according to Hees. He further stated that Kraft Heinz is "already becoming the benchmark for customer service in some key categories."

78. The above statements on May 4, 2016 were materially misleading because they failed to disclose: (i) that, rather than recognizing synergies from the integration, Kraft Heinz had implemented wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance; (ii) that these cost-cutting measures dramatically reduced productivity, service quality, and distribution, which resulted in case fill rates that were consistently in the mid-70% range; and (iii) that, as a result, Kraft Heinz's relationship with retailers was significantly impaired and the Company lost business, which would require the Company to reinvest purported synergy savings to rebuild the business.

79. On August 4, 2016, Kraft Heinz held a conference call in connection with its second quarter 2016 financial results, during which the Individual Defendants continued to represent that the cost-cutting measures were "synergistic." When a Barclays analyst asked about the "$300 million in synergies in the quarter," defendant Basilio confirmed that Kraft Heinz is "at just over $300 million in savings for the second quarter." And, the Company was purportedly "achieving savings without sacrificing quality" and had already addressed the few "minor disruptions" in its supply chain, according to defendant Zoghbi. He continued:

> During the quarter, the bulk of our integration activity shifted to supply chain and operations activities, including an SAP integration go-live, which was completed in the quarter. Thus far, ***our service levels remain good for most of our product groups*** with some challenges in the cold cut segment of our meat business, as well as ***minor disruptions*** in food service in the month of May that was ***quickly corrected. Overall, as Bernardo mentioned, our savings are coming in faster than planned and we are achieving these savings without sacrificing quality.***

80.     Also during the August 4, 2016 call, defendant Hees claimed that Kraft Heinz had completed a "critical step" in the integration, consolidating its supply chain and enterprise IT systems, while keeping case fill rates "on target":

> *In terms of our integration program, we delivered roughly $300 million of savings in Q2.* But I am even happier to report that, in Q2, we *put a critical step behind us*, one of the riskier activities we had in our agenda. That was the integration of the legacy Kraft and legacy Heinz front office SAP modules in North America. So now we are one face to our customers as a [systems-integrated] company.
>
> *And we did this while keeping our case fill rate in the United States on target at 98%* with minor service issues in food service already addressed. In fact, we *had very good execution around the world in Q2* with Europe remaining above its case fill rate target at more than 99%, Canada at 97% and our rest of the world segment for the first time above 96%. Importantly, none of this would be possible without bringing our performance-driven culture to life.

81.     During the August 4, 2016 call, a Sanford Bernstein analyst sought to clarify the impact of the reduced promotional activity, asking whether "the relationship with the retailers may be weakening as [Kraft Heinz] pull[s] back on some of that promotional activity." Defendant Zoghbi dismissed the concern because Kraft Heinz was "not going into large deep discounting [of] promotional activities," but rather had seen "some improvement due to minimization of negative ROI promotional activities." He affirmed that the "relationship with retailers is very strong." Regarding the "challenging environment" of "declining consumption" in the consumer goods markets, defendant Zoghbi added that Kraft Heinz was "investing more in [its] new product development program in line with where the consumer trends are now and where they are going in the future and we are increasing our investment and supporting our big brands."

82.     The above statements on August 4, 2016 were materially misleading because they failed to disclose: (i) that, rather than recognizing synergies from the integration, Kraft Heinz had implemented wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance; (ii) that these cost-cutting measures dramatically reduced productivity, service

quality, and distribution, which resulted in case fill rates that were consistently in the mid-70% range; (iii) that, as a result, Kraft Heinz's relationship with retailers was significantly impaired and the Company lost business, which would require the Company to reinvest purported synergy savings to rebuild the business; and (iv) that Kraft Heinz had not integrated the legacy companies' SAP modules, which led to supply chain disruptions, poor service quality, and lost business.

83. On November 3, 2016, Kraft Heinz held a conference call in connection with its third quarter 2016 financial results, during which defendant Zoghbi assured that the "integration program" was "on plan." Specifically, he stated:

> The final piece of my update is our integration program where we are well underway and, more importantly, **on plan**. During Q3, we maintained 98% case per rate [i.e. fill rate] despite some service issues that continued to negatively impact cold cuts and Lunchables and held back our sales in those two parts of the business. That being said, we are improving those service issues in Q4.

84. During the same call, a Goldman Sachs analyst inquired about the Company's measures "to ensure that the North America growth is more sustainable," to which defendant Hees replied that Kraft Heinz's performance outside of North America was a function of "temporary" issues unrelated to the Company's model. Specifically, he stated:

> First, on the rest of the world part, we continue to see really very solid near- and long-term growth perspective for the business. As Paulo said, there were temporary behind, **temporary issues** behind this quarter like distributors disruption in Middle East and Africa . . . . **I cannot see any correlation to your question to the model given that everything we did** . . . if you see all our lines connected to the market like marketing, salary, and other investments, **they all grew** up in [the UK] in the last four years.

85. Also during the November 3, 2016 call, an analyst asked about the Company's "promotion effectiveness," and defendant Zoghbi stated that "trade promotion and some promotional. . . is part of our broader revenue management program. What we focused on, since we came together as one company, is truly building the capabilities." He stated that "discussions with our trade partners has been very good because it has been mutually beneficial for them and

us." Defendant Hees specifically assured that Kraft Heinz is "not going to somebody and just saying that we are cutting across the board promotional activities. We are just doing more with less."

86.     The above statements on November 3, 2016 were materially misleading because they failed to disclose: (i) that, rather than recognizing synergies from the integration, Kraft Heinz had implemented wide-ranging cost-cutting measures that reduced essential brand support and supply chain performance; (ii) that these cost-cutting measures dramatically reduced productivity, service quality, and distribution, which resulted in case fill rates that were consistently in the mid-70% range; and (iii) that, as a result, Kraft Heinz's relationship with retailers was significantly impaired and the Company lost business, which would require the Company to reinvest purported synergy savings to rebuild the business.

87.     On February 15, 2017, Kraft Heinz held a conference call in connection with its fourth quarter and full year 2016 financial results. During the call, defendant Hees claimed that the Company's cost-cutting measures are "paying off" and leading to "better performance at retail." Specifically, he stated:

> It is also clear that our *go-to-market investments are paying off* and delivering profitable growth through distribution gains and *better performance at retail*. We supported go-to-market activations with better management or a few teams in Canada, US, Brazil, Russia and China. These efforts result in phased *execution improvement* in a challenging retail environment all around the world, including Australia, Japan, China, Russia, Egypt, Brazil, and Germany.
>
> [Through] our retail routines, including zero-based budgeting and many of my objectives, we drove *sustainable improvements* throughout the year. *ZBB savings were a key driver of value creation across the Company*, delivering faster than expected savings at the outset of the year and contributing to the Company achieving $1.2 billion in cumulative savings since the inception of our Integration Program.

88.     During the same call, defendant Zoghbi touted the success of investments in the Company's brands and infrastructure, stating:

> We've been working on establishing the revenue management program
> infrastructure processes and the benefit of it for quite some time now . . . it works
> best for us, not just in the investments in the footprint, but more in investments in
> brand and particularly in visiting the brand equity as we invest in marketing
> activity, as we invest in new products, as we invest in renovation like taking
> artificial stuff out . . . . So that's giving us the power to one, price, and two, the
> ability to increase household penetration through renovation of product and
> innovation of product.

89. The above statements were materially misleading because they failed to disclose:

(i) that the purported sustainable savings were achieved by cost-cutting measures that reduced

essential brand support and supply chain performance and function; (ii) that this included

indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of

critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic

losses in its supply chain, reduced productivity, and lower service quality, all of which impaired

relationships with retailers and led to significant loss of business.

90. On May 3, 2017, Kraft Heinz held its conference call in connection with the first

quarter 2017 financial results. During the call, an analyst specifically asked about the Unilever bid

and whether the notorious cost-cutting approach "could make it harder for you to execute

additional deals going forward," but defendant Hees denied that the "approach to reducing costs

may cut into [the earnings] multiple." Rather, he claimed that the measures would lead to "efficient

. . . profitable growth." When another analyst asked about "the perception [that] the cost savings

are close to full and fully identified and the revenues are declining," which "underscores this notion

that maybe the business – the whole model is broken, that it's not sustainable," defendant Hees

"strongly disagree[d]." He stated:

> Look, I strongly disagree with this statement . . . . [W]ith – the profitability level
> we have today allows us to invest strongly behind our brands and product quality.
> So with that in mind, our strategy really continues to be focusing on creating
> profitable growth within the company through really 4 things: first, Big Bet
> innovation, doing bolder and stronger product development; second, achieving a
> higher share of voice with more working media dollars behind our brands; third,

investing behind our go-to-market capabilities, touching the shelves in a much more structured way; and fourth, achieving the operation efficiencies so we can support and invest behind growth. Those are the 4 things we have been doing since the merger and the things we'll continue to build moving forward. So I strongly disagree with this statement.

91.     Yet another analyst clarified whether there were "any particular costs you could identify that you've reduced . . . that if you had to do over again, you wouldn't have done?" Defendant Hees affirmed that "there was **absolutely no** efficiencies or something that took over the capacity of the company to generate the things I said before: To focus on Big Bets, to focus on go-to-market capability, to grow our share of voice behind our brands and so. So it's a no."

92.     The above statements on May 3, 2017 were materially misleading because they failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

93.     On August 3, 2017, Kraft Heinz held a conference call in connection with its second quarter 2017 financial results during which defendant Hees stated that "[c]umulative savings from our integration program were approximately $1.45 billion at the end of the second quarter" and Kraft Heinz is "improving execution in all areas of the business." He confirmed that the Company "remain[s] no track with [its] cost savings initiatives."

94.     The above statements were materially misleading because they failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of

critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

95.     On November 1, 2017, Kraft Heinz held a conference call in connection with its third quarter 2017 financial results during which defendant Hees again affirmed that the Company was "on track" and touted the significant "integration savings" that would continue to deliver "sustainable, profitable growth."

96.     The above statements were materially misleading because they failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

97.     On May 2, 2018, Kraft Heinz held a conference call in connection with its first quarter 2018 financial results. During the call, defendant Hees stated that "even though we substantially complete our Integration Program in Q4, we *remain in a strong position to both offset cost inflation and fuel high-return investments in our brand.*"

98.     The above statement was materially misleading because it failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses

in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

99.     On August 3, 2018, Kraft Heinz held a conference call in connection with its second quarter 2018 financial results during which defendant Hees assured that the cost-cutting measures did not jeopardize revenue growth. He stated: "[A]s we always said as well, we wouldn't hesitate to sacrifice one point of margin to generate accelerated growth on the top line." Defendant Knopf stated that "we continue to have good visibility on significant productivity and cost savings initiatives for the remainder of the year and going into 2019 as well."

100.     The above statement was materially misleading because it failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

101.     On November 1, 2018, Kraft Heinz held a conference call in connection with its third quarter 2018 financial results. During the call, defendant Hees attributed the lower profitability during the quarter to "several *one-off* factors, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the *short term*." Defendant Knopf also attributed the disappointing performance to "*transitory issues* on both the sales and cost sides of the equation that we do not expect to repeat."

102.     The above statement was materially misleading because it failed to disclose: (i) that the purported sustainable savings were achieved by cost-cutting measures that reduced essential brand support and supply chain performance and function; (ii) that this included indiscriminate layoffs in the Company's R&D and supply chain departments and elimination of critical maintenance and product quality functions; and (iii) that the foregoing resulted in dramatic losses in its supply chain, reduced productivity, and lower service quality, all of which impaired relationships with retailers and led to significant loss of business.

**D.     The Individual Defendants Should Have Recorded Impairments Due to the Deterioration in Kraft Heinz's Brands Caused by the Cost-Cutting Measures**

103.     On November 6, 2015, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q for third quarter 2015. Kraft Heinz reported $50.6 billion in intangible assets and $46.8 billion in goodwill. It stated that Kraft Heinz "perform[s] [its] annual impairment testing in the second quarter or when a triggering event occurs" and that "[n]o impairment of goodwill was reported." Moreover, Kraft Heinz "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. . . . No events occurred during the [reporting period] that indicated it was more likely than not that [the Company's] indefinite-lived intangible assets were impaired."

104.     The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

105.     On March 3, 2016, the Individual Defendants caused Kraft Heinz to file its annual report on Form 10-K for the period ended December 31, 2015 (the "2015 10-K"), which stated

that the Company "performed [its] annual impairment testing in the second quarter of 2015, prior to the completion of the 2015 Merger" and "[n]o impairment of goodwill was reported" and "[t]here were no accumulated impairment losses to goodwill."

106.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

107.    On May 5, 2016, the Individual Defendants caused Kraft Heinz to file its quarterly report on Form 10-Q for the first quarter 2016, reporting $55.8 billion in intangible assets and $43.5 billion in goodwill. It stated that the Company "test[s] goodwill for impairment at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

108.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

109.    On August 5, 2016, the Individual Defendants caused Kraft Heinz to file its quarterly report on Form 10-Q for the second quarter 2016, reporting $53.6 billion in intangible assets and $44.6 billion in goodwill. It stated that the Company "test[s] goodwill for impairment

at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

110. The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

111. On November 4, 2016, the Individual Defendants caused Kraft Heinz to file its quarterly report on Form 10-Q for the third quarter 2016, reporting $53.5 billion in intangible assets and $44.5 billion in goodwill. It stated that the Company "test[s] goodwill for impairment at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

112. The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

113. On February 23, 2017, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, McDonald, Hees, Basilio, and Skinger caused Kraft Heinz to file its annual

report on Form 10-K for fiscal 2016 (the "2016 10-K"), reporting $55.8 billion in intangible assets and $44.1 billion in goodwill. It also stated that the Company "test[s] goodwill and indefinite-lived intangible assts for impairment at least annually in the second quarter or when a triggering event occurs," but "[n]o events occurred during the period ended December 31, 2016 that indicated it was more likely than not that" goodwill or indefinite-lived intangible assets "were impaired."

114.    In connection with the 2016 10-K, defendants Hees and Basilio signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud.

115.    The 2016 10-K also stated that defendants Hees and Basilio "concluded that [the Company's disclosure controls and procedures as of December 31, 2016, the end of the period covered by this report, were effective."  Furthermore, the report stated that there had been "no changes in [the Company's] internal control over financial reporting during the quarter ended December 31, 2016, that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."  Moreover, the 2016 10-K stated that "management determined that as of December 31, 2016, [the Company] maintained effective internal control over financial reporting."

116.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

117.    On May 4, 2017, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, McDonald, Hees, Basilio, and Skinger caused the Company to file its quarterly report for the period ended April 1, 2017 (the "Q1 2017 10-Q") with the SEC, reporting $53.4 billion in indefinite-lived intangible assets and $44.3 billion in goodwill.  The report was signed by defendants Basilio and Skinger, and defendants Hees and Basilio signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. Regarding disclosure controls and internal control over financial reporting, the Q1 2017 10-Q was substantially similar to the statements previously made by Kraft Heinz.  It stated that the Company "test[s] goodwill for impairment at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

118.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

119.    On August 4, 2017, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, McDonald, Hees, Basilio, and Skinger caused the Company to file its quarterly report for the period ended July 1, 2017 (the "Q2 2017 10-Q") with the SEC.  The report was signed by defendants Basilio and Skinger, and defendants Hees and Basilio signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of

any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure

of all fraud. Regarding disclosure controls and internal control over financial reporting, the Q2

2017 10-Q was substantially similar to the statements previously made by Kraft Heinz.

120.    The Q2 2017 10-Qreported $44.6 billion in goodwill and $53.5 billion in indefinite-

lived intangible assets. It also reported that, based on the annual impairment test, there was no

impairment to goodwill and a $48 million impairment to a trademark owned by the Company's

Italian subsidiary. The report stated, in relevant part:

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. *As a result of our 2017 annual impairment test, there was no impairment of goodwill*. Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.
>
> Our goodwill balance consists of 18 reporting units and had an aggregate carrying value of $44.6 billion as of July 1, 2017.
>
> *        *        *
>
> We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $48 million in SG&A for the three and six months ended July 1, 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our Europe segment as the related trademark is owned by our Italian subsidiary. *Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017*.
>
> Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.5 billion as of July 1, 2017. . . .

121.    The above statements were materially misleading because they failed to disclose:

(i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii)

that, as a result, it was likely that the Company's intangible assets and goodwill were impaired;

and (iii) that there were material weaknesses in the Company's internal control over financial

reporting with respect to goodwill and intangible asset testing.

122.     On November 6, 2017, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson,

Lemann, Pope, Telles, Hees, Knopf, and Skinger caused the Company to file a Form 8-K with the

SEC, disclosing that financial statements in the Q1 2017 10-Q and Q2 2017 10-Q "should not be

relied upon due to the misstatement in adopting new Accounting Standards Update 2016-15 ('ASU

2016-15'). . . . ASU 2016-15 requires companies to record cash receipts from beneficial interests

within trade receivable securitization programs as cash provided from investing activities in the

statement of cash flows."  Though the Company would file amended Form 10-Qs to "correctly

classify certain items in our condensed consolidated statements of cash flows," the Form 8-K stated

that these changes "[did] not reflect a fundamental change in our underlying business" and "[did]

not impact any other components of our consolidated financial statements, including, without

limitation, cash and cash equivalents, net income, net sales or any other financial data."

123.     In the same Form 8-K, the Company disclosed that there was a material weakness

in its internal controls relating to the adoption and disclosure of new accounting standards and that

its internal controls and procedures were not effective.  The Form 8-K stated, in relevant part:

> In reevaluating the effectiveness of the design and operation of our disclosure
> controls and procedures as of April 1, 2017 and July 1, 2017, and as part of our
> assessment as to whether or not there were any changes during the third quarter
> ended September 30, 2017 that have materially affected, or are reasonably likely to
> materially affect, our internal control over financial reporting, we have concluded
> that the ASU 2016-15 adoption misstatement, as described above, was primarily
> the result of a failure of an existing control surrounding the adoption and disclosure
> of new accounting standards. ***We have concluded that this control failure
> constitutes a material weakness in internal control over financial reporting and
> that our disclosure controls and procedures were not effective***. The remediation
> of this material weakness will primarily include steps to improve the validation and
> documentation of new accounting standards' impacts and communication with the
> appropriate individuals, including the importance of adherence to the internal
> control structure that is in place regarding the adoption of new accounting standards
> and guidance. We plan to have these remediation steps in place during our 2017
> fiscal year, but will allow for testing to determine operating effectiveness before
> concluding on remediation.

124.    The above statements in the November 6, 2017 Form 8-K were materially misleading because they failed to disclose: (i) that cost-cutting strategies implemented after the Merger led to improper accounting practices as employees struggled to meet unrealistic goals; (ii) that agreements related to the procurement function were improperly recorded; and (iii) that the value of Kraft Heinz's goodwill and intangible assets was overstated.

125.    On November 7, 2017, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, Hees, Knopf, and Skinger caused the Company to file its quarterly report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 10-Q"), reporting net income of $943 million.  The report was signed by defendants Knopf and Skinger.

126.    Regarding internal control over financial reporting, the Q3 2017 10-Q disclosed that the Company's "disclosure controls and procedures were not effective as of September 30, 2017 due to the material weaknesses in internal control over financial reporting related to the misapplication of ASU 2016-15." It further stated, in relevant part:

> We did not maintain effective controls over the adoption of new accounting standards. Specifically, we did not maintain effective controls to evaluate and document the impact of new accounting standards, including communication with the appropriate individuals in coming to our conclusions on the application of new standards.

> This control deficiency resulted in the misstatement of our operating and investing cash flows and related financial disclosures, and in the restatement of our consolidated financial statements for the quarters ended April 1, 2017 and July 1, 2017, including the comparable prior periods. Additionally, this control deficiency could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

127.    The Q3 2017 10-Q reported $53.6 billion in indefinite-lived intangible assets and $44.9 billion in goodwill. It stated that the Company "test[s] goodwill for impairment at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s]

indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

128.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

129.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

130.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

131. 

132.

133.



134.

135.    On February 16, 2018, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, Hees, Knopf, and Skinger caused the Company to file its 2017 10-K, reporting $44.8 billion in goodwill and $53.7 billion in indefinite-lived intangible assets.  These defendants signed the report, attesting to the accuracy of the information reported therein. The 2017 10-K disclosed, "[o]ur trademarks are material to our business and are among our most valuable assets," and "[w]e consider our intellectual property rights, particularly and most notably our trademarks, but also our patents, trade secrets, copyrights and licensing agreements, to be a significant and valuable aspect of our business."

136.    It also stated that the Company "test[s] goodwill and indefinite-lived intangible assts for impairment at least annually in the second quarter or when a triggering event occurs," but "[n]o events occurred during the period ended December 31, 2016 that indicated it was more likely than not that" goodwill or indefinite-lived intangible assets "were impaired."

137.    In connection with the 2017 10-K, defendants Hees and Knopf signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The 2017 10-K also stated that defendants Hees and Basilio "concluded that [the Company's disclosure controls and procedures, as of December 30, 2017, were effective." The 2017 10-K stated that the Company's internal control over financial reporting was effective.

138.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

139.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

140.    On May 3, 2018, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Skinger caused the Company to file its quarterly report on Form 10-Q for the period ended March 31, 2018 (the "Q1 2018 10-Q") with the SEC, reporting $44.8 billion in goodwill and $53.8 billion in indefinite-lived intangible assets. It stated that the Company "test[s] goodwill for impairment at least annually in the second quarter or when a triggering event occurs" and similarly that it "test[s] indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs." The Company stated that there were no impairments to goodwill or indefinite-lived intangible assets.

141.    The report was signed by defendants Knopf and Skinger, and defendants Hees and Knopf signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The Q1 2018 10-Q  also stated that defendants Hees and Knopf "concluded that our disclosure controls and procedures, as of March 31, 2018, were effective." Furthermore, the report stated that there had been "no changes in [the Company's] internal control over financial reporting during the quarter ended March 31, 2018, that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."

142.    The above statements were materially misleading because they failed to disclose: (i) that Kraft Heinz's severe cost-cutting measures had deteriorated the Company's brands; (ii) that, as a result, it was likely that the Company's intangible assets and goodwill were impaired; and (iii) that there were material weaknesses in the Company's internal control over financial reporting with respect to goodwill and intangible asset testing.

143.    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████    ███████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

144.     ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████    █████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

145.     ██████████████████████████████████████████

████████████████



146. ██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████████

147. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████    ████████████████

███████████████████████████████████████████████

██████████████████████████

148.   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

149.   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

- ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████

150. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████ ████████████████████

████████████████████████████

151. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

152. ███████████████████████████████████████

███████████████████████████████████████████

████████████ ████████████████████████ █████████████

███████████████████████████████████████████

███████████████████████████████████████████

153.

154.



155.

156.

157.    On August 3, 2018, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Garlati caused the Company to file its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "Q2 2018 10-Q") with the SEC, reporting $44.3 billion in goodwill and $53.4 billion in intangible assets.

158.    The Q2 2018 10-Q reported impairments to goodwill and intangible assets and indicated that four reporting units were at risk of additional impairments.  The report stated, in relevant part: :

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of June 30, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. *As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region.* The goodwill carrying value of this reporting unit was $509 million prior to its impairment. *Additionally, we noted that four of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, and $326 million for Southeast Asia.*

* * *

Accumulated impairment losses to goodwill were $164 million at June 30, 2018. There were no accumulated impairment losses to goodwill at December 30, 2017.

*        *        *

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of June 30, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. *As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the Quero brand in Brazil. Additionally, as of April 1, 2018, two brands (ABC and Smart Ones) each had excess fair value over its carrying value of less than 10%.* These brands had an aggregate carrying value of $665 million as of April 1, 2018.

As a result of our 2017 annual impairment testing, we recognized a non-cash impairment loss of $48 million in SG&A in the second quarter of 2017 . This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary.

159.    The report was signed by defendants Knopf and Garlati, and defendants Hees and Knopf certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud. The Q2 2018 10-Q also stated that defendants Hees and Knopf "concluded that our disclosure controls and procedures, as of June 30, 2018, were effective."  Furthermore, the report stated that there had been "no changes in [the Company's] internal control over financial reporting during the quarter ended June 30, 2018, that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting.

160.    The above statements made in connection with second quarter 2018 financial results were materially misleading because they failed to disclose: (a) that cost-cutting strategies implemented after the Merger led to improper accounting practices as employees struggled to meet unrealistic goals; (b) ███████████████████████████████████████████ ████████████████████████████████████████████ (c) ████████████████████████ (d) ████████████████ ████████████████████████████████████████████ ██████████████ (e) that agreements related to the procurement function were improperly recorded; (f) that the value of Kraft Heinz's goodwill and intangible assets was overstated; (g) that there was a material weakness in the Company's internal control over financial reporting; (h)  that, as a result of the foregoing, the Company's financial results were overstated; and (i) ████████ ████████████████████████████████████

161.    ████████████████████████████████████ ████████████████████████████████████████████



162.



163. ████████████████████████████

164. 

165.

166.     On November 2, 2018, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Garlati caused Kraft Heinz to file its quarterly report on Form 10-Q for the period ended September 29, 2018 (the "Q3 2018 10-Q") with the SEC, reporting $44.3 billion in goodwill and $53.0 billion in indefinite-lived intangible assets.  The report was signed by defendants Knopf and Garlati, and defendants Hees and Knopf signed certifications pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material change to Kraft Heinz's internal controls over financial reporting, and the disclosure of all fraud.

167.     The Q3 2018 10-Q  also stated that defendants Hees and Knopf "concluded that our disclosure controls and procedures, as of September 29, 2018, were effective." Furthermore, the report stated that there had been "no changes in [the Company's] internal control over financial reporting during the quarter ended September 29, 2018, that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting.

168.    The Q3 2018 10-Q stated that five of Kraft Heinz's reporting units were at risk of impairment, stating in relevant part:

> Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of September 29, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region. The goodwill carrying value of this reporting unit was $509 million prior to its impairment. Additionally, ***five of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, $326 million for Southeast Asia, and $232 million for Other Latin America.***
>
> . . . No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our goodwill was impaired.
>
> Accumulated impairment losses to goodwill were $164 million at September 29, 2018. There were no accumulated impairment losses to goodwill at December 30, 2017.

169.    Kraft Heinz also recognized a $215 million impairment to one of its trademarks. The Q3 2018 10-Q stated, in relevant part:

> In the third quarter of 2018, we recognized a non-cash impairment loss of $215 million in SG&A related to the *Smart One*s brand. This impairment loss was primarily due to reduced future investment expectations and continued sales declines in the third quarter of 2018. We transferred the remaining carrying value of *Smart Ones* to definite-lived intangible assets. No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our other indefinite-lived intangible assets were impaired.

170.    On November 6, 2018, Kraft Heinz announced that it agreed to sell its Canadian natural cheese business to Parmalat S.p.A for approximately $1.23 billion.

171.    The above statements in the Q3 2018 10-Q were materially misleading because they failed to disclose: (a) that cost-cutting strategies implemented after the Merger led to improper accounting practices as employees struggled to meet unrealistic goals; (b) ███████████

███████████████████████████████████████████████████

████ (c) ██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ (d) ████████████

███████████████████████████████████████████████████

██████████████ (e) ██████████████████████████████████

███████████████████████████████████████████████████

(f) that agreements related to the procurement function were improperly recorded; (g) that the value of Kraft Heinz's goodwill and intangible assets was overstated; (h) that there was a material weakness in the Company's internal control over financial reporting; (i) that, as a result of the foregoing, the Company's financial results were overstated; and (j) █████████████████

███████████████████████████████████████████████████

████

**E.** ██████████████████████████████████████████
████████████████████

172. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████



173. ████████████████████████████████

████████████████████████████████████

████████████████████████████

174. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████

175. ████████████████████████████████

█████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████

176. ████████████████████████████████

█████

████████████████████████████████

████████████████████████████

██ ████████████████████

██ ████████████████████████████

████████████████████████

██ ████████████████████████████

████████████████████████████

██████████

██ ████████████████████████████

- ███████████████████████████████████
  ██████

- ███████████████████████████████████
  █████████████

- ███████████████████████████

███████████████████████████████████████
███████████████████████████████████████
██████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████

██████████████████████

177. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

- ████████████████████████████████
  ███████

- ██████████████████████████████████
  ██████████████████

- ██████████████████████████████████
  ███████

- ██████████████████████████████████
  ███████████████████

- ███████████████████████████████

178. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████  ███████████████

██████████████████████████████████████████████

████████████████████████████████████

    ████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████
    ████████████████████████████████████
    ██████████████

179.   ████████████████████████████████████████

████████████████████████████



180. ████████████████████████████████████████

████████████████████████████





181. ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

182. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

183. ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

184. ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

   ██████████████████████████████████
   ██████████████████████████████████
   ██████████████████████████████████
   █████████ .

185. ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

**F.** ████████████████████████████████

186. ██████████████████████████████████████████████

████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

187. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

188. ██████████████████████████████████████████████

████████████████████████████████ ████████████████████████

██████ ████ ████ ████ ████ ████ ████ ████ ███ ████ ████

████████████████████████████████████████████████████████

███████████████

189. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

190. ████████████████████████████████████

### G. The Individual Defendants Cause the Company to Issue a Misleading Proxy

191. On March 2, 2018, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, and McDonald issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on April 23, 2018. In the proxy statement, these ten Individual Defendants solicited stockholder votes in favor of three management proposals, including: (i) a proposal to elect Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, and Telles to new terms as directors; and (ii) a proposal to approve executive compensation.

192. The proxy statement disclosed that the Board had determined that defendants Cahill and Zoghbi were not independent directors. Regarding corporate governance, the proxy statement stated that the Board had "adopted a number of corporate governance practices to promote and enhance the Board's independent leadership, accountability and oversight." Specifically, the Board maintained an Audit Committee tasked with oversight of, among other things, the Company's financial statements:

> Our Audit Committee, among other duties, oversees:
>
> • the integrity of our financial statements, our accounting and financial reporting processes and our systems of internal control over financial reporting and safeguarding of our assets;
>
> • our compliance with legal and regulatory requirements;

- our independent auditors' retention, termination, qualifications, independence and performance;

- the performance of our internal auditors and internal audit function;

- our financial matters and financial strategy; and

- our guidelines and policies that govern the process by which we assess and manage risk.

193.     Moreover, with respect to risk management, the proxy statement stated:

The Board has ultimate responsibility for risk oversight, but it has delegated primary responsibility for overseeing risk assessment and management to the Audit Committee. The Audit Committee discusses guidelines and policies to govern the process by which management assesses and manages risk, including Kraft Heinz's major financial risk exposures and the steps taken to monitor and control those exposures. In addition, pursuant to its charter, the Audit Committee reviews and discusses risk assessment and risk management guidelines, policies and processes utilized in our Strategic Enterprise Risk Management ("SERM") approach. Our SERM approach is an ongoing process affected at all levels of our operations and across business units and functions to identify, assess, monitor, manage and mitigate risk. The SERM approach facilitates open communication between management and the Board to advance the Board's and committees' understanding of our risk management process, how it is functioning, the participants in the process, key risks to our business and performance and the information gathered through the approach. The Audit Committee annually reviews the SERM approach, as well as the results of the annual SERM assessment.

Annually, the Audit Committee allocates responsibility for overseeing the review and assessment of key risk exposures and management's response to those exposures to the full Board, or another committee of the Board or it retains those responsibilities, as appropriate. Management provides reports to the Board, the Audit Committee or other appropriate committee, in advance of meetings, regarding these key risks and the actions management has taken to monitor, control and mitigate these risks. Management also attends Board and committee meetings to discuss these reports and provide any updates. The Audit Committee or other appropriate committee reports key risk discussions to the Board following its meetings. Board members may also further discuss the risk management process directly with members of management.

194.     Regarding executive compensation, the proxy statement described the Company's

pay programs for its named executive officers ("NEOs"), including defendants Hees, Knopf, and

Basilio.  Specifically, it stated that for fiscal 2017, defendants Hees, Knopf, and Basilio received

base salaries of $1 million; $500,000; and $750,000, respectively. In addition, NEOs are entitled to incentive compensation based on certain performance goals (called management by objectives "MBOs"). For fiscal 2017, the proxy statement provided:

> Bernardo Hees: Mr. Hees had five MBO goals. These were: (i) "Delivering Kraft Heinz Financial Results", which was evaluated based on Kraft Heinz's financial performance, (ii) "Ensuring Service Level and Product Quality", which was evaluated based on year-over-year quality improvement, (iii) "Increasing Market Share and Developing R&D Pipeline", which was evaluated based on market share and the new product development, (iv) "Delivering New Projects to Sustain Business", which was evaluated based on business expansion and project specific goals and (v) "Developing People", which was evaluated based on talent retention. Based on Mr. Hees's performance, he was given an overall performance score of 60%.

> Paulo Basilio: Mr. Basilio had three MBO goals. These were (i) "Delivering Kraft Heinz Financial Results", which was evaluated based on Kraft Heinz's financial performance, (ii) "Delivering New Projects to Sustain Business", which was evaluated based on business expansion and project specific goals, and (iii) "Increase KHC financial efficiency", which was evaluated based on design of the Global Center of Excellence structure. Based on Mr. Basilio's performance, he was given an overall performance score of 55%.*

> David Knopf: Mr. Knopf had two MBO goals. These were (i) "Delivering Kraft Heinz Financial Results", which was evaluated based on financial performance of the U.S. Planters business, and (ii) "Ensuring Market Share and R&D Pipeline", which was evaluated based on market share and new product development in the U.S. Planters business. Based on Mr. Knopf's performance, he was given an overall performance score of 58%.*

* * *

> *Each of Messrs. Basilio's, Knopf's and Drevon's MBO goals related to the roles each held prior to his promotion, effective during the fourth quarter of 2017. Messrs. Drevon and Piani did not achieve the MBO threshold and, therefore, were not eligible for a PBP payout.

195. As a result of the reported performance, defendants Hees, Knopf, and Basilio received $4,194,179, $3,477,222, and $2,202,826, respectively, in total compensation for fiscal 2017. The proxy statement sought stockholder approval of the executive compensation program for named executive officers.

196.    The proxy statement was materially misleading because it misrepresented: (a) the accuracy of the Company's financial statements, which had been overstated by improper accounting practices as employees struggled to meet unrealistic cost-cutting goals; and (b) the Board's actual activities with respect to risk management, especially the risks posed by the cost-cutting strategies.

197.    On April 26, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the proxy statement. In particular: (i) Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, and Telles were reelected to new terms as directors; and (ii) the executive compensation for Hees, Knopf, and Basilio was approved.

## H.    The Truth Emerges in a Series of Partial Disclosures

198.    On February 21, 2019, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Garlati caused the Company to disclose a $15.4 billion impairment to its goodwill and intangible assets. In a press release, Kraft Heinz stated:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts. As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the *Kraft* and *Oscar Mayer* trademarks. These charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

199.    The same press release revealed an SEC investigation into Kraft Heinz's accounting procedures related to the procurement function. The press release stated:

> ***The Company received a subpoena in October 2018 from the U.S. Securities and Exchange Commission (the "SEC") associated with an investigation into the Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function,***

*including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors.*

Following this initial SEC document request, the Company together with external counsel launched an investigation into the procurement area. ***In the fourth quarter of 2018, as a result of findings from the investigation, the Company recorded a $25 million increase to costs of products sold*** as an out of period correction as the Company determined the amounts were immaterial to the fourth quarter of 2018 and its previously reported 2018 and 2017 interim and year to date periods. Additionally, the Company is in the process of implementing certain improvements to its internal controls to mitigate the likelihood of this occurring in the future and has taken other remedial measures. The Company continues to cooperate fully with the U.S. Securities and Exchange Commission.

At this time, the Company does not expect the matters subject to the investigation to be material to its current period or any prior period financial statements.

200.    The same day, during a conference call to discuss fourth quarter 2018 financial results, defendant Knopf explained that the impairment "reflected revised margin expectations" "driven by our second half performance" "which was primarily driven by supply chain issues that we had in the cost side." Defendant Hees recognized that management was "overly optimistic on delivering savings that did not materialize by year-end."

201.    However, analysts were skeptical that recent performance could result in such a dramatic writedown. During the same conference call, when an analyst pointed out that "companies generally don't take write-downs because recent performance was bad and because discount rates have risen[,]" defendant Knopf responded that "the majority of the impairment, which was really concentrated in [the cheese, cold cuts business, and the Canada retail business] was, by far and away, driven by the second half performance and the new level of margin and profitability that we're talking about versus what it was before."

202.    Still, the analyst wondered whether the 3G's notorious zero-based budgeting strategy had damaged the Company's brands:

$15 billion write-down on 2 of [its] biggest brands, Kraft and Oscar Mayer … literally means the brand equities there aren't what they used to be. So when

investors are looking at the consistent financial disappointments at Kraft, maybe even bringing the eye into the discussion. And if they ask why – if the 3G belt-tightening strategy goes too far and if it damages brands, is there at least some evidence starting to point to yes there?

203.    On this news, the Company's share price fell $15.98, or over 33%, over four consecutive trading sessions to close at $32.20 per share on February 27, 2019, on unusually heavy trading volume.

204.    On February 22, 2019, the *Wall Street Journal* published an article entitled "Key Brands Pay Price of Kraft Heinz Cost-Cutting," noting that similar businesses have not been as severely affected by shifting consumer trends. The disappointing impairment charges "validate fears that Kraft Heinz may have been more focused on costs than on building brand equity." In particular, the article provides:

> As a result, Kraft Heinz wrote down its assets by a total of $15.4 billion, which is bigger than the $9.6 billion in the combined write-offs of the entire U.S. consumer staples industry from 2013 through 2017, according to studies by Duff & Phelps.

> The news rattled investors, who wiped out more than $14 billion of the company's market value Friday. Michael Lavery, an analyst at Piper Jaffray, said he has lost confidence that Kraft Heinz can successfully manage big brands to compete in the changing consumer environment.

> "These impairments validate fears that Kraft Heinz may have been more focused on costs than on building brand equity," he said. "Even if management has now seen the light," he said, its brands are likely too damaged to drive growth in a sustainable way.

> Specifically, Kraft Heinz wrote down $7.1 billion worth of goodwill, suggesting some of the value the company thought the Heinz merger had generated effectively didn't exist.

205.    On February 28, 2019, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Garlati caused Kraft Heinz to file a Notification of Late Filing on Form 12b-25 with the SEC stating that it could not file its annual

report until the Company concluded an "internal investigation into the procurement area as a result of the previously disclosed subpoena received in October 2018 from the [SEC]."

206.　On April 22, 2019, the Company announced that defendant Hees would leave the Company effective June 30, 2019 and would be replaced by Miguel Patricio.

207.　On May 6, 2019, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, van Damme, Zoghbi, Hees, Knopf and Garlati caused Kraft Heinz to disclose in a Form 8-K filed with the SEC that the Company would restate its financial statements for 2016, 2017, and the first nine months of 2018 to reflect a $181 million increase in costs of products. After receiving the SEC's subpoena, the Audit Committee conducted an investigation with external counsel and forensic accountants, "which identified that several employees in the procurement area engaged in misconduct," prompting the restatement because of "the number of years over which the misconduct occurred and the number of transactions, suppliers, and procurement employees involved." The Form 8-K stated that the "misstatements principally relate to the incorrect timing of when certain cost and rebate elements associated with complex supplier contracts and arrangements were initially recognized," and the correction would lead to "corresponding decreases to costs of products sold in future financial periods."

208.　The Audit Committee's investigation included a "comprehensive review of significant supplier contracts," which "identified additional misstatements." These were "primarily related to certain supplier contracts and arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period."

209.　The foregoing errors "required adjustments of approximately $208 million, of which approximately $27 million was recorded in the previously furnished fourth quarter 2018

cost of products sold." Thus, the cumulative net effect of the misstatements was approximately $181 million, which "would have been significant to the fourth quarter of 2018 if corrected in that period." Moreover, "the largest correction [was] a $38 million increase to cost of products sold in the third quarter of 2017."

210.    The investigation also evaluated other aspects of complex supplier contracts and found that "certain arrangements that were improperly classified as embedded capital leases." Correcting this error resulted in a decrease to 2018 net loss by approximately $2 million, to 2017 Adjusted EBITDA by approximately $2 million, and to 2018 Adjusted EBITDA by approximately $33 million.

211.    Kraft Heinz had taken certain remedial actions in response to the foregoing restatement, "including employee personnel actions and certain improvements to its internal controls, to mitigate the likelihood of this occurring in the future."

212.    The May 6, 2019 Form 8-K disclosed an additional $13 million impairment resulting from certain errors which were identified during the interim impairment test conducted in fourth quarter 2018. The errors related to projected net cash flows and allocation calculations, and the correction was recognized as "a net increase of approximately $13 million to non-cash impairment losses of SG&A." Specifically, the corrections resulted in "an increase to the impairment loss for intangible assets of approximately $278 million, partially offset by a reduction to the impairment loss initially calculated for the goodwill reporting units of approximately $173 million," as well as a "further reduction to the goodwill impairment loss of approximately $92 million" due to the corrections related to the supplier rebate misstatements.

213.    These accounting errors amounted to a material weakness in Kraft Heinz's internal control over financial reporting.  The Form 8-K filed on May 6, 2019 stated that the Company

"anticipates identifying and reporting two or more material weaknesses in its internal controls over financial reporting" in the 2018 Annual Report yet to be filed.

214.    Kraft Heinz also revealed that it had received another subpoena from the SEC regarding goodwill and intangible asset impairments.  The May 6, 2019 Form 8-K stated that Kraft Heinz "received an additional subpoena from the SEC on March 1, 2019 associated with its assessment of goodwill and intangible asset impairments and related matters, and this subpoena also included document requests related to the procurement area."

215.    On May 7, 2019, CNBC published an article entitled "Misconduct at Kraft Heinz puts spotlight on employee pressure to meet bonus targets."  The article posited that pressure to meet management-based objectives ("MBOs"), i.e. cost-cutting targets, took a toll on the Company's resources, marginalized Kraft Heinz's internal controls, and damaged the Company's brands and trademarks.  In 2017, few executives received a bonus because "Kraft Heinz only grew its organic EBITDA by 3%," below the performance target of 6.1%. The declining sales led to pressure to increase EBITDA, which largely "fell on the procurement and operations teams, which contributed a large percentage of the company's cost savings – particularly as other savings stalled." Kraft Heinz's CEO's objectives were used to guide "management-based objectives" that were used to determine employees' bonuses, and the "pressures to meet MBOs were particularly intense" in the procurement group. According to suppliers, "Kraft Heinz employees are aggressive in demanding lower contract costs, sometimes at the sacrifice of longer-term alternatives used by peers like Unilever or Proctor & Gamble." Referring to the May 6, 2019 Form 8-K, the article noted that employees had been "marking down savings from its supplier contracts that should have been carried over a longer time period," which "can inaccurately imply that they achieved certain targets and that they did not reach."

216.    On June 7, 2019, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, van Damme, Zoghbi, Hees, Knopf and Garlati caused Kraft Heinz to file its belated annual report on Form 10-K for the period ended December 29, 2018 (the "2018 10-K").  The report restated certain financial information to correct the accounting treatment for supplier contracts and related agreements associated with the procurement function, as previously disclosed. The internal investigation also included a "comprehensive review of supplier contracts and related arrangements to identify other potential misstatements in the timing of the recognition of supplier rebates, incentive payments, and pricing arrangements." This review found additional misstatements "primarily related to certain supplier contracts and related arrangements where the allocation of value of all or a portion of rebates and up-front payments to contractual elements in the current period should have been deferred and recognized over an applicable contractual period." The "review identified adjustments that resulted in an understatement of cost of products sold totaling $208 million, including $175 million relating to the periods up through September 29, 2018." More specifically, the "misstatements of cost of products sold related to our internal investigation and review included $22 million for fiscal year 2018, $94 million for fiscal year 2017, $35 million for fiscal year 2016, and $24 million for fiscal year 2015."

217.    The 2018 10-K disclosed that the corrections related to the procurement function also resulted in a $15 million net increase to impairment losses ($278 million increase to impairment losses due to errors in projected net cash flows and allocations; $171 million reduction to impairment losses for certain units; and $92 million reduction to goodwill due to the procurement-related misstatements).

218.    As a result of the restatements and impairments, the 2018 10-K admitted that the Company's "disclosure controls and procedures were not effective" and that there were material

weaknesses in its internal control over financial reporting. One weakness related to "Supplier Contracts and Related Arrangements" where "certain employees in [the Company's] procurement organization engaged in misconduct and circumvented controls . . . that affected the accounting for certain supplier rebates, incentives, and pricing arrangements, *in an attempt to influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain due to changes in [the Company's] business environment.*" There was also insufficient documentation "to determine the appropriate accounting for certain cost and rebate elements and embedded leases."

219.    The other material weakness related to "Goodwill and Indefinite-lived Intangible Asset Impairment Testing" because the Company "did not design and maintain effective controls [related to] the allocation of cash flow projections to certain brands used as a basis for performing" interim impairment tests. It resulted in errors associated with the fourth quarter 2018 impairment test "because approximately five to ten percent of cash flows were not subjected to our control procedures."

220.    According to the 2018 10-K, the Company had undertaken remedial efforts in connection with these material weaknesses, including implementing changes to the performance-based targets given to employees. Recognizing that lofty performance targets led to the issues in the procurement division, Kraft Heinz would revise performance measures "to help drive challenging but attainable targets" and "reassess[] certain employees' key performance indicators." To account for the possibility that the revised targets may still be too demanding, Kraft Heinz would also "implement[] checkpoints to evaluate significant changes in the environment that could adversely impact the attainability of management goals and targets" and enhance

training on MBOs to, among other things, include a "process to request relief from previously established MBOs."

221.    As to the procurement division, Kraft Heinz would also implement certain improvements in the contract approval policies and process to ensure that all relevant parties are involved and standard documentation and analyses are used. The Company was also in the process of developing additional "monitoring controls over supplier contracts and related arrangements to ensure transactions are recorded in accordance with" GAAP. The Company also made personnel changes for those who engaged in misconduct and held mandatory training for the global procurement function regarding the associated policies and procedures.

222.    Kraft Heinz also made changes regarding the internal controls regarding procurement and impairment testing. Specifically, the Company was in the process of evaluating potential upgrades to the procurement management software "to enhance the identification, tracking, and monitoring of supplier contracts and related arrangements." Moreover, Kraft Heinz was implementing procedures to "enhance [its] analysis of forecasted cash flows in the impairment assessment" and to "test the accuracy of forecasted cash flow allocations to specific brands."

223.    The 2018 Form 10-K disclosed, for the first time, the discount rates, long-term growth rates, and royalty rates used to determine fair value of the Company's reporting units and trademarks.

| | Goodwill Carrying Value (in billions) | Discount Rate | | Long-Term Growth Rate | | Royalty Rate | |
|---|---|---|---|---|---|---|---|
| | | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum |
| Reporting units | $        29.0 | 7.0% | 10.7% | 1.5% | 4.7% | | |
| Brands (excess earnings method) | 24.4 | 7.5% | 7.5% | 0.8% | 2.1% | | |
| Brands (relief from royalty method) | 4.9 | 7.5% | 10.2% | 0.5% | 4.0% | 1.0% | 20.0% |

224.    Moreover, the 2018 10-K disclosed the impact on fair value of changes to various assumptions with these rates, stating:

> If we had changed the assumptions used to estimate the fair value of our reporting units and brands with 20% or less excess fair value over carrying amount, as of the latest testing date for each of these reporting units and brands, these isolated changes, which are reasonably possible to occur, would have led to the following increase/(decrease) in the aggregate fair value of these reporting units and brands (in billions):

| | Discount Rate | | Long-Term Growth Rate | | Royalty Rate | |
| | 50-Basis-Point | | 25-Basis-Point | | 100-Basis-Point | |
| | Increase | Decrease | Increase | Decrease | Increase | Decrease |
|---|---|---|---|---|---|---|
| Reporting units(a) | $ (5.3) | $ 6.3 | $ 2.6 | $ (2.4) | | |
| Brands (excess earnings method)(a) | (1.9) | 2.3 | 0.9 | (0.8) | | |
| Brands (relief from royalty method)(a) | (0.4) | 0.5 | 0.2 | (0.2) | $ 0.4 | $ (0.4) |

225.    ██████████████████████████████████████████████

██████████████████████████████████████████ While the Company had previously disclosed reporting units with fair value cushions less than 10%, the 2018 10-K further stated that reporting units and brands with fair value cushions less than *20%* presented "a heightened risk of future impairment." The 2018 10-K stated:

> [T]hese and other individual reporting units and brands that have 20% or less excess fair value over carrying amount as of their latest testing date have a heightened risk of future impairments if any assumptions, estimates, or market factors change in the future. Reporting units with a heightened risk of future impairments had an aggregate goodwill carrying amount of $29.0 billion at December 29, 2018 and included: U.S. Grocery, U.S. Refrigerated, Canada Retail, Latin America Exports, Southeast Europe, Australia and New Zealand, and Northeast Asia. Of the $29.0 billion with a heightened risk of future impairments, $9.3 billion is attributable to reporting units with 0% excess fair value over carrying amount. Brands with a heightened risk of future impairments had an aggregate carrying amount of $29.3 billion at December 29, 2018 and included: *Kraft*, *Philadelphia*, *Oscar Mayer*, *Velveeta*, *Miracle Whip*, *Planters*, *A1*, *Cool Whip*, *Stove Top*, *ABC*, and *Quero*. Of the $29.3 billion with a heightened risk of future impairments, $24.0 billion is attributable to brands with 0% excess fair value over carrying amount.

226.    Even after recording $15.4 billion impairment, Kraft Heinz has reported additional impairment charges, demonstrating that the Company continues to suffer harm from zero-based

budgeting. On August 8, 2019, Kraft Heinz announced its financial results for first half of fiscal 2019 in a press release, in which it disclosed another billion dollars' worth of impairment charges: (i) $744 impairment to goodwill of certain reporting units (EMEA East, Brazil, United States Refrigerated, and Latin America Exports) "primarily based on new five-year operating forecasts for several international businesses that establish revised expectations and priorities for the coming years in response to current market factors;" (ii) $474 impairment to intangible assets, "primarily driven by the application of a higher discount rate to reflect the markets' perceived risk in the Company's valuation."

227.    The same day, the Company disclosed in a Form 12b-25 that it could not timely file its quarterly reports for the first and second quarters of 2019 due to continued testing of its internal controls with respect to impairment of goodwill and intangible assets. Kraft Heinz had implemented certain procedures related to forecasted cash flow allocations, which had to be tested before it could file the quarterly reports.

228.    Also on August 8, 2019, Kraft Heinz held a conference call during which defendant Knopf admitted that information concerning goodwill reporting units and trademarks with less than 20% fair value cushions was material. When an analyst asked for context as to why the Company's five-year operating forecast differed from expectations at the end of the prior year, defendant Knopf explained: "And also, you should keep in mind that we did start the year at nearly *$60 billion of goodwill and indefinite-lived intangibles with less than 20% attrition relative to carrying value. So what that means is there's going to be risk of future impairments*, given any change in forecasts or modeling assumptions can particularly trigger that."

229.    On August 13, 2019, the Company filed its quarterly report on Form 10-Q for the period ended March 30, 2019 (the "Q1 2019 10-Q"), which had been delayed pending the review

and filing of the 2018 10-K. Concurrently, the Company filed its quarterly report on Form 10-Q for the period ended June 29, 2019 (the "Q2 2019 10-Q"). With respect to the goodwill impairments disclosed earlier in August, these reports stated that "the factors contributing to the impairment loss were the result of circumstances that arose during the first quarter of 2019."

(a)     The $286 million impairment loss in the EMEA segment resulted from a new five-year operating plan that "established a revised downward look for net sales, margin, and cash flows in response to lower expectations for margin and revenue growth opportunities in the region." The plan was developed after the Russia, Poland, Middle East, and Distributors operations were reorganized into the EMEA East reporting unit.

(b)     The $205 million impairment loss in the Brazil reporting unit resulted from a new five-year operating plan which was developed after experiencing "lower than expected performance in launches of new products coupled with the de-listing of certain existing products as well as higher costs due to changes in our sourcing approach to support revenue growth plans"

(c)     The $129 million impairment loss in the Latin America Exports reporting unit resulted from a new five-year operating plan created after the Company reorganized the Puerto Rico and Other Latin America Exports business with Costa Rica, Panama, Colombia, Argentina, and Andinos operations into the Latin America Exports unit. The new plan included a "revised downward outlook for net sales and margins and adjusted cash flow forecasts to reflect lower expectations in the market, higher costs associated with changes in our sourcing approach, and increased investments in the business to support growth."

230.     The Q2 2019 10-Q also stated that, after performing the 2019 annual impairment test, Kraft Heinz "identified an impairment related to the U.S. Refrigerated reporting unit," which was "primarily due to an increase in the discount rate assumption used for the fair value

estimation." Because this valuation change "was not indicative of events or conditions that would have constituted a triggering event during the first quarter of 2019," it was recorded as a "non-cash impairment loss of $118 million in SG&A in the second quarter of 2019 within our United States segment."

231.    Finally, the Q2 2019 10-Q stated that the $474 million impairment to intangible assets disclosed earlier "primarily related to six brands (*Miracle Whip*, *Velveeta*, *Lunchables*, *Maxwell House*, *Philadelphia,* and *Cool Whip*)." The impairment was "due to an increase in the discount rate assumptions used for fair value estimations" which, in turn, was to reflect the "perceived risk in the valuation implied by the sustained reduction in [Kraft Heinz's] stock price." In addition, the reduction in fair value for *Miracle Whip* and *Maxwell House* was 'driven by lower expectations of near and long-term net sales growth that were adjusted in the second quarter of 2019 due to anticipated trends in consumer preferences." For *Lunchables*, the reduction was also "due to lower forecasted net sales and royalty rate assumptions associated with lower profit margin expectations driven by pricing actions at certain customers." These brands had an aggregate value of $13.5 billion prior to the impairment.

232.    On February 13, 2020, the Company issued a press release to announce its fourth quarter and full year 2019 financial results.  Therein, Kraft Heinz disclosed a $453 million impairment to goodwill of its Australia and New Zealand segment, as well as its Latin America Exports businesses, and a $213 million impairment to the *Maxwell House* trademark. The next day, Kraft Heinz filed its annual report on Form 10-K for the period ended December 28, 2019 (the "2019 10-K"), in which it provided more detail about these impairments:

(a)    A $357 million impairment in the Australia and New Zealand reporting unit related to "lower than expected revenue and profitability" in the fourth quarter "driven by increased

operational costs, portfolio rationalization projects, declines in sales categories . . . , and reduced market share realization for specific categories." A new 2020 annual operating plan was developed that "set lower expectations for revenue growth and profit margins in the coming years."

(b)     A $96 million impairment loss in the Latin America Exports unit related in part to "lower than expected revenue and profitability due to higher supply chain costs along with less favorable expansion into new channels and loss of certain significant customers."

(c)     A $213 million impairment loss in SG&A related to the "reduction in fair value of the *Maxwell House* trademark was driven by expectations of near-term net sales and profitability declines outlined in the 2020 annual operating plan in response to consumer shifts from mainstream coffee brands to premium coffee brands."

### I.     Defendants Hees, Knopf, Basilio, Behring, Lemann and Telles Sold Over $1.2 Billion in Kraft Heinz Stock While In Possession of Material Non-Public Information

233.     Defendants Behring, Lemann, and Telles were, at all relevant times, directors of the Company.  Defendant Hees was CEO, and defendant Knopf was CFO.  Defendant Basilio served as CFO and as Zone President.  As such, defendants Behring, Lemann, Telles, Hees, Knopf, and Basilio have a highly sophisticated understanding of the Company's financial results and their import.

234.     On August 7, 2018, 3G Capital, through a subsidiary of 3G Global Food Holdings LP, sold 20,630,314 shares of Kraft Heinz common stock at a price of $59.85, for total proceeds of $1,234,724,292.90.

235.     Defendants Behring, Lemann, Telles, Hees, Knopf, and Basilio control 3G Capital and represent three of the five founding partners of 3G Capital and three of the eleven additional partners at 3G Capital.  The material, nonpublic information about Kraft Heinz was the direct result of the changes implemented at Kraft Heinz by these defendants consistent with 3G Capital's

business philosophies, including a series of cost-reduction initiatives when integrating the operations of Kraft and Heinz.

236.

237.    Defendants Behring, Lemann, Telles, Hees, Knopf, and Basilio thus used their fiduciary positions to enrich themselves on the basis of material nonpublic information and failed to discharge their fiduciary positions by causing the Company to candidly reveal the truth of its business.

**J.      Kraft Heinz Settles Charges With SEC for $62 Million**

238.    In October 2018, the Company received a subpoena from the SEC related to its procurement area, specifically the accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to agreements with its suppliers.

239.    Following the receipt of this subpoena, the Company, together with external counsel and forensic accountants, and subsequently, under the oversight of the Company's Audit Committee, conducted an internal investigation into its procurement area and related matters. The SEC has issued additional subpoenas seeking information related to the Company's financial reporting, incentive plans, debt issuances, internal controls, disclosures, personnel, its assessment of goodwill and intangible asset impairments, its communications with certain stockholders, and other related information and materials in connection with its investigation.

240.    On September 3, 2021, the SEC filed an action in the United States District Court for the Southern District of New York (the "SEC Action") entitled *U.S. Securities and Exchange Commission v. Klaus Hofmann*, 21-CV-7407-RA (S.D.N.Y.). The SEC charged the Company,

former Chief Operating Officer Eduardo Pelleissone, and former Chief Procurement Officer Klaus Hofmann with violations of "negligence-based anti-fraud, reporting, books and records, and internal accounting controls provisions of the federal securities laws."

241.    The SEC Action concerns a multi-year expense management scheme by Kraft Heinz Company's ("KHC") procurement division to improperly reduce KHC's cost of goods sold[2] and achieve costs savings targets that were externally touted to the market and internally tied to performance-based targets. The misconduct resulted in KHC reporting inflated earnings before interest, taxes, depreciation and amortization ("EBITDA"), a key performance metric for investors.

242.    The SEC Action alleges that from the fourth quarter of 2015 through the end of 2018 (the "Relevant Period"), procurement employees negotiated agreements with numerous suppliers to obtain upfront cash payments and discounts, in exchange for future commitments to be undertaken by KHC, while improperly documenting the agreements in ways that caused the Company to prematurely and improperly recognize the expense savings.

243.    In accordance with accounting principles generally accepted in the United States ("Generally Accepted Accounting Principles" or "U.S. GAAP"), if upfront cash and discounts are tied to future commitments, then the expense savings must be recognized over the period KHC performed the future obligations.  According to the SEC Action, procurement division employees, however, negotiated and maintained false and misleading supplier contracts that made it appear as if expense savings were provided in exchange for past or same-year actions performed by KHC when, in reality, they were upfront payments in exchange for a future benefit from KHC, in order to improperly recognize costs savings prematurely.

---

[2]    Cost of goods sold refers to KHC's direct costs of producing its food and beverage goods. This amount includes the supplier costs that KHC expends to produce its goods.

244.     According to the SEC Action, over the Relevant Period, KHC entered into approximately 59 transactions which were improperly recognized as a result of the false and misleading documentation negotiated and generated by procurement division employees.  Had these transactions been properly documented and accounted for, KHC's cost of goods sold during that period would have been approximately $50 million higher than reported in its public financial statements.

245.     These misleading transactions, along with numerous other misstated accounting entries, led KHC, in June 2019, to restate its financial statements in its annual report on Form 10-K filed with the SEC.  The restatement included financial data reported for fiscal year ("FY") 2015, as well as the financial statements contained in reports filed with the SEC on quarterly Forms 10-Q and annual Form 10-K for FYs 2016 and 2017 and the first three quarters of FY 2018 that were filed with the SEC.  KHC corrected a total of $208 million in cost savings arising from 295 transactions and also corrected its Adjusted EBITDA, as reflected in the restatement.

246.     Klaus Hofmann ("Hofmann")[3], KHC's Chief Procurement Officer during the Relevant Period, managed the procurement division and was responsible for, among other things, approving certain of KHC's contracts with suppliers.  In that role, Hofmann and others signed contract approval forms for many of the improperly recognized transactions. Hofmann also certified the accuracy and completeness of the financial statements generated by the procurement division over the first three quarters of 2018.  KHC then relied upon this sub-certification in

---

[3]     Hofmann served as KHC's Global Head of Procurement and Chief Procurement Officer. Hofmann left KHC in May 2020. Prior to his employment with KHC, Hofmann was the Global Head of Procurement for H.J. Heinz Co. ("Heinz"), before Heinz merged with and into Kraft Foods Group Inc. ("Kraft") to form KHC in 2015.

making representations to its auditors regarding the completeness and accuracy of its financial statements.

247.    According to the SEC Action, despite numerous warning signs that should have alerted Hofmann that KHC procurement division employees were circumventing KHC's internal controls in order to achieve artificial cost savings targets in supplier contracts, Hofmann negligently approved and failed to prevent supplier contracts that masked the true nature of the transactions. Hofmann also should have known that the false and misleading contract documentation that he negligently approved and failed to prevent was provided to KHC's finance and controller groups responsible for preparing KHC's financial statements ("controllers"), thus causing KHC to prematurely recognize cost savings in its financial statements.

248.    According to the SEC Action, Hofmann violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rules 13b2-1 and 13b2-2.

249.    The SEC Action sought injunctive relief, civil penalties, and other appropriate and necessary equitable relief.

250.    On September 3, 2021, the SEC issued an Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order in *In the Matter of The Kraft Heinz Co., and Eduardo Pelleissone, Respondents*, Administrative Proceeding, File No. 3-20523 (the "SEC Order"), which stated in relevant part:

> KHC shall cease and desist from committing or causing any violations and any future violations of Securities Act Sections 17(a)(2) and 17(a)(3) and Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

> KHC shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $62,000,000 to the Securities and Exchange Commission. The

Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Pelleissone[4] shall cease and desist from committing or causing any violations and any future violations of Securities Act Sections 17(a)(2) and 17(a)(3), Exchange Act Sections 13b-5, 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 13b2-1, 13b2-2(a), 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

Pelleissone shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $300,000, disgorgement of $12,500, and prejudgment interest of $1,711.31 to the Securities and Exchange Commission. If timely payment of the civil money penalty is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury.

251. The SEC Order further stated:

**KHC's Internal Controls Deficiencies**

[] Throughout the Relevant Period, the company did not design or maintain effective controls for the procurement division, including those implemented by the finance and controller groups, in connection with the accounting for supplier contracts and related arrangements. The company reported this material weakness in its annual report on Form 10-K filed on June 7, 2019. For example, on the Friday after the close of the August 2017 books, the controller group allowed KHC to recognize fully in 2017 a rebate that it had previously determined correctly to

---

4       Eduardo Pelleisonne was KHC's Global Head of Operations and Chief Operating Officer between July 2015 and November 2018, and its Head of Strategic Projects from November 2018 until June 2019, when he left the Company. During the period of 2016 through 2018, Pelleissone served as a member of KHC's disclosure committee, which was tasked with reviewing and affirming the accuracy and completeness of the company's quarterly and annual filings. Before the merger with Kraft, Pelleissone was the Global Head of Operations for Heinz. Pelleissone is currently the president of operations in regional subsidiary of a different publicly traded company.

spread over a future-year period. The changed decision by that Monday to allow immediate recognition was not adequately documented nor explained to internal stakeholders, and it was made after procurement employees were instructed by a superior in operations to "find a way . . . to get back" the payments into the August books.

[] During the Relevant Period, finance personnel in gatekeeping roles also overlooked indications that some expenses were potentially being improperly managed and accounted for in the procurement division. In one internal communication, for example, a member of KHC's controller group acknowledged a procurement buyer's effort to "jam [a] rebate in to help [KHC's] results in 2017." That member of the controller group took no steps to report this conduct to legal or compliance, nor to determine whether it was part of a larger practice within procurement.

[] During the Relevant Period, KHC also tied internal performance metrics and compensation of the procurement legal group staff to assisting the procurement division's efforts to reduce costs. Additionally, prior to 2018, KHC failed to provide the legal group with adequate staffing and resources for reviewing numerous global supply contracts, many of which were under negotiation at the same time. Under these conditions, the part of the legal group in charge of reviewing procurement contracts overlooked facts indicating that contract documentation was inconsistent with the underlying negotiated transaction, and the group failed to have reasonably sufficient controls over the procurement contracting process.

[] Pelleissone should have known that, in not properly addressing several indicia that supplier contracts were being used to manage expenses, he caused KHC's internal accounting controls failures, including those relating to: (i) its accounting-related policies and procedures, (ii) the preparation and signing of contract approval forms which were to communicate the key commercial terms of procurement transactions to the controllers, (iii) the review of contract documentation and contract approval forms by KHC's controllers, (iv) the completion and approval of management representation letters affirming the accuracy and completeness of the financial records of KHC's Zones, business units, and procurement division, and (v) a disclosure committee whose function was to review and confirm the accuracy and completeness of KHC's draft periodic filings.

252.    The SEC Order found that "[f]rom the fourth quarter of 2015 through the end of 2018 . . . , procurement employees negotiated agreements with numerous suppliers to obtain upfront cash payments and discounts, in exchange for future commitments to be undertaken by [the Company], while improperly documenting the agreements in ways that caused the company to prematurely and improperly recognize the expense savings." Over the three year period, Kraft

Heinz "entered into approximately 59 transactions which were improperly recognized as a result of the false and misleading documentation negotiated and generated by procurement division employees." Moreover, "[h]ad these transactions been properly documented and accounted for, [the Company's] cost of goods sold during that period would have been approximately $50 million higher than reported." In connection with the restatement in June 2019, Kraft Heinz "corrected a total of $208 million in cost savings arising from 295 transactions, and also corrected its Adjusted EBITDA."

253.    The SEC Order also found that "[b]y 2017 . . . the procurement division had largely exhausted its ability to extract synergies from the [M]erger" and raw material costs increased, making it difficult for procurement employees to achieve incremental savings in fiscal 2017 and 2018. The division "implemented overly ambitious annual budget and division-level savings targets, based on corporate KHC targets" and "pushed procurement division employees to come up with ideas to generate additional immediate, same-year, savings, and did not adjust the internal targets."

254.    Without admitting or denying the SEC's findings, Kraft Heinz consented to cease and desist from future violations and agreed to pay a civil penalty of $62 million. Additionally, Hoffman consented to a final judgment permanently enjoining him from future violations, ordering him to pay $100,000 and barring him from serving as an officer or director of a public company for five years.

255.    On September 9, 2021, the Honorable Ronnie Abrams, District Court Judge for the Southern District of New York, entered a Final Judgment in *U.S. Securities and Exchange Commission v. Klaus Hofmann*, 21-CV-7407-RA (S.D.N.Y.) as to Klaus Hofmann and held:

> Defendant is permanently restrained and enjoined from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 77q(a)(2),

(3)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (b) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $100,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. 77t(d)]. Defendant shall satisfy this obligation by paying $100,000 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment. IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## K.    Denial of Motion to Dismiss the Securities Class Action

256.    On August 11, 2021, this Court denied the motion to dismiss the Securities Class Action, holding that a claim for securities fraud had been stated against Kraft Heinz, 3G Capital, Hees, Basilio, Knopf, Behring, Zoghbi, and Oliveira (the "MTD Order"). *See Hedick v. The Kraft Heinz Company, et al.*, Case No. 19-cv-1339, ECF No. 310.

257.    The Court found that each of the following categories of statements were misleading: integration and savings plan; transitory issues; financial projections and performance; case fill rates; working media investments; contracts with Canadian retailers; efficacy of internal controls.

258.    The misleading statements were issued with the requisite inference of scienter because there is "a difference between the true source of Kraft Heinz's cost savings and the efficacy of that program, and what Defendants said publicly," (*i.e.* that the savings were achieved through cost efficiencies and synergy savings from the Merger). MTD Order at 26. The executives had access to monthly internal scorecards showing that Kraft Heinz failed to achieve cost-cutting targets and losses between 15-20% per year. *Id.* The Company also "admitted that employees within its procurement division 'engaged in misconduct' by intentionally manipulating the timing

of rebates to artificially increase reported earnings in order to 'influence the achievement of internal financial targets that became or were perceived to have become increasingly difficult to attain," which also supported scienter. *Id.* at 28. 3G Capital's sale of 20 million shares "weighs slightly in favor of scienter" because generated $1.2 billion in proceeds for 3G Capital but was offset by the executives' increases in personal ownership of the Company. *Id.* at 29.

259.    It is now a virtual certainty that Kraft Heinz will incur significant liability due to the breaches of fiduciary duty committed by Defendants when they issued misleading statements about the Company's financial results.

## VI.    DAMAGES TO KRAFT HEINZ

260.    As a direct and proximate result of the Individual Defendants' conduct, Kraft Heinz has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)  costs incurred from the SEC investigations, including the $62 million penalty;

b)  costs incurred from the Company's internal investigation into its accounting practices and policies;

c)  costs incurred from revisiting and restating previous financial reports;

d)  costs incurred from restoring the value of its impaired brands and trademarks;

e)  costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

f)  costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Kraft Heinz.

261.    In addition, Kraft Heinz's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

262.    The actions complained of herein have irreparably damaged Kraft Heinz's corporate image and goodwill.  For at least the foreseeable future, Kraft Heinz will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Kraft Heinz's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

263.    Plaintiffs bring this action derivatively in the right and for the benefit of Kraft Heinz to redress injuries suffered, and to be suffered, by Kraft Heinz as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, unjust enrichment, violations of Section 14(a) of the Exchange Act, and contribution for violations of Section 10(b) of the Exchange Act.  Kraft Heinz is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

264.    Plaintiffs will adequately and fairly represent the interests of Kraft Heinz in enforcing and prosecuting its rights.

265.    Plaintiffs have continuously been a shareholder of Kraft Heinz at times relevant to the wrongdoing complained of and are current Kraft Heinz shareholders.

266.    At the time this action was commenced,[5] the Board consisted of the following eleven individuals: defendants Abel, Behring, Cahill, Telles, Cool, Dewan, Jackson, Lemann, Pope, Van Damme and Zoghbi.  Accordingly, Plaintiffs need only allege demand futility as to six of the eleven directors who were on the Board at the time this action was commenced.[6]  A pre-suit demand upon the Board is excused in this case because a majority of the Board members are

---

[5]    The lead case in this consolidated action was filed on May 15, 2019.

[6]    After this action was commenced, on June 12, 2019, Castro-Neves replaced Defendant Telles on the Board.

disabled from fairly, independently, and objectively considering any pre-suit demand that Plaintiffs may make.

**Demand Is Excused Because There Is Reason to Doubt the Independence of the Majority of the Members of the Kraft Heinz Board**

267.    Board members Abel, Behring, Cool, Lemann, Telles, and Van Damme lack the independence necessary to impartially consider a pre-suit demand due to their long-time and lucrative business associations with 3G Capital and its affiliates, Berkshire Hathaway and Buffett, and each other.

268.    As of June 5, 2019, 3G Capital owned 22.1%, and Berkshire Hathaway owned 26.7%, of the Company's common stock. According to the Company's SEC filings, 3G Capital and Berkshire Hathaway may be deemed a "group" for purposes of §13(d) of the Exchange Act and, therefore, are deemed to hold 595,539,525 shares of common stock – or 48.8% of the Company – as of June 5, 2019.

269.    Defendants Lemann, Behring, and Telles are co-founders of 3G Capital, which, as detailed above, improperly sold Company stock at inflated values while in possession of, and based upon, adverse material nonpublic information.  Additionally, 3G Capital partners Hees, Basilio, and Knopf are alleged in the Securities Class Action to have issued false and misleading public statements, and are charged with violations of the Exchange Act.  Accordingly, Board members Lehman, Behring, and Telles are each interested and lack independence from each other and from the other Defendants associated with 3G Capital (including Hees, Basilio, Knopf, and Castro-Neves) so as to undermine their ability to fairly, independently, and objectively consider a pre-suit demand.  Defendants Lehman, Behring, and Telles are also disabled from fairly, independently, and objectively considering a pre-suit demand due to their own personal financial interests in 3G

Capital which are worth tens of billions of dollars and they profited directly from 3G's $1.2 billion sale of Kraft stock.

270. Defendant Van Damme has maintained personal friendships with 3G Capital's co-founders for decades. In 1995, bankers at Lazard Bank introduced Van Damme and Telles at Lazard Bank's office in New York in order to entertain the prospect of pursuing a deal between the Van Damme family controlled company, Interbrew, and the 3G Capital controlled company known as Companhia de Bebidas das Americas S.A. ("AMBEV"), a predecessor of AB InBev. At the time of their introduction, Van Damme's family was one of the three controlling families of Interbrew, while 3G Capital co-founders Telles, Lemann, and Carlos Alberto da Veiga Sicupira ("A. Sicupira") controlled Ambev. Although no deal came to fruition from their introductory meeting, Van Damme and Telles continued to stay in contact thereafter. Then, in early 2002, Van Damme joined Telles for breakfast at a New York hotel, where Van Damme met 3G Capital co-founders, Lemann and A. Sicupira. Following Van Damme's introduction to Lemann and A. Sicupira, Van Damme's personal ties to 3G Capital's co-founders grew much stronger. Van Damme and Lemann became so close that the two have watched samba schools at the Rio Carnival together, vacationed together with their respective partners in the Hamptons, and visited each other in the Swiss Alps.

271. In addition to defendant Van Damme's personal relationships with 3G Capital's cofounders, he also has substantial business dealings with 3G Capital. The 3G Capital-controlled Ambev and Van Damme family-controlled Interbrew ultimately merged in 2004 to become one of the world's largest brewing conglomerates. Van Damme also invested in 3G Capital's venture fund that financed 3G Capital's acquisition of Burger King in 2010 and Heinz in 2013. Moreover, Van Damme's ties to 3G Capital are exacerbated by his substantial overlapping directorships with

3G Capital's co-founders and affiliates.  For example, Van Damme previously served as a director of Burger King Worldwide, Inc. and its predecessor while it was privately owned by 3G Capital between 2011 and 2014.  At the time this action was commenced, Van Damme served on the board of directors of Restaurant Brands International ("RBI"), through which 3G Capital owns Burger King and Tim Hortons Inc.  During his tenure at RBI—which spanned from December 2014 through April 2020—Van Damme served on RBI's board with Behring from December 2014 to May 2020, with Castro-Neves from June 2018 to May 2020, and with 3G Capital founding principal partner, A. Sicupira, since December 2014. Van Damme is and since 1992 has been a director of AB InBev, which 3G Capital has controlled through board designees and its significant ownership stake. Over the years, numerous 3G Capital partners and representatives have served alongside Van Damme on the AB InBev board including Behring (2014-2019), Telles (2004-present), A. Sicupira (2004-2019), A. Sicupira's daughter, Ceclia Sicupira (2019-present), Lemann (2004-2014), and Lemann's son, Paulo Alberto Lemann (2014-present).  Castro-Neves was also an executive officer of AB InBev during the same time period. When Van Damme replaced Warren Buffet on Kraft Heinz's board in 2018, it was publicly reported that Van Damme was close to 3G Capital's founders.  Accordingly, Van Damme is disabled from fairly, independently, and objectively considering a pre-suit demand due to his long-standing and ongoing business relationships, friendships, and overlapping directorships with 3G Capital, its founders, and its partners.

272.    Defendants Abel and Cool are employees of Berkshire Hathaway.  Berkshire Hathaway has significant and mutually beneficially ongoing business relationships with 3G Capital such that the companies, and their partners and employees, would not risk current or

potential future deals by acting in any manner potentially adverse to one another. The companies'
business dealings include the following:

(a)  In 2013, Berkshire Hathaway and 3G Capital acquired Heinz for $23 billion,
with Berkshire Hathaway putting up three times as much cash and with 3G Capital being primarily
responsible for Heinz's operations;

(b)  When 3G Capital-controlled Burger King acquired Canadian coffee and
doughnut chain Tim Horton's in 2014 for $11 billion, Berkshire Hathaway committed $3 billion
of preferred equity to finance the deal;

(c)  In 2015, Berkshire Hathaway and 3G Capital orchestrated the $46 billion
Merger between Kraft and Heinz;

(d)  In 2017, Berkshire Hathaway and 3G Capital used Kraft Heinz to make an
unsuccessful $143 billion takeover offer for British-Dutch conglomerate Unilever; and

(e)  On February 25, 2019, in the wake of the Company's announcement of the
$15.4 billion impairment charge, Buffett once again affirmed that he is open to Berkshire
Hathaway doing more deals with 3G Capital in the future.

273.  Additionally, it is well known that Berkshire Hathaway's Buffett and 3G Capital
founder, defendant Lemann, who are among the richest individuals in the world, have been close
friends since serving together on Gillette's board of directors decades ago. Buffett himself publicly
described defendant Lemann as "a good friend of mine and marvelous human being." According
to the book *Dream Big*: *How the Brazilian Trio behind 3G Capital - Jorge Paulo Lemann, Marcel
Telles and Beto Sicupira - acquired Anheuser-Busch, Burger King and Heinz* ("*Dream Big*"),
which includes the author's account of a private interview with defendant Lemann and Buffett, the
two "have become so close that Buffett has accompanied Lemann to three workshops with Jim

Collins [Lemann's mentor] in Colorado in recent years."  *Dream Big* describes defendant Lemann and Buffett as "longstanding friends" who have close have a "close relationship."  In May 2019, defendant Lemann and his family attended Berkshire Hathaway's annual meeting in Omaha, Nebraska.  Following the Company's announcement of the $15.4 billion impairment charge, Buffett publicly supported defendant Lemann and stated his intent to attend defendant Lemann's 80th birthday party in August 2019.



*Warren Buffett and Marc Lemann, son of Jorge Paulo Lemann. Marc made a study of Heinz during an internship at 3G in 2009 and recommended buying shares in the company. In 2013, 3G joined forces with Buffett to acquire the food producer for US$28 billion.*

274.    Defendant Cool is beholden to Buffett and Berkshire Hathaway (and therefore to 3G Capital and its partners) such that she is incapable of exercising independent objective judgment in deciding whether to bring this action.  Defendant Cool has been described in the press

as Buffett's protégé. After first meeting Buffett in 2006, defendant Cool was hired as Buffett's financial assistant in 2009 after graduating from Harvard Business School. Five years later, at age 30, defendant Cool was named CEO of Pampered Chef, a Berkshire Hathaway subsidiary, a job she continues to hold. Defendant Cool is also involved in other Berkshire Hathaway companies, serving as Chairman of Benjamin Moore, Larson-Juhl and Oriental Trading Company. Defendant Cool's friendship with Buffett is so close that Buffett stood in for defendant Cool's late father by walking her down the aisle at her wedding in 2013. Defendant Cool served with Buffett on the Company's Board until his departure in 2018, and they both signed the Company's 2016 and 2017 Forms 10-K – which were admittedly false and misleading and contained financial statements which have now been restated. For these reasons, defendant Cool is not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

275. Defendant Abel is also beholden to Buffett and Berkshire Hathaway (and therefore to 3G Capital and its partners) such that he is incapable of exercising independent objective judgment in deciding whether to bring this action. Defendant Abel has become a wealthy individual under Berkshire Hathaway's employment and owes his career to Berkshire Hathaway and Buffett. Defendant Abel joined Berkshire Hathaway in 2000 and eventually took over as CEO of Berkshire Hathaway Energy (f/k/a/ MidAmerican Energy Holdings) in 2008. Defendant Abel's compensation as a Berkshire Hathaway Energy employee has been astounding. For example, in 2016, defendant Abel received approximately $41 million in compensation. In both 2019 and 2020, defendant Abel made a base salary of $16 million, along with annual bonuses of $3 million in each of those years. After defendant Abel was named to Berkshire Hathaway's board of directors in 2018 as Vice Chairman—Non-Insurance Operations, Buffett said defendant Abel has "rare talents" and that "Berkshire blood flows through [his] veins." Moreover, defendant Abel has

officially been announced to be Buffett's successor at Berkshire Hathaway. For these reasons, defendant Abel is not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

276.     At the time this action was commenced, defendant Zoghbi was employed full time by Kraft Heinz as a Special Advisor and received substantial monetary compensation as a result of that employment. Defendant Zoghbi was paid more than $12.1 million in salary, bonus, and other incentive-based compensation for 2016 and more than $17 million for 2017. Although defendant Zoghbi's 2018 total compensation has not been reported, the combination of his $850,000 base salary and his significant incentive awards likely again pushed his total compensation well into the seven figures. Defendant Zoghbi will act to preserve and not threaten his position and the perquisites thereof and, therefore, is incapable of exercising independent objective judgment in deciding whether to bring this action.

277.     Defendant Cahill serves as a consultant to Kraft Heinz, pursuant to which he provides advisory and consulting services related to current and historical finances, relationships with licensors, customers and vendors, employee matters, product development, marketing and distribution, government affairs, and strategic opportunities. Defendant Cahill has received, and will continue to receive, substantial monetary compensation as a result of that employment. Defendant Cahill is paid $500,000 annually for these services, in addition to the $255,009, $255,008, and $235,050 he received in 2016, 2017, and 2018, respectively, for his services as a director. In addition to his compensation as a consultant to the Company, defendant Cahill is beholden to 3G Capital and Berkshire Hathaway due to the $19.9 million golden parachute payout he received as a result of the Kraft Heinz merger. Defendant Cahill will act to preserve and not

threaten his position and the perquisites thereof and, therefore, is incapable of exercising independent objective judgment in deciding whether to bring this action.

278.    Moreover, the Board admits in the Company's Annual Reports on Form 10-K that defendants Cahill and Zoghbi are not independent.  Therefore, defendants Cahill and Zoghbi are not capable of exercising independent judgment in considering a demand to commence and vigorously prosecute this action.

279.    The overlapping directorships, long-standing friendships, and substantial business relationships outlined above raise (at a minimum) a reason to doubt that defendants Behring, Lemann, and Telles would vote to initiate litigation against defendants Abel and Cool.  Defendants Behring, Lemann, and Telles will not risk their and their firms' reputations and future investment opportunities by voting to initiate litigation.  Likewise, there is a reason to doubt that defendants Cahill, Zoghbi, and Van Damme would vote to initiate litigation against defendants Behring, Lemann, Telles, Hees, Basilio, and Knopf, due to the sense of obligation they feel for the substantial rewards they reaped from defendants Behring, Lemann, Telles, Hees, Basilio, and Knopf, and because it would likely prevent them from being presented with future opportunities to serve on the boards of companies controlled by defendants Behring, Lemann, Telles, Hees, Basilio, and Knopf.

280.    As a result of the foregoing, defendants Abel, Behring, Cahill, Telles, Cool, Lemann, Van Damme, and Zoghbi are incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand, therefore, is excused as futile.

**Demand Is Excused Because a Majority of the Board Members Face a Substantial Likelihood of Liability for Their Misconduct**

281.    Pursuant to their specific duties as Board members, the members of the Kraft Heinz Board are charged with managing and conducting the business affairs of the Company.  Board

members Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme, and Zoghbi – a majority of the Board – breached their fiduciary duty of loyalty (and candor and good faith) owed to Kraft Heinz by making materially false statements and/or omitting material facts in the Company's stockholder reports about the Company's publicly reported net income, the value of its goodwill and intangible assets, and the integrity of the Company's internal controls over financial reporting and disclosure. Additionally, Board members Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Telles, and Pope each signed the Company's 2016 and 2017 Forms 10-K, which were admittedly false and misleading and contained financial statements which have now been restated. Thus, these members of the Kraft Heinz Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each member participated personally in the wrongdoing and therefore face a substantial likelihood of liability for their breach of fiduciary duties.

282. Defendants Dewan, Jackson, and Pope served as members of the Audit Committee. These Audit Committee Defendants were responsible for reviewing the adequacy of Kraft Heinz's financial reporting and disclosure controls, reviewing the integrity of Kraft Heinz's annual and quarterly financial results and financial statements, and reviewing Kraft Heinz's annual and quarterly SEC Forms 10-Q and 10-K. ████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████    █████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

As a result, Audit Committee Defendants Dewan, Jackson, and Pope and Director Defendant Cahill are not disinterested and face a substantial likelihood of liability, rendering a pre-suit demand upon them futile.

283.    Demand is also futile as to defendants Behring, Lemann, and Telles because they face a substantial likelihood of personal liability in connection with their improper sale of Kraft Heinz stock.  Through 3G Capital, the Insider Selling Defendants sold $1.2 billion worth of Kraft Heinz stock under highly suspicious circumstances. █████████████████

███████████████████████████████████

█████  █████████████████████████████

███████████████████████████████████

████████████████████    The Insider Selling Defendants, as directors and/or the top level officers of Kraft Heinz, possessed material, nonpublic Company information and used that information to enrich themselves.  The Insider Selling Defendants sold stock based on this knowledge of material, nonpublic company information regarding the Company's operating performance, goodwill, the adequacy of Kraft Heinz's internal controls over its financial

reporting, and the impending decrease in the value of their holdings of Kraft Heinz stock. Accordingly, Insider Selling Defendants Behring, Lemann, and Telles face a substantial likelihood of liability for breaches of their fiduciary duties of loyalty. Any demand upon defendants Behring, Lemann, and Telles is, therefore, futile.

284. In addition, Behring, Cahill, Abel, Dewan Jackson, Lemann, Telles, Cool, and Pope were members of the Board when the Company's misleading statements were issued in 2018. These defendants knew that the proxy statement solicited votes to reelect and compensate directors who were breaching their fiduciary duties. The Board faces a substantial likelihood of liability because they caused the Company to issue the misleading proxy statement, and defendants Behring, Cahill, Abel, Dewan Jackson, Lemann, Telles, Cool, and Pope would be interested in a demand regarding whether they had discharged their duties as Board members.7

285. Any suit by the Board to remedy these wrongs would expose the Defendants in the Securities Class Action—Hees, Basilio, Knopf, Zoghbi, Skinger, Garlati, Behring, 3G Capital, and Kraft Heinz—to liability for violations of the federal securities laws and would likely result in civil actions being filed against one or more of the other Individual Defendants. The Securities Class Action alleges violations of §§10(b), 20(a), and 20A of the Exchange Act. If the Board elects for the Company to press forward with its right of action against the Individual Defendants in this action, then Kraft Heinz's efforts would compromise its defense of the Securities Class Action. As alleged above, this Court denied the motion to dismiss the Securities Class Action on August 11, 2021. As a result, Director Defendants Behring and Zoghbi face substantial exposure to

---

7       Even if the relevant demand futility Board was the Board as comprised on the date the Section 14(a) claim relating to the misleading proxy statement was first pleaded (March 30, 2020), demand as to that claim would still be futile because a majority of the Board members at that time (defendants Behring, Cahill, Abel, Dewan Jackson, Lemann, Telles, Cool, and Pope) made the misleading statements in the proxy.

liability for violations of the federal securities laws and are incapable of impartially considering a demand to commence and vigorously prosecute this action. Accordingly, demand on the Board is excused.

286. Plaintiffs have not made any demand on the other stockholders of Kraft Heinz to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Kraft Heinz is a publicly held company with over 1.2 billion shares outstanding and thousands of stockholders;

(b) making demand on such a number of stockholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

287. making demand on all stockholders would force Plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## VIII. CLAIMS

### COUNT I

### Against All Defendants for Breach of Fiduciary Duty

288. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

289. Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Kraft Heinz's business and affairs, particularly with respect to issues as fundamental as public disclosures.

290. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants

intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kraft Heinz.

291.    In breach of their fiduciary duties owed to Kraft Heinz, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

292.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

293.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kraft Heinz has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**Against 3G Capital, Behring, Lemann, Telles, Hees, Knopf, and Basilio –** *Brophy* **Claim**

294.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

295.    As alleged above, Behring, Lemann, Telles, Hees, Knopf, and Basilio are fiduciaries of Kraft Heinz, possessed material, non-public information of Kraft Heinz, and used that information improperly to profit from sales of Kraft Heinz stock. When Behring, Lemann, Telles, Hees, Knopf, and Basilio directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

296.    When Behring, Lemann, Telles, Hees, Knopf, and Basilio sold their Kraft Heinz stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of Kraft Heinz stock would be significantly lower. Behring, Lemann, Telles, Hees, Knopf, and Basilio timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating Kraft Heinz's non-public information.

297.    Plaintiffs have no adequate remedy at law.

## COUNT III

### Against All Defendants for Unjust Enrichment

298.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

299.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Kraft Heinz.

300.    Plaintiffs, as shareholders and representatives of Kraft Heinz, seek restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### Against Defendants Behring, Hees, Basilio, Knopf, Zoghbi, and Oliveira for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act

301.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

302.    The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

303.    Kraft Heinz is named as a defendant in a related securities fraud lawsuit that alleges and asserts claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same acts alleged herein. If Kraft Heinz is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial financial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

304.    As officers, directors and otherwise, these defendants had the power or ability to, and did, control or influence, either directly or indirectly, Kraft Heinz's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

305.    These defendants are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

306.    These defendants have damaged the Company and are liable to the Company for contribution.

307.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT V

**Violations of Section 14 of the Securities Exchange Act of 1934 Against Behring, Cahill, Abel, Dewan Jackson, Lemann, and Pope**

308.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

309.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statement filed on March 2, 2018 violated §14(a) and Rule 14a-9 because it failed to disclose: (i) the accuracy of the Company's financial statements, which had been overstated by improper accounting practices as employees struggled to meet unrealistic cost-cutting goals; and (ii) the Board's actual activities with respect to risk management, especially the risks posed by the cost-cutting strategies.

310.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

311.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.  The proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) executive compensation; and (iii) ratification of the appointment of the Company's independent auditor. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

312.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## IX.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Kraft Heinz, demands judgment as follows:

A.     Declaring that Plaintiffs may maintain this action on behalf of Kraft Heinz and that Plaintiffs are adequate representatives of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kraft Heinz;

D.     Directing Kraft Heinz to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kraft Heinz and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen the Company's controls over financial reporting;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.     a proposal to strengthen Kraft Heinz's oversight of its disclosure procedures;

4.     a provision to control insider transactions; and

5.     a provision to permit the stockholders of Kraft Heinz to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Kraft Heinz has an effective remedy;

F.      Awarding to Kraft Heinz restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: November 22, 2021

Respectfully submitted,

__/s/Matthew M. Houston
**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
Pavithra Rajesh
712 Fifth Avenue
New York, NY 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
mhouston@glancylaw.com
bsachsmichaels@glancylaw.com
prajesh@glancylaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Frank A. Richter (IL Bar #6310011)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
Facsimile: (312) 674-46766
frichter@rgrdlaw.com

Travis E. Downs III
Benny C. Goodman III
Erik W. Luedeke
655 West Broadway, Suite 1900
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
travisd@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

*Lead Counsel for Plaintiffs*