**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE KRAFT HEINZ SHAREHOLDER | ) | No. 20 C 2259 |
| DERIVATIVE LITIGATION | ) | |
| | ) | Judge Jorge L. Alonso |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In these consolidated shareholder derivative actions, plaintiffs accuse numerous directors and officers of The Kraft Heinz Company ("Kraft Heinz" or "the company"), of making and causing the company to make misleading statements about the company's performance amid imprudently aggressive cost-cutting efforts. According to plaintiffs, these misleading statements allowed some defendants, as well as an investment firm with which they were affiliated, to profit improperly from sales of the company's stock.

Defendants have moved to dismiss plaintiffs' Consolidated Verified Second Amended Complaint. Because the Court concludes that plaintiffs have not adequately alleged that it would have been futile to make a pre-suit demand on the company's board of directors, as required under Delaware law, defendants' motions to dismiss are granted.

## BACKGROUND

Plaintiffs, several Kraft Heinz shareholders, brought these consolidated cases derivatively, on behalf of nominal defendant Kraft Heinz, against defendants Alexandre Behring, Bernardo Hees, Paulo Basilio, David H. Knopf, George Zoghbi, Vince Garlati, Christopher R. Skinger, Rafael Oliveira, John T. Cahill, Gregory Abel, Feroz Dewan, Jeanne P. Jackson, Jorge Paulo Lemann, John C. Pope, Alexandre Van Damme, Tracy Britt Cool, Marcel Hermann Telles, Mackey J. McDonald, and 3G Capital, Inc. ("3G"). The dispute arises out of the 2015 merger of

Kraft Foods Group, Inc. ("Kraft") into The H.J. Heinz Company ("Heinz") to form Kraft Heinz and the aggressive cost-cutting strategy defendants adopted and executed in the wake of the merger.

The following facts come from the operative Consolidated Verified Second Amended Complaint (ECF No. 81; *see* ECF No. 79-1 (redacted version)) (hereafter, "the complaint" or "CVSAC"). As it must at this stage, the Court accepts as true the factual allegations of the complaint. Plaintiffs allege that 3G is a private equity firm known for its cost-cutting strategies, including "zero-based budgeting," which requires companies to justify each item in each year's annual budget, regardless of whether and how much they budgeted for the expense in the previous year. Prior to the merger, ownership of Heinz was divided approximately equally between 3G and Berkshire Hathaway, Inc. After Heinz completed its merger with Kraft, 3G and Berkshire Hathaway owned approximately 51% of the outstanding shares of Kraft Heinz common stock. A number of the individual defendants—namely, Hees, Basilio, Knopf, Lemann, and Telles—have been affiliated with 3G since before the merger. After the merger, they took up roles as officers or directors of Kraft Heinz. Other defendants are not directly affiliated with 3G but are alleged to be close business associates of the 3G-affiliated defendants. These include Abel and Cool, who are Berkshire Hathaway employees, and Van Damme, whose "Interbrew" company merged with the 3G-controlled "Ambev" in 2004 to create InBev, one of the worlds' largest brewing conglomerates at that time. (CVSAC ¶¶ 270-71.)

Although 3G had purportedly succeeded in implementing its zero-based budgeting strategy at other consumer goods companies, plaintiffs allege that the strategy did not work at Kraft Heinz. Instead, the strategic shift had two ill effects: (1) the value of the company's brands deteriorated

because performance dipped as employees struggled with the new cost constraints, and (2) the procurement division misstated the terms of supplier contracts, including by front-loading rebates in the first year of multi-year contracts, rather than recording portions of the rebates immediately and deferring the rest to spread them out over the length of the underlying contracts.

Actions that Kraft Heinz took to cut costs that allegedly hindered the company's performance included the following: implementing indiscriminate layoffs, eliminating critical maintenance and product quality functions, making across-the-board cuts to vendor and supplier services, closing key plants and distribution centers without replacing them, cutting media and marketing expenditures, and eliminating trade promotions that had helped to secure valuable retail space. Plaintiffs allege that, from November 2015 until 2018, defendants regularly made misleading statements to investors in earnings calls, in which they touted savings from efficiencies and synergies the merger had purportedly generated, without disclosing that any savings the company was realizing actually came from its harmfully aggressive cost-cutting efforts. Further, when analysts raised the possibility that the company's cost-cutting might damage relationships with customers, defendants rejected it. In reality, plaintiffs allege, the cost-cutting was reducing essential brand support, supply chain performance, productivity, service quality, and distribution, resulting in diminished "case fill rates," *i.e.*, diminished rates of customer orders filled correctly and on time.

According to plaintiffs, these issues damaged the company's relationships with its customers, the retailers who sell its products to consumers. However, from November 2015 until 2018, the individual defendants caused the company to file Forms 10-Q, 10-K, and 8-K in which

3

they reported no impairment of goodwill[1] or any events that were likely to impair the company's goodwill. When they did report any weakness in their controls, they did so without disclosing the difficulties caused by the cost-cutting measures or the incorrect recording of their contractual obligations to their suppliers due to the issues with the procurement division. In March 2018, Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, and McDonald issued a proxy statement soliciting shareholder votes for a proposal to elect Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, and Telles to new terms as directors, and to approve executive compensation. Plaintiffs allege that this proxy statement was misleading because it misrepresented the accuracy of the company's financial reporting, which had been undermined by improper accounting practices, and the risks posed by the cost-cutting strategies.

In advance of a meeting of the Kraft Heinz Board of Directors' Audit Committee on July 31, 2018, defendant Garlati, who had recently begun to serve as the company's Global Controller and Principal Accounting Officer, provided the Board of Directors with a memorandum in which he explained that, following an annual impairment test, the company recognized impairments to goodwill in certain reporting units and brands. Several reporting units were nearing or had fallen below a 10% fair value cushion. The second and third quarter Forms 10-Q stated that the company

---

[1] In accounting terminology, goodwill is an intangible asset that consists of "the amount by which a business's overall value exceeds the value of its constituent assets, often due to a recognizable brand name [or] a sterling reputation." *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 982 (S.D. Cal. 2020) (internal quotation marks omitted). An impairment to goodwill is "'the condition that exists when the carrying amount of goodwill exceeds its implied fair value,'" where the "carrying amount" is the amount "'as displayed in the financial statements'" and the "fair value" is the "'price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants.'" *Janssen v. Reschke*, No. 17 C 8625, 2020 WL 6044284, at *3 (N.D. Ill. Oct. 13, 2020) (quoting Financial Accounting Standards Board's Accounting Standards Codification 350-20-35-2 and Master Glossary, https://asc.fasb.org/Home).

recognized an impairment loss, and four and five reporting units, respectively, were at risk of future impairments. Plaintiffs allege that even these disclosures, however, were misleading because they did not reveal the full scope or depth of the problem.

In late 2018 and early 2019, after the company filed its third quarter Form 10-Q, several defendants discussed or reviewed information suggesting that there were certain "risks associated" with the pressure to cut costs (CVSAC ¶ 172), there was a risk of impairment of goodwill, and the procurement department needed new training. At a February 21, 2019 meeting, according to the meeting minutes, Garlati "discussed the fiscal 2018 year-end close status, including the base audit and the impairment analysis resulting in an approximately $15.4 billion impairment." (CVSAC ¶ 184.) On the same day, defendants Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, van Damme, Zoghbi, Hees, Knopf, and Garlati caused the company to disclose the massive $15.4 billion impairment to goodwill in a press release. The *Wall Street Journal* reported that the write-down was "bigger than the $9.6 billion in the combined write-offs of the entire U.S. consumer staples industry from 2013 through 2017, according to studies by Duff & Phelps." (*Id.* ¶ 204 (internal quotation marks omitted).) The news caused the company's stock price to nosedive.

The same February 21, 2019 press release also revealed a Securities and Exchange Commission ("SEC") investigation into the company's accounting related to the procurement function, after the company had received a subpoena in October 2018. Another SEC subpoena concerning the company's goodwill and intangible asset impairments arrived in March 2019. In a belated 2018 Form 10-K filed in June 2019, the company disclosed additional misstatements. It also admitted that its "disclosure controls and procedures were not effective" and there were material weaknesses in its internal control over financial reporting, particularly with respect to

procurement and goodwill. (CVSAC ¶¶ 218-19.) Over the next year, the company continued to recognize impairments to goodwill.

In the complaint, plaintiffs assert their claims in five counts. Kraft Heinz is a Delaware corporation, and the first three claims arise under Delaware law: Count I, against all defendants, for breach of fiduciary duty for making untrue statements to shareholders or permitting the company to make untrue statements in public filings, *see Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998); Count II, against 3G, Behring, Lemann, Telles, Hees, Knopf, and Basilio, for insider trading under *Brophy v. Cities Service Co.*, 70 A.2d 5, 8 (Del. 1949), *see Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121, 134 n.58 (Del. 2021), and Count III, against all defendants, for unjust enrichment. The remaining claims arise under federal law: Count IV, for contribution for violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, asserted under section 21D of the Act, 15 U.S.C. § 78u-4, in a separate consolidated class action for securities fraud, which is also pending before this court, *see Hedick v. The Kraft Heinz Company*, Case No. 19 C 1339; and Count V, for violation of section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n, for submitting a misleading proxy statement.

## DISCUSSION

"A derivative suit is brought by an investor in the corporation's (not the investor's) right to recover for injury to the corporation." *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998). It is a "cardinal precept of Delaware law . . . that directors, rather than shareholders, manage the business and affairs of the corporation." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (internal quotation marks omitted). "The board's authority to govern corporate affairs extends to

6

decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider." *Id.* "Only when the corporation's board defaults in its duty to protect the interests of the investors" may shareholders take over for the board by bringing a derivative suit. *Felzen*, 134 F.3d at 875. To ensure that the "stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur," among other reasons, Delaware law imposes the "substantive requirement" that, prior to initiating a derivative suit, shareholders must either "(1) make a demand on the company's board of directors, or (2) show that demand would be futile." *Zuckerberg*, 262 A.3d at 1047 (internal quotation marks omitted).

Plaintiffs did not file a pre-suit demand with Kraft Heinz asking the directors to initiate this action against themselves on behalf of the corporation. They allege that they are excused from doing so because "a majority of the Board members are disabled from fairly, independently and objectively considering any pre-suit demand" that plaintiffs may have made. (CVSAC ¶ 266.) Defendants move to dismiss for, among other reasons, failure to adequately plead demand futility.

## I. Legal Standards

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alteration marks

omitted). Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)); *see In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003).

Additionally, any claims of or including acts of fraud or deception must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud," apart from "[m]alice, intent, knowledge, and other conditions of a person's mind," which "may be alleged generally." *See United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775, 781 n.29 (7th Cir. 2016); *see also Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 604 (7th Cir. 2019) (stating that claims of fiduciary duty "premised on allegations that the defendants knowingly misled Plaintiffs" were subject to the "heightened pleading requirements" of Rule 9(b)). Ordinarily, plaintiffs asserting claims subject to Rule 9(b) must plead such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the

method by which the misrepresentation was communicated." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008); *see Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011).

Similarly, Federal Rule of Civil Procedure 23.1 requires a plaintiff in a shareholder derivative action to "state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). While it is federal law that "governs the degree of detail that . . . plaintiff[s] must furnish when [they] give[] [their] reasons" for not making a pre-suit demand, "[t]he function of the demand futility doctrine is a matter of substance, not procedure," so the law of the state of incorporation—here, Delaware—determines "whether those reasons are sufficient." *Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 722 (7th Cir. 2013); *see Dorvit v. Winemaster*, 950 F.3d 984, 988-89 (7th Cir. 2020) ("[T]he demand futility requirement is not a mere technical, procedural hurdle [but] a substantive *sine qua non* of derivative suits."); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98-99, 108-09 (1991); *Abbott Labs.*, 325 F.3d at 803.

## II. Demand Futility

Because plaintiffs did not make a pre-suit demand, they must show that demand is excused as futile in order to proceed with this suit. Because "derivative litigation upsets the balance of power that [Delaware law] establishes between a corporation's directors and its stockholders," the demand requirement is "not excused lightly." *Zuckerberg*, 262 A.2d at 1049. The essence of the inquiry is whether a majority of directors are "under an influence which sterilizes their discretion"

such that "there is reason to doubt that the board could bring its impartial business judgment to bear on a litigation demand." *Id.* at 1048-49 (internal quotation marks omitted).

The Delaware Supreme Court recently refined its test for demand futility, adopting a "three-part . . . universal test for assessing whether demand should be excused as futile." *Zuckerberg*, 262 A.2d at 1058. The universal test requires courts to evaluate allegations of demand futility by asking the following three questions on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.*

Delaware permits its corporations to include in their certificates of incorporation exculpatory provisions that limit or eliminate their directors' personal liability for some breaches of fiduciary duty, including breaches of the duty of care. These exculpatory provisions may not, however, go so far as to "eliminate or limit the liability of . . . [a] director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders" or "[a] director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," among other exceptions not relevant here. Del. Code. tit. 8, § 102(7). Kraft Heinz's certificate of incorporation exculpates the company's directors for breaches of

fiduciary duty "[t]o the full extent" permitted by Delaware law. (Second Amended and Restated Certificate of Incorporation of H.J. Heinz Holding Corporation, Individual Defs.' Mem. Ex. 2, ECF No. 107-2).

"Where, as here, the certificate of incorporation includes an exculpatory provision pursuant to . . . § 102(b)(7), 'a substantial likelihood of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'" *In re Vaxart, Inc. S'holder Litig.*, No. CV 2020-0767-PAF, 2021 WL 5858696, at *20 (Del. Ch. Nov. 30, 2021) (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62-63 (Del. Ch. 2015)); *see Zuckerberg*, 262 A.3d at 1054. Thus, to the extent that they rely on the second *Zuckerberg* prong, plaintiffs must plead that a majority of the director defendants faced a substantial likelihood of liability for breaching their duty of loyalty, acting in bad faith, committing intentional misconduct, or knowingly violating the law. Such claims require the allegation of "particularized facts that demonstrate that the directors acted with scienter, *i.e.,* that they had actual or constructive knowledge that their conduct was legally improper." *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (internal quotation marks omitted) (citing cases); *see also Owens on Behalf of Esperion Therapeutics, Inc. v. Mayleben*, No. CV 12985-VCS, 2020 WL 748023, at *7 (Del. Ch. Feb. 13, 2020); *In re Discover Fin. Servs. Derivative Litig.*, No. 12 C 6436, 2015 WL 1399282, at *5 (N.D. Ill. Mar. 23, 2015) (citing *Wood*).

Although the complaint's demand futility allegations address both independence and the likelihood of personal liability (CVSAC ¶¶ 267-87), plaintiffs focus primarily on the latter theory (and the second prong of the universal *Zuckerberg* test) in their response brief. In order to determine whether a majority of the Kraft Heinz Board is exposed to a substantial likelihood of

personal liability in this suit, the Court must first "identify precisely what Plaintiffs allege these fiduciaries did wrong." *Genworth Fin., Inc. Consol. Derivative Litig.*, No. CV 11901-VCS, 2021 WL 4452338, at *12 (Del. Ch. Sept. 29, 2021). Plaintiffs argue that the lawsuit substantially threatened a majority of the eleven director defendants—namely, Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme, and Zoghbi—with personal liability for the following reasons: (1) all eleven director defendants breached their fiduciary duty of loyalty by causing the company to make materially false statements and/or omissions in various financial reports to shareholders, including documents filed with the SEC, (2) Dewan, Jackson, and Pope breached their fiduciary duty based on their conduct as members of the Board's Audit Committee, which had a particular responsibility to oversee and monitor the company's internal controls over financial reporting and disclosures, (3) Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, and Telles issued a misleading proxy statement in 2018 in violation of section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n, and (4) Behring, Lemann, and Telles violated their fiduciary duties by causing 3G to sell over $1.2 billion of Kraft Heinz stock based on inside information. Additionally, plaintiffs argue that Cahill and Zoghbi are not independent because each of them relies on his position as a director of Kraft Heinz as a principal source of income.

### A.  Liability For Misleading Statements In And About Financial Reporting

Plaintiffs argue that all of the director defendants knew or should have known that the 3G-backed cost-cutting strategy was harming the company's performance in ways that would result in impairments to goodwill, but were not immediately being recorded as such. In quarterly and annual reports filed with the SEC between 2015 and 2019, the company stated that no events occurred indicating that goodwill was likely to have been impaired, although the directors knew of the

12

company's aggressive cost-cutting measures. In particular, plaintiffs argue, the Garlati memorandum in July 2018 made clear to the directors that goodwill was beginning to suffer. Still, the directors took no action to cause the company to disclose any potential impairments.

"Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). "[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty." *Id.* at 9. To plead a claim of breach of fiduciary duty based on a board of directors' misleading statement when there is "no request for stockholder action" in the offending communication, "a plaintiff must allege that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'" *In re TrueCar, Inc. S'holder Derivative Litig.*, No. CV 2019-0672-AGB, 2020 WL 5816761, at *13 (Del. Ch. Sept. 30, 2020) (quoting *Malone*, 722 A.2d at 14). "'A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants.'" *Id.* (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009)). "Thus, to adequately allege that a director faces a substantial likelihood of liability for disclosure violations, the plaintiff must plead specific factual allegations showing 'that the director defendants had knowledge that any disclosures or omissions were false or misleading.'" *TrueCar*, 2020 WL 5816761, at *13 (quoting *Citigroup*, 964 A.2d at 134).

Delaware courts recognize that directors' mere "'execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or

constructive notice'" of any alleged improprieties. *TrueCar*, 2020 WL 5816761, at *13 (quoting *Wood*, 953 A.2d at 142); *see Guttman v. Huang*, 823 A.2d 492, 498 (Del. Ch. 2003) (dismissing complaint that was "entirely devoid of particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties") (cited in *Wood*). The Court sees no relevant distinction between Federal Rule of Civil Procedure 23.1 and its Delaware equivalent in this regard. *See, e.g.*, *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1234 (10th Cir. 2016) (relying on *Wood* and *Guttman*). Here, plaintiffs' allegations of scienter amount to little more than speculation that the directors must have known that the company's cost-cutting efforts would harm the company and result in an impairment to goodwill. But speculation is not enough. *See Iotex Commc'ns, Inc. v. Defries*, No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998). The complaint does not assert particularized facts on which a factfinder might base a conclusion that the directors had some reason to know, at the time of the allegedly misleading statements, that the cost-cutting strategy was damaging Kraft Heinz brands to an extent that would entail a significant impairment to goodwill.

Plaintiffs do not make any allegations to suggest what facts arising at what time should have put the directors on notice that the company's cost-cutting was not taking advantage of merger-generated efficiencies and synergies but, instead, opening self-inflicted wounds that would result in an impairment to goodwill. The closest they come is to cite the Garlati memorandum in July 2018, which provides some support for the view that the company's brands had weakened. However, after Garlati presented that memorandum to the Board, the company *did* disclose certain impairments to goodwill, as well as risks of further impairment, in its second and third quarter Forms 10-Q. The Court fails to see why the directors were required to disclose more information

14

at that time, or what else they were to disclose, if anything. How were they to know, for example, that the shakiness of certain units' goodwill was due to the company's cost-cutting strategy, that the problem would worsen rather than improve, or what the magnitude of the problem would be when it fully manifested? Plaintiffs do not explain, and the Court cannot indulge plaintiffs in speculating.

The cases plaintiffs cite do not convince the Court otherwise. These cases generally involved board statements that contradicted or denied problems revealed by more mature regulatory investigations or more comprehensive reports of improprieties, about which it could be fairly inferred that board members must have been aware of the details. *See, e.g.*, *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990-91 (Del. Ch. 2007), *Forestal v. Caldwell*, No. CV164492MWFGJSX, 2016 WL 9774914, at *9-10 (C.D. Cal. Nov. 14, 2016); *compare Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf*, No. C 11-2369 SI, 2012 WL 424557, at *6 (N.D. Cal. Feb. 9, 2012) (cited by plaintiffs) *with In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 42 F. Supp. 3d 473, 483 (S.D.N.Y. 2012) (distinguishing *Pirelli* because in that case the "directors faced a substantial likelihood of liability" because "they claimed that internal controls were effective but knew of significant problems with internal controls"). Plaintiffs must show that any "misstatement was made knowingly or in bad faith," and "[m]erely alleging that there were signs of problems" at the company, without more, "is not sufficient to show that the director defendants knew that [Kraft Heinz's] disclosures were false or misleading." *Citigroup*, 964 A.2d at 135; *see also Owens*, 2020 WL 748023, at *8 ("While Plaintiff urges the Court to infer *scienter*, the Complaint pleads no facts that would allow a reasonable inference the Outside

Directors, individually or collectively, knew that anything included in the press release was false.") *aff'd sub nom. Owens v. Mayleben*, 241 A.3d 218 (Del. 2020).

Even assuming that defendants were aware of certain warning signs, it does not follow that they failed to disclose any particular information about them "in bad faith—that is, with intent to do harm or in conscious disregard of their responsibilities." *Carpenters' Pension Fund of Illinois v. Neidorff*, 30 F.4th 777, 791 (8th Cir. 2022); *see also id.* at 791 n.11 (explaining that, to demonstrate a breach of the duty of loyalty, plaintiffs must "demonstrate not just that the Director Defendants knew of problems . . . but also that they failed to disclose this information to shareholders with 'an actual intent to do harm' or in 'intentional dereliction of [their] dut[ies]'") (quoting *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020)). Plaintiffs do not set forth particularized facts sufficient to demonstrate that defendants had the requisite scienter in making allegedly misleading statements or causing Kraft Heinz to issue allegedly misleading documents.

### B. Membership On Audit Committee And Potential *Caremark* Claim

Similarly, plaintiffs argue that Dewan, Jackson, and Pope should have known of the looming impairment to goodwill because of their service on the Board's Audit Committee. This argument is a non-starter under well-settled Delaware law, as this Court has previously recognized. "Committee membership is . . . an insufficient basis on which to infer knowledge." *Discover*, 2015 WL 1399282, at *7 (citing *Wood,* 953 A.2d at 142-43, *Desimone v. Barrows,* 924 A.2d 908, 942 (Del. Ch. 2007), and *Goldman Sachs*, 42 F. Supp. 3d at 483). Members of the Audit Committee may have a specific responsibility for oversight of matters related to the allegedly misleading shareholder communications, but it does not follow that they had knowledge of deception or wrongdoing in the dissemination of those communications or the materials they relied on,

16

particularly considering that board members are entitled to rely in good faith on the reports of employees and officers. *Citigroup*, 964 A.2d at 135; *see In re Zimmer Biomet Holdings, Inc. Derivative Litig.*, No. CV 2019-0455-LWW, 2021 WL 3779155, at *15 (Del. Ch. Aug. 25, 2021); *see also Neidorff*, 30 F.4th at 791.

Defendants purport to find in plaintiffs' response brief an effort to characterize the breach of fiduciary duty claim as what is known under Delaware law as a *Caremark* claim, for improper oversight of the company, rather than a narrower *Malone* claim, for making misleading communications to shareholders. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 364-65 (Del. 2006) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996)); *see generally Genworth*, 2021 WL 4452338, at *12-15 (discussing in detail whether the plaintiffs' claim was properly considered a *Caremark* claim or a claim for breach of fiduciary duty by making false disclosures to shareholders); *see also Citigroup*, 964 A.2d at 121-35 (considering breach of fiduciary duty claim under both a *Caremark* theory and a *Malone* theory); *TrueCar*, 2020 WL 5816761, at *12-20 (similarly considering both a "disclosure claim" under *Malone* and a *Caremark* claim). The Court agrees that plaintiffs' brief is confusing as to its theory of breach, and it is not clear whether plaintiffs intend to assert a *Caremark* claim or not. Even if so, the breach of fiduciary duty claim is doomed by the same deficiency that dooms it if it is considered as a *Malone* claim, as explained above: plaintiffs have not alleged particularized facts that suffice to demonstrate the requisite scienter, *i.e.*, that they "consciously disregarded their duties or otherwise acted in bad faith." *Citigroup*, 964 A.2d at 128; *see TrueCar*, 2020 WL 5816761, at *19-20.

17

For all these reasons, based on the allegations of the operative complaint, the Court finds little to distinguish this case from those many "similar cases where the plaintiff failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have been on notice of alleged accounting improprieties, and any facts suggesting that the board knowingly allowed or participated in a violation of law." *Wood*, 953 A.2d at 143.

### C.  Misleading Proxy Statement Under Section 14(a) Of Securities Exchange Act

Plaintiffs argue that demand was futile as to their claim that the 2018 proxy statement issued by Behring, Cahill, Abel, Cool, Dewan, Jackson, Lemann, Pope, Telles, and McDonald was misleading because there is no need to demonstrate a mental state such as recklessness or knowing or intentional misconduct for purposes of such a claim under section 14(a) of the Securities Exchange Act. *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("There is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials."); *see Gumm v. Molinaroli*, 569 F. Supp. 3d 806, 832 (E.D. Wis. 2021) (citing *Beck*). Plaintiffs are correct, as far as their argument goes, but it does not go far enough because this is not a securities fraud action. This is a shareholder derivative action involving a Delaware corporation, and plaintiffs must plead demand futility, which means that they must plead that this lawsuit threatened a majority of directors with liability for claims that do not fall within the exculpatory provision of the company's certificate of incorporation. *Zuckerberg*, 262 A.3d at 1054; Del. Code. tit. 8, § 102(7). But if a section 14(a) claim has no mental state component, and plaintiffs have not pleaded that defendants acted knowingly, intentionally, or in bad faith, then the claim does not threaten the director defendants

18

with a substantial likelihood of liability because it is not the kind of claim that exceeds the protection of the exculpatory provision. *TrueCar*, 2020 WL 5816761, at *21 (citing *In re LendingClub Corp. Derivative Litig.*, No. CV 12984-VCM, 2019 WL 5678578, at *15-16 (Del. Ch. Oct. 31, 2019)); *see Zimmer Biomet Holdings*, 2021 WL 3779155, at *23-24, *aff'd,* 279 A.3d 356 (Del. 2022). Because, as the Court has explained above at length, plaintiffs do not plead by way of particularized facts that defendants made any misleading disclosures to shareholders— including the March 2018 proxy statement—knowingly, intentionally, or in bad faith, they do not plead a non-exculpated claim that suffices to establish demand futility.

### D. Remaining Claims

Plaintiffs argue that demand is futile as to Behring, Lemann, and Telles because they faced a substantial likelihood of liability on the *Brophy* (insider trading) claims, and demand is futile as to Cahill and Zoghbi because they depend on their position as directors as a primary source of income, and therefore lack independence from the other defendants. The Court need not address these arguments because, even if plaintiffs are correct as to all five of these directors, that would not suffice to establish that demand was futile as to a majority of the eleven-person Board. Because plaintiffs fail to establish demand futility as to any of the other six directors, the arguments pertaining to just these five directors are a moot point. Plaintiffs have not made particularized allegations sufficient to establish that demand would have been futile as to a majority of the Board, so defendants' motions to dismiss must be granted. The Court need not reach defendants' arguments that plaintiffs have failed to state a claim. *See In re Fifth Third Bancorp Derivative Litig.*, No. 20 C 4115, 2022 WL 970569, at *10 (N.D. Ill. Mar. 30, 2022) ("Because Defendants' demand futility argument is dispositive, the Court need only address that argument.").

For these reasons, the Court dismisses plaintiffs' complaint in its entirety. The parties do not address whether any dismissal should be with or without prejudice. The Court is not inclined to dismiss the case with prejudice at this point, as, for all the Court knows, plaintiffs may be in possession of new information that might permit them to establish demand futility in an amended complaint. *See, e.g.*, *In re Abbott Depakote S'holder Derivative Litig.*, 909 F. Supp. 2d 984, 1000 (N.D. Ill. 2012).

The Court makes one final note. Much of the material the parties submitted to the Court in briefing the present motions was filed under seal. At the time these motions were briefed, this case was proceeding before a different judge, and the Court is unaware of why so much of the docket is sealed. If plaintiff chooses to file an amended complaint, and if the parties intend to file further documents under seal, the Court will require the parties to provide a fuller explanation than the Court has found in the written record for why they are entitled to proceed under seal. In particular, the Court will expect the parties to file motions to seal in which they explain why the standards for filing under seal, as set forth in decisions such as *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544, 547 (7th Cir. 2002), and *Union Oil Co. of California v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000), are met in this case.

## CONCLUSION

Defendants' motions to dismiss the Consolidated Verified Second Amended Complaint [97, 104] are granted, and the complaint is dismissed without prejudice. Plaintiffs may file an amended complaint, if any, by May 1, 2023. The Court sets a status hearing for May 11, 2023.

**SO ORDERED.**                    **ENTERED: March 31, 2023**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**